```
1    without impinging on the franchise, and determining
2    whether that opinion was still good law today or
3    whether it was subject to change.
4    Q.    Do you recall a discussion that if a second
5    brand operation appeared to be desirable and the
6    Kramer memo was still good law --
7              MR. WALLINGFORD:  Well, wait a minute.
8              MR. HOLSTEAD:  Let me finish my
9    question.
10             MR. WALLINGFORD:  Okay.
11   Q.    [Mr. Holstead]  -- and the Kramer memo was
12   still good law, that the way to get around the problem
13   was limit second brand operations to corporate cities
14   and not do any second brand operations in licensee
15   cities?  Because that appears to me what Item 4 is
16   saying.
17   A.    Well, I don't have a specific independent
18   recollection at the moment, but it's probable that
19   that was one of the alternatives that was discussed.
20   Q.    All right.  Was that alternative ever
21   implemented, that Avis under any guise would start a
22   second brand operation in a corporate city?
23   A.    No, not that I'm aware of.
24   Q.    Okay.  They were just put on hold and died
25   while you were at Avis?
```

Exhibit 2
Page 31 of 95

A 45420

1  A.  Well, I don't know that we ever implemented any
2  second brand operation.
3  Q.  Okay. Mr. Schaffer, on over a page or two,
4  still under the date 1-6-81, the top reference is
5  "Wizard." And down the page is a reference to Alaska.
6  Can you read that, or has that been blanked out?
7  A.  Yeah, I can read it. I haven't read it, but I
8  can read it.
9  Q.  Why don't you read it, please.
10          (Pause)
11  A.  I've read it.
12  Q.  All right. In summary, what these notes tell
13  me is that the Alaska license was issued in 1965
14  before statehood, had been further amended, there were
15  no provisions in it for any payments to the
16  Advertising Trust, that Avis had received five percent
17  of time and mileage from the Alaska licensee's rental
18  operations but they never put any part of those monies
19  into the Advertising Trust, that that amounted to
20  $100,000 a year back to 1965.
21          And down towards the very bottom, "Should pay
22  to trust on basis of 3.93 contribution with 1.07 going
23  to licensee relations."
24          And there's some other references in there.
25  But you recall that discussion?

Exhibit 2
Page 32 of 95

A 45421

# EXHIBIT D

Exhibit  &gt;
Page 33 of 95

NO. 81-46584

| | |
|---|---|
| THE ADVERTISING & POLICY COMMITTEE OF AVIS RENT-A-CAR SYSTEM, ET AL | IN THE DISTRICT COURT OF |
| VS. | HARRIS COUNTY, TEXAS |
| AVIS RENT-A-CAR SYSTEM, INC., ET AL | 270TH JUDICIAL DISTRICT |

APPEARANCES:

    Ms. Paula W. Hinton
    Vinson & Elkins
    3200 First City Tower
    Houston, Texas 77002
        For the Plaintiffs

    Mr. Robert Harrell
    Fulbright & Jaworski
    800 MBank Building
    Houston, Texas 77002
        For the Defendants

\* \* \* \* \* \*

ORAL DEPOSITION OF BARRY R. SHAPIRO, produced at the instance of the plaintiffs in the above-styled cause on the 18th day of October, 1985, before Bill McFerron, a Certified Shorthand Reporter in and for the State of Texas, at the offices of Avis World Headquarters, 900 Old Country Road, Garden City, New York, in accordance with the stipulations hereinafter set forth.

Pink

Exhibit 2
Page 34 of 95

Case 3:03-cv-00029-TMB   Document 172-7   Filed 06/19/06   Page 4 of 10

A 45423

1   Committee?
2   A   I believe so.
3   Q   Did you leave that at Avis when you left Avis?
4   A   Yes, ma'am.
5   Q   What sort of materials, if you recall, would you
6       receive? Studies, reports, agendas?
7   A   I think it would typically be agendas and reports
8       that were intended for delivery to the committee.
9   Q   Okay.
10
11              (Plaintiff's Exhibit No. 110 marked
12              for identification.)
13
14  BY MS. HINTON:
15  Q   Who is Kenneth Goodkind?
16  A   Ken Goodkind is an attorney who reported to me.
17  Q   I'd like you to review this memo, please, sir.
18  A   Okay. I'd like to make a telephone call.
19              MR. HARRELL: Let's go off the
20      record.
21
22              (Recess)
23
24  BY MS. HINTON:
25  Q   Do you think it would be fair to characterize the

Exhibit 2
Page 35 of 95
Case 3:03-cv-00029-TMB   Document 172-7   Filed 06/19/06   Page 5 of 10
A 45424

intent behind this memo as predatory?

    MR. HARRELL: I'm going to object to that question. What does that have to do with anything in this lawsuit?

    MS. HINTON: We have an allegation of predatory conduct on behalf of the licensor.

    THE WITNESS: Can I talk to you?

    MS. HINTON: Please note for the record the witness and Avis' counsel has left the room.

    (Recess)

    MR. HARRELL: Why don't you ask another question, Paula?

    MS. HINTON: Let me go back and ask the question I asked.

    Let the record reflect that counsel for Avis and the witness have been gone for, approximately, 20 minutes while discussing these matters that have come up.

    MR. HARRELL: I don't think it's been 20 minutes, but I will stipulate that we have had an off the record discussion.

Exhibit 2
Page 36 of 95
Case 3:03-cv-00029-TMB  Document 172-7  Filed 06/19/06  Page 6 of 10
A 45425

BY MS. HINTON:

Q    Showing you once again Plaintiff's Exhibit No. 110. Have you had an opportunity to review that exhibit, Mr. Shapiro?

A    Yes, ma'am.

Q    Do you think it would be fair to characterize the intent behind this memo as predatory?

    MR. HARRELL: I'm going to object to the question on a number of grounds, including your characterization of it as being predatory. It's a legal conclusion. He doesn't have to give a legal opinion. But more than anything, I'm going to object to his answering questions about Plaintiff's Exhibit No. 110 because it is clear that this is a legal memorandum and the matters that are discussed in this memorandum are protected by the attorney-client privilege. The memorandum was inadvertently produced.

    MS. HINTON: Okay.

BY MS. HINTON:

Q    Mr. Shapiro, do you refuse to answer my question?

A    Yes, ma'am.

Q    Are you relying on advice of Avis' counsel?

A    Yes, ma'am.

                    MS. HINTON: Please certify that
         question. And let the record reflect that
         this document was produced by the defendants
         and is noted as NY0119, Document Number 1456,
         and this does not appear on the defendants'
         privileged list.
BY MS. HINTON:
Q    Mr. Shapiro, what is meant by the subject of
     off-airport rentals?
A    Generally, that means car rental services pro-
     vided by operators who do not hold concessions
     from the airport authority to maintain the
     counter and facility on the airport.
Q    Was Avis ever considering -- Let me put it this
     way. Strike that question.
         Does Avis have any off-airport rental
     locations?
A    Yes, ma'am.
Q    Why was Avis looking at off-airport rental
     locations in licensee territories?
                    MR. HARRELL: Sorry?
                    MS. HINTON: If you have an
         objection, just state it and I'll certify
         the question.
                    Please let the record reflect that

Exhibit 2

Case 3:03-cv-00029-TMB   Document 172-9   Filed 06/19/06   Page 28 of 95   Page A 45427

1  Defendants' attorney and the witness left the
2  room once again.
3
4           (Recess)
5
6           THE WITNESS: Could I have the
7  question again, please?
8           MS. HINTON: Would you please read
9  back the question?
10
11          (Question read)
12
13 A  The corporation was looking at off-airport rental
14 locations not only in licensee territories, it
15 was looking at off-airport rental locations
16 everywhere.
17    Off-airport operators are typically cut-rate
18 operators and don't provide the full range of
19 services that the major car rental companies and
20 their licensees provide on-airport, and indeed
21 off-airport, as well. And the corporation
22 considered the desirability of forming an off-
23 airport car rental division, if you will,
24 operating under a name other than Avis, which
25 would provide a service not provided -- or would

service a market not served by the corporation or its licensees. And the corporation studied this issue and for a variety of reasons, one of the principal reasons was the corporation's desire not to take any steps which would violate its licensees' rights or would prejudice their operations, the corporation decided that it would not proceed with an off-airport car rental program.

BY MS. HINTON:

Q Was the fact that the corporation decided not to, I believe you said, infringe on its licensees the only reason they decided not to go into the off-airport rental operation?

A I don't know if it was the only reason. It was certainly a reason.

Q Was that the reason why they decided not to establish those off-airport rental locations in licensee territories?

A I'm sorry, I don't understand the question.

Q Was this reason applicable to the decision with respect to licensee territories and off-airport rental locations?

A It could have been. I mean this -- Let me think. I really can't answer that question.