A. Siragusa                     W. Kramer
WHQ                             WHQ

Off-Airport Car Rental Operations Conducted by Avis or ITT

May 7     69

## FACTS

It has been proposed that Avis Rent A Car System, Inc., should, through a newly formed subsidiary, engage in a so-called off-airport type of car rental operation in several cities throughout the United States, or in the alternative provide management and technical assistance to I.T.T. to enable it, through a newly formed subsidiary of that corporation, to do the same thing. In either case, the resulting activity would not use the name Avis, but would directly compete with existing corporate owned and licensee airport operations.

This new off-airport operation would be conducted substantially in the same manner as Avis' off-airport competitors, i.e., direct telephone line on the airport for requests for service, storage off the airport (with resulting delay in delivery of vehicle to customer) and lower rates. It would also, however, be national in scope with a reservation service and national credit cards.

The purpose of this memorandum is to examine what legal problems would be encountered, aside from anti-trust problems which would be generated by the acquisition of an existing off-airport operator, upon the establishment of an off-airport operation in a licensee city.

## CONCLUSIONS

1. Avis Rent A Car System, Inc. could not, through a newly formed subsidiary, engage in off-airport operations in any licensee city.

2. I.T.T. could, through a newly formed subsidiary of that company, engage in off-airport operations in an Avis licensee city, however, Avis Rent A Car System, Inc. could not provide management and technical assistance to I.T.T. or its subsidiary in return for a management fee.

Exhibit 16

Page 1 of 8

A 45398

A. Siragusa
Page 2

W. Kramer
May 7, 1969

## DISCUSSION

I. Avis Itself Engaging In Off-Airport Operations.

Under the Avis Exclusive License Agreement, each Avis licensee is granted the exclusive right to use the Avis name and the Avis System in conducting a rent a car business in a particular area or location. The Avis System is defined in the Agreement to consist, among other things,

"of uniform methods of operation, accounting, advertising service and publicity, courtesy and credit card service, kind and amount of insurance protection, method of procuring insurance protection and equipment, style and character of equipment, furnishings and appliances used in the conduct of said business, methods of procuring business and referral of business, and the right to use the name "Avis", "Avis System", "Avis Rent A Truck System" and "Avis Rent A Car System", all of which constitute a part of said system, which system is generally known as Avis Rent A Car System..."

Each of the parties to the license agreement undertakes many obligations, one of the most important of which, for the purpose of this discussion, is Avis' obligation,

"to use every means at its disposal to encourage the use of the System on a national basis by concerns using motor vehicles in the transportation of their employees, merchandise, or goods." (License Agreement, Sec. 6.4)

Any off-airport operation in a licensee city must, of necessity, seek to attract business from concerns using motor vehicles in the transportation of their employees, merchandise, or goods. However, by engaging in such an operation, Avis would not be fulfilling its obligation to use every means at its disposal to encourage the use of the Avis System by concerns using motor vehicles, etc. - a breach of contract.

In addition to its own express obligation to encourage use of the Avis System, Avis requires the licensee to agree to cooperate with it and other licensees in promoting and developing the national recognition of the Avis System. (License Agreement Sec. 3.15). By requiring the licensee to so cooperate, Avis implies that it will itself promote and develop such national recognition. Avis could not, however, promote and develop national recognition of the Avis System in the manner looked to

Exhibit 16
Page 2 of 8

A 45399

in the license agreement, if it was at the same time promoting and developing a new off-airport system.

Aside from the express provisions of the license agreement discussed above, their would, under general contract principles, be implied in the agreement, a covenant that Avis will not perform any act which would prevent or hinder performance by the licensee. In this regard, it is to be noted that the licensee is required to remit 5% of his time and mileage charges, less discounts as administrative and advertising fees; (License Agreement Sec. 3.11), he is required to comply with all bulletins, directives, etc. issued from time to time by Avis and generally to conduct his business in a businesslike manner; (License Agreement Sec. 3.7), he is required to spend certain amounts each year on advertising and sales promotion of his own business (License Agreement Sec. 3.7), and to take certain other steps requiring the expenditure of monies designed to publicize the Avis name in his locality; (License Agreement Sec. 3.15), and if he fails to meet reasonable standards promulgated by Avis for the operation of a rent a car business, including reasonable standards as to minimum number of cars to be operated, said standards to be based on population "and such other criteria" as Avis "shall reasonably determine to be relevant to the car rental potential" of his city, his agreement can be terminated "with cause". (License Agreement Sec. 14). A new off-airport operation would diminish the potential and possibly the existing revenues of a licensee, thereby impairing his ability to take the steps described above with respect to promotion of the Avis name, maintenance and expansion of fleet size which could be required of him under the agreement, - a breach of the implied covenant not to hinder performance.

Included within the concept of an implied covenant not to hinder or prevent performance would be an implied covenant in a contract granting an exclusive privilege to conduct a certain business in a certain area, that the grantor of that privilege will not compete with the grantee within that area. There has not been much litigation on the question of a covenant not to compete being implied in an exclusive license agreement. However, as demonstrated by the following cases, there is no question that such an implied covenant exists.

In *Parev Products Co., Inc.* v. *I. Rockeach & Sons, Inc.*, 124 F.2d 147 (2d Cir. 1941) the complainant, Parev, manufactured cooking oil made from coconut oil called "Parev Schmaltz" which was prepared in such a way as to make it kosher. The defendant, Rockeach, was engaged in the exclusive merchandising of food and cleansing products mostly to persons of the orthodox Jewish faith. Parev granted to Rockeach the exclusive right to use

Exhibit 16  
Page 3 of 8

A 45400

Case 3:03-cv-00029-TMB   Document 199-18   Filed 07/31/06   Page 3 of 8

A. Siragusa
Page 4

W. Kramer
May 7, 1969

the formula, which was patented, for making Parev Schmaltz for a period of 25 years with an option to renew for an additional 25 years. In return Parev was to receive royalties on sales of the product. Rockeach had very liberal rights with respect to cancellation of the agreement, including the right to cancel without cause, within two years of execution by payment of $1.00 and after two years by payment of $500. Parev, on the other hand, agreed not to manufacture any product similar to Parev Schmaltz and the three principals in the Parev company personally agreed not to compete in the sale of Parev Schmaltz or a similar product. Finally, Rockeach promised that upon termination of the agreement, it would not continue to sell the cooking oil or any product of a similar nature.

After executing the agreement and commencing operations, Rockeach, pursuant to a provision in the agreement which allowed it to do so, changed the name of the product to "Nyafat" and began to market it. For 15 years the arrangement was very successful and a significant amount of royalties were paid to Parev. Then Rockeach began to manufacture a semisolid cooking oil named Kea which was made almost wholly from cottonseed oil. This new product was being sold to the same orthodox Jewish trade that had previously been purchasing Nyafat and when Parev's royalties began to diminish, it claimed that Rockeach had undertaken the sale of Kea in order to avoid its obligation to pay royalties. Rockeach, on the other hand, claimed that the entry into the market of Crisco and Spry, other cooking substances, had already begun to cause a diminishing in the sales of Nyafat and that it was necessary for it to market Kea in order to compete with these new products.

On the basis of the above, Parev sought an injunction to prevent Rockeach from making any further sales of Kea on the theory that in the agreement there was an implied negative covenant on the part of Rockeach not to compete with Nyafat or in anyway interfere with the sales of Nyafat. Rockeach resisted the injunction on the grounds, first, that no covenant should be implied unless Rockeach engaged in "tortious" (unfair) conduct, and second, that even if such a covenant were to be implied, it would not apply to Kea because it was made from a different substance and had a different color and flavor than Nyafat.

The District Court refused to grant the injunction primarily because of the differences between the two products. On appeal to the Second Circuit Court of Appeals, it was determined that the differences in the products should not be a material consideration. If a covenant is to be implied, said the Court, it must be a covenant which would reach the core of the dispute, that is, that a directly competitive product was produced by Rockeach. Since both products were used for exactly the same purpose -

Exhibit 16
Page 4 of 8

A 45401

shortening - any implied covenant must take note of that fact.

The Circuit Court of Appeals stated that its decision must seek to preserve the status previously created and developed by the parties. It noted that any future benefit to be derived from the original formula would depend solely on the actions taken by Rockeach with respect to Nyafat. At the same time, it recognized that Rockeach must not be prevented from avoiding losses of its existing share of the cooking oil market caused by the entry of new products. Since Rockeach had the greatest advantage under the contract in that it could theoretically build up sales of Kea while it let sales of Nyafat diminish, the Court was of the opinion that the only solution would be to let Rockeach market Kea only so long as it did not invade the market already established for Nyafat. The Court then took notice of Rockeach's claim that Kea was sold only to people who no longer bought Nyafat, i.e., to those people who were then buying Crisco and Spry and concluded that Parev should only be entitled to prevent loss of the market which Nyafat would retain without regard to outside competition.

After the above analysis, the Court affirmed the District Court's denial of the injunction on the ground that any injunction which would accomplish the desired result would be so vague as to be unenforceable. The Court acknowledged, however, that Parev should not be denied the opportunity to show a loss of the Nyafat market as defined above. In this regard, the Court felt that expert appraisals of market conditions could be obtained to determine what sales of Kea represented those persons who had changed from outside products and what sales represented those who had changed from Nyafat. With the loss of sales thus established the measure of damages would be the royalties on the displaced sales of Nyafat.

This case is extremely relevant because the reason for Avis' going into the off-airport operation would be to prevent other off-airport operators from making inroads into the general car rental/airport market. The case stands for the proposition then that, if Avis entered a licensee city, the licensee would at a minimum be entitled to damages for loss of its existing market to the new off-airport operation.

In Harden v. Eska Co., 127 N.W. 2d 595 (Sup. Ct. Iowa 1964), the defendant had granted to the plaintiff the exclusive right to sell a product known as Port-A-Temp in St. Louis, Missouri and surrounding areas. In violation of the exclusive agreement, the defendant authorized other sales of its product within the complainant's exclusive territory. When the complainant commenced litigation seeking reimbursement of expenses incurred prior to

Exhibit 16
Page 5 of 8

A 45402

Case 3:03-cv-00029-TMB   Document 199-18   Filed 07/31/06   Page 5 of 8

A. Siragusa
Page 6

W. Kramer
May 7, 1969

the breach of the exclusive contract. the defendant argued that the plaintiff was only authorized to conduct "direct selling" (door to door) within the exclusive area and that the other sales authorized by it in the area were through discount operation - another method of selling. The Court refused to accept this argument on the ground that the distinction between direct selling and other methods of selling such as retailing was too narrow. The rule is well settled said the Court, that one party to a contract may not hamper the efforts of the other party in performing according to the terms of the contract. A promise to perform a particular act implies a promise not to perform an inconsistent act. Here the complainant had invested substantial amounts before commencing activities pursuant to the grant of the exclusive privilege. This he was expected to do as the original agreement looked to his expending his best efforts to provide a maximum return for both parties. When the defendant allowed others to sell the same product within the exclusive area, it made full realization of the benefits to be reaped under the contract impossible. The Court went on to cite approvingly the Buckley & Scott case, infra which holds that there is implied in an exclusive franchise an agreement on the part of the grantor not to engage in competition with the dealer in the latter's territory by a means which would practically destroy the right granted and which would render it impossible to operate the territory as the franchise required it to.

In Buckley & Scott Utilities, Inc. v. Petroleum Heat & Power Co., 313 Mass. 496, 48 N.E. 2d 154, (   ), the complainant had been granted an exclusive license to sell Nokol Oil Burners in certain parts of Massachusetts by a company which was subsequently acquired by the defendant. As part of the acquisition the defendant assumed all of the liabilities of the acquired company's outstanding contracts. At the time it was granted the exclusive franchise the complainant was also engaged in the fuel supply business. When the defendant acquired the original licensor, it tried to force the complainant to cease its fuel supply business, since the defendant too was engaged primarily in the business of selling fuel oil. When the plaintiff refused to cease its fuel supply operations, the defendant attempted to acquire the plaintiff's business and when it was rebuffed, it commenced selling oil burners within the exclusive territory but under a slightly different name. In upholding the plaintiff's right to recover damages for unfair competition and misappropriation of business to which it was entitled under the franchise agreement, the Court stated that to permit the defendant to market the same product under a slightly different name would render the original franchise useless. There was, said the Court, implied in the exclusive franchise, an agreement on the part of the franchisor not to engage in competition with the franchised dealer within his exclusive territory in a manner that would practically destroy the right granted and that

Exhibit 16
Page 6 of 8

A 45403

would also render it impossible for the dealer to obtain sales and to operate his entire territory as his franchise agreement required him to.

The reasoning in the above cases, taken together with the analysis of selected provisions of the Avis Exclusive License Agreement set out above seem clearly to establish that Avis could not engage in an off-airport operation in a licensee city without violating the said license agreement.

II. <u>I.T.T. Engaging In Off-Airport Operations With Management And Technical Assistance Supplied By Avis.</u>

It is extremely doubtful whether the objections raised above with respect to Avis itself engaging in off-airport operations could be overcome by having I.T.T. establish a subsidiary to do the same thing with Avis supplying management and technical assistance in return for payment of a fee for supplying the same. When Avis supplies such assistance it would, in effect be the same as if it itself engaged in such activities. Providing management and technical assistance to an off-airport operator who would be competing with the Avis "System" is inconsistent with an express obligation to use every means at its disposal to encourage use of the Avis System by concerns using motor vehicles; is inconsistent with the implied obligation to promote and develop national recognition of the Avis System; and would just as effectively impair the ability of the licensee to promote the Avis name and maintain and expand his fleet size as he could be required to do under the agreement. Moreover, the result would be indirect competition.

III. <u>I.T.T. Itself Engaging In An Off-Airport Operation In A Licensee City.</u>

There would be nothing in the relationship between Avis and its licensees which would as a matter of law prevent I.T.T. from itself engaging in off-airport operations in a licensee city. When I.T.T. acquired Avis, the acquisition took the form of a stock acquisition and thus I.T.T. assumed none of the obligations of Avis, Inc. or Avis Rent A Car System, Inc. Moreover, it would appear that I.T.T. could, in establishing such an off-airport operation utilize on a permanent and full time basis, personnel from within the Avis organization. Avis' obligations to its licensees are obligations of a corporation and not its individual stockholders or employees. Thus, if selected personnel were given the opportunity to associate with the new off-airport operation which was a subsidiary of I.T.T., Avis licensees would

Exhibit 16
Page 7 of 8

A 45404

Case 3:03-cv-00029-TMB   Document 199-18   Filed 07/31/06   Page 7 of 8

A. Siragusa  
Page 8

W. Kramer  
May 7, 1969

not be in a position to object on legal grounds. At the same time, however, large scale transfers of Avis management would probably give rise to a cause of action for some form of unfair competition on the part of I.T.T.

IV. <u>Avis Engaging In Car Rental Operations In Licensee Cities Under A Different System.</u>

It must be emphasized that the conclusions reached herein are bottomed on the assumption that the contemplated new operation would take the form of an off-airport operation with national characteristics (e.g., reservation service and national credit cards) which would seek as its customers the same persons who are presently using the Avis System. Those conclusions, however, would not be as easily reached if the new operation was conducted under a system for renting vehicles which was genuinely different from the Avis System and which would seek as its customers a different market than that sought by the present Avis System. In this category would probably fall the local discounter whose business was not businessmen and airport oriented but rather concentrated on local downtown rentals. Even if such a new system could be developed, however, the conclusions reached above would probably be the same with respect to a licensee city which had, in addition to an airport location, a downtown location which was competing with the local discounter for the local downtown rental market.

WJK/mjh

cc: D. Schaffer

Exhibit 16  
Page 8 of 8

A 45405