UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| ALASKA RENT-A-CAR, INC., an Alaska corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CENDANT CORPORATION, AVIS RENT A CAR SYSTEM, INC., AVIS GROUP HOLDINGS, INC., CENDANT CAR RENTAL GROUP, INC., AVIS CAR RENTAL GROUP, INC., and BUDGET RENT A CAR SYSTEM, INC.,<br><br>Defendants. | No. 3:03-cv-00029-TMB<br><br>MEMORANDUM DECISION AND ORDER<br>[Re: Motions at Docket Nos. 164, 170, 172,178, 180, 182, and 183] |

I.  THE LAWSUIT

Alaska Rent-A-Car, Inc. ("RAC"), an Avis licensee, has sued Cendant Corporation ("Cendant"), the parent of RAC's licensor and it affiliated entities.  The lawsuit is based upon the acquisition by Cendant of Budget Rent A Car and its continued operation by Cendant, either directly or through a subsidiary, in competition with RAC.  RAC alleges that the acquisition and operation of Budget violates certain agreements to which RAC is a party and otherwise violates the law.  RAC asserts twelve cause of action: (1) Breach of the License Agreement; (2) Breach of an Agency Settlement; (3) Breach of the covenant of good faith and fair dealing; (4) Breach of the covenant not to hinder or prevent performance; (5) Piercing the corporate veil; (6) Violation of the Alaska Unfair Trade Practices Act; (7) Violation of the Alaska Uniform Trade Secrets Act; (8) Permanent injunctive relief; (9) Breach of a Master License and Motor Operating agreements as a third-party beneficiary; (10) Anti-Trust violations under both Federal and Alaska law; (11) Fraud; and (12) Interference with prospective economic advantage.

## II. MOTIONS PRESENTED

Pending before the court are seven summary judgment motions: six filed by RAC and one by Defendants.

At Docket No. 164 Plaintiff moved for summary judgment on Counts I (breach of a License Agreement) and II (breach of a settlement agreement) of the complaint; at Docket No. 215 Defendants opposed the motion, to which Plaintiff replied at Docket No. 279.

At Docket No. 170 Plaintiff moved for summary judgment on Count X (Sherman and Alaska Anti-Trust) of the complaint; at Docket No. 212 Defendants opposed the motion, to which Plaintiff replied at Docket No. 268.

At Docket No. 172 Plaintiff moved for summary judgment on Count III (breach of the covenant of good faith and fair dealing) of the complaint; at Docket No. 215 Defendants opposed the motion, to which Plaintiff replied at Docket No. 279.

At Docket No. 178 Plaintiff moved for injunctive relief prohibiting defendant Cendant from spinning off its subsidiaries and Defendants from: (1) marketing Avis and Budget as being associated; (2) providing business cards bearing both the Avis and Budget logos; (3) providing marketing literature possessing both Avis and Budget logos; and (4) communicating in any way that Avis and Budget are affiliated or associated with each other; at Docket No. 213 Defendants opposed the motion, to which Plaintiff replied at Docket No. 280.

At Docket No. 182 Plaintiff moved for summary judgment on Count VI (Alaska Unfair Trade Practices Act) of the complaint; at Docket No. 216 Defendants opposed the motion, to which Plaintiff replied at Docket No. 265.

At Docket No. 183 Plaintiff moved for injunctive relief prohibiting Defendants from engaging in conduct that Plaintiff asserts violates the law or is in breach of the contract and a declaration that it is entitled to receive all rental referrals in Alaska; at Docket No. 214 Defendants opposed the motion, to which Plaintiff replied at Docket No. 267.

At Docket No. 180 Defendants moved for summary judgment on all counts of the complaint; at Docket No. 199 Plaintiff opposed the motion, to which Defendants replied at Docket No. 249.

The Court heard oral argument on March 7, 2007, and now renders its decision on the pending motions.

## III.  DEFENDANTS

Defendants and their respective affiliations are as follows.  Cendant Corporation ("Cendant") (f/k/a HFS, Inc.) is a publicly held Delaware corporation.  Avis Rent A Car System, Inc. ("ARACS") is Delaware corporation wholly owned by Avis Group Holdings, Inc.[1]  Avis Group Holdings, Inc. ("AGH") (f/k/a Avis Rent A Car, Inc.) is a Delaware corporation wholly owned by Avis Car Holdings, LLC.[2]  Cendant Car Rental Group, Inc. ("CCRG") is a Delaware corporation wholly owned by Cendant Finance Holding Corporation,[3] also a Delaware corporation.[4]  Avis Car Rental Group, Inc. ("ACRG") (f/k/a Cendant Car Rental, Inc. and HFS Car Rental, Inc.) is a Delaware corporation wholly owned by CCRG.[5]  Budget Rent A Car System ("BRAC") (f/k/a Cherokee Acquisition Corp.) is a Delaware corporation wholly owned by CCRG.

## IV.  BACKGROUND

Since February 1, 1965, RAC has been the holder of the Avis franchise for specified locations within the State of Alaska under a License Agreement with Avis, Inc. In 1973 ARACS attempted to open an Avis car rental location in Valdez, Alaska prompting RAC to sue to prevent the opening.  In January 1976 the suit was settled and the parties executed an Amendatory Agreement to the 1965 License Agreement expanding the locations in the state where RAC was granted a license.

---

[1] In January 2006 ARACS became a Delaware LLC.

[2] In January 2006 AGH became a Delaware LLC.

[3] In January 2006 CCRG became a Delaware LLC and in April 2006 changed its name to Avis Budget Car Rental, LLC.  For continuity, the Court will continue to refer to it as "CCRG."

[4] Although shown in the record as subsidiary of Cendant Finance Holding Corporation (not a party to this lawsuit), it appears that Defendants acknowledge that CCRG is a subsidiary of Cendant.

[5] In January 2006 ACRG became a Delaware LLC.

In 1995 ARACS acquired the assets and business of Agency Rent A Car, Inc. ("Agency") and attempted to operate the Agency car rental business.[6]  Avis licensees from ten states (but not including RAC) sued on grounds that the licensor's acquisition and operation of the Agency car rental business violated their exclusive license agreements.  In 1997, after consolidation with two other lawsuits and transfer to the U.S. District Court for the Eastern District of New York, the parties settled the Agency litigation and resolved the dispute over the scope of the licenses.[7]  On February 18, 1998, RAC was invited to join the Agency Settlement, to which RAC signified its joinder on July 24, 2001.  This lawsuit involves all three agreements.

In November 2002 Cendant, through Cherokee Acquisition Corp. (now BRAC), acquired Budget Rent A Car.  This lawsuit arises out of that acquisition and the operation of Budget.

## V.  FACTS[8]

A.  GENERAL DESCRIPTION OF BUSINESS ACTIVITIES.[9]

Cendant.  Cendant is a multi-national corporation with numerous subsidiaries whose operations encompass real estate services, hospitality services, time-share resorts, travel distribution services, and car rentals.  In 2005 the operations of Cendant and its subsidiaries generated consolidated net revenues of $18.236 billion and net income in the amount of $1.341 billion.  As of December 31, 2005, Cendant and its subsidiaries had assets valued at $34.104 billion, including $835 million cash on hand.

---

[6] ARACS was the successor by assignment to the original licensor, Avis, Inc.  It appears from the record that in or prior to July 1997 the franchise business and "system" were transferred to HFS Car Rental, Inc. (now Avis Car Rental Group, Inc.).

[7] The parties to that agreement, other than the Licensees, were HFS Car Rental, Inc. (now Avis Car Rental Group, Inc.), Avis Rent A Car, Inc. (now Avis Group Holdings, Inc.), Avis Rent A Car System, Inc., and HFS, Inc. (now Cendant).

[8] The Court notes that both parties have failed to properly authenticate many of the documents submitted in support of or opposition to the motions at bar.  However, neither party has filed an objection to the use of any document and, in most cases, both parties rely on the same document.  Consequently, the Court will treat the lack of proper authentication as waived. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550–51 (9th Cir.1990); *Townsend v. Columbia Operations*, 667 F.2d 844, 849 (9th Cir.1982).

[9] As provided by Cendant filings.

Avis.  In 2001 Cendant acquired all the outstanding shares of Avis that it did not own at the time, making Avis a subsidiary of CCRG.  Avis and its related subsidiaries provide business and leisure customers with a wide range of services at more than 2,000 locations in the United States, Canada, Australia, New Zealand and the Latin American/Caribbean region.  Avis also has a license agreement with Avis Europe Holdings Ltd., an independent third party owning or franchising an additional 3,000 Avis locations in Europe, Africa, the Middle East and Asia.

Avis owns or leases property at more than 850 locations in the United States, employing more than 5,700 employees.  Avis makes more than 16 million vehicle rental transactions annually.  In 2005 Avis generated revenues of approximately $3.2 billion, of which approximately 85% ($2.7 billion) were generated in the United States.  As of December 31, 2005, Avis had assets of more than $10 billion.

In addition to real property lease agreements and marketing agreements, Avis is a party to a variety of other contracts with third parties.  Avis holds required meetings and prepares minutes, and maintains its own financial records.

Budget.  Budget operates directly or by franchise over 1,800 of the approximately 2,600 car rental locations that are part of the Budget system.  Budget operates approximately 700 Budget car rental locations in the United States, Canada, Puerto Rico, Australia and New Zealand and franchises the Budget System to independent business owners who operate approximately 1,100 locations throughout the United States, Canada, Latin America, the Caribbean and the Asia Pacific region.

Budget owns or leases property at more than 600 locations, and employs more than 9,400 employees in the United States covering car and truck rentals.  Budget makes more than 7.7 million vehicle rental transactions annually.   In 2005, Budget generated revenues of approximately $1.6 billion, of which approximately 90% ($1.4 billion) were derived from U.S. operations.  Budget also operates a truck rental business utilizing a fleet of approximately 32,100 trucks rented through a network of approximately 2,700 company owned and commissioned dealer locations throughout the continental United States.  In 2005, Budget's truck rental business generated total

vehicle rental revenue of approximately $546 million.  As of December 31, 2005, Budget had assets of more than $1.7 billion.

In addition to real property lease agreements and marketing agreements, Budget is a party to a variety of other contracts with third parties that are typical for corporations engaged in the type of business it conducts.  Budget holds required meetings and prepares minutes, and maintains its own financial records.

CCRG.  CCRG was incorporated April 29, 1996.  As of December 31, 2005, CCRG had assets of more than $3 billion, independent of the assets of Avis and Budget.  In April 2006, CCRG issued $1 billion of senior unsecured notes.  CCRG has more than 11,000 employees in the United States.  CCRG holds required meetings and prepares minutes, and maintains its own financial records.

B.  Contractual Relationships.

Cendant and CCRG provide certain services to ARACS and BRAC in accordance with contractual agreements.  Cendant and CCRG have entered into a "Cost Sharing Services Agreement" with ARACS.  Under the Agreement, Cendant and CCRG are engaged to provide certain services to ARACS and the terms of payment by ARACS for those services are defined.  The Agreement provides that: "The Services described herein are intended to meet the management support and administrative need of Avis.  Avis' business will at all times be subject to Avis' own policies and practices as such policies and practices may be developed and implemented by Avis from time to time."[10]  Cendant and CCRG contractually warrant the quality of the services provided.  The Agreement specifically provides that Cendant and CCRG are independent contractors in the provision of the services, and defines the limitations of liability and indemnification obligations of the respective parties.

The Agreement defines in detail the scope of the management support and administrative services provided.  The Accounting Services and Computer Support provided include the maintenance of accounts and a general ledger system. It also includes accounts receivable and accounts payable services, including the processing

_____

[10] Avis Cost Sharing Agreement, ¶ 4 (Docket 167-59 at 3).

and posting of receipts and the making of payments.  Payroll Services provided by Cendant include payroll processing services by printing payroll checks and distributing such checks as directed by Avis.  Finance and Treasury services include cash management, operational funding, bank account establishment and management, international exchange management, and inter-company interest expense and bank fee allocations.

Cendant and CCRG have different obligations with respect to services relating to commercial sales, pricing, revenue management and marketing and promotions.  The Agreement provides that CCRG will establish its overall strategies for commercial sales, pricing, marketing and promotions, and will provide certain sales, revenue, and management technical support services.  Cendant is not obligated to provide any of these services, except that Cendant agrees to provide marketing services in connection with special events that Avis conducts or in which Cendant participates.  The agreement sets forth ARACS' obligation to pay or reimburse Cendant or CCRG, as applicable, for the services provided and the method for determining direct costs to be paid by ARACS.

Cendant has entered into a similar Cost Sharing Services Agreement with CCRG and BRAC.[11/]

C.  Finance and Management.

The financing and leasing of the vehicles that comprise the fleet of vehicles rented from Avis' corporate locations and Budget's corporate locations is governed by a series of agreements.  AESOP Leasing, another Cendant subsidiary, owns the fleet vehicles and leases them to CCRG.  CCRG in turn subleases vehicles to Avis and Budget.  The amount owed to CCRG by Avis and Budget for the leasing of the fleet vehicles is tracked separately and each pay a *pro rata* share for using the fleet vehicles.

Cendant uses a centralized system for handling financial transactions divided into two parts: treasury, which handles banking, *i.e.*, the transfer of funds between Cendant and its subsidiaries; and accounting, which records the transactions among Cendant and it subsidiaries or between subsidiaries.  The treasury department for Cendant and

---

[11/] Comparison of the two agreements reveals that they are substantially similar in nature and scope.

its subsidiaries is centralized at Cendant.  The financial performance of all subsidiaries is consolidated at the Cendant level.  The Cendant treasurer is also the treasurer of Budget and supervises the treasurer of Avis.  The Cendant treasury department acts as a bank for the entire Cendant organization.  All cash from the operating accounts of each of Cendant's United States subsidiaries is swept vertically up every day into a single Cendant concentration account where the cash for the entire Cendant company is held and invested in an overnight investment product.  ARACS and BRAC each have their own suite of operating accounts from which all cash is transferred at the end of the day to a single bank account at Cendant, where it is commingled with the cash of all Cendant subsidiaries.

ARACS and BRAC each have two separate accounts: collection accounts, in which receipts are deposited; and disbursement accounts for accounts payable. Controlled disbursement services are used for each of the subsidiaries' disbursement accounts so that each day the account holds only the minimum amount of funds necessary to pay checks clearing that day, with daily funding for the account coming on an as-needed basis—first by transfer from a subsidiary's collection accounts, and then as cash from Cendant in the amount necessary to settle the daily cash position of the disbursement account.  Cash is not moved from Cendant to the disbursement account of any subsidiary until a check is due to clear the account.  Any cash left in a subsidiary's collection account after making the subsidiary's required disbursements is transferred that night to Cendant.

CCRG apparently does not have any collection or disbursement accounts.  It appears that collections that may come in for CCRG are deposited in the main concentration account for Cendant and any disbursements for CCRG also come from that account.

The payroll for all the subsidiaries is prepared at Cendant, which pays all employees out of a single payroll bank account funded by the Cendant concentration account.  The employees of each division receive checks with the logos of their various business units, but the routing number at the bottom of each payroll check is a single Cendant-controlled bank account.

Transactions between Cendant and its subsidiaries or between subsidiaries are accounted for by bookkeeping entries. For example, Cendant charges ARACS and BRAC monthly for services Cendant provides to them that are recorded in a "trading account." There is also an inter-company ledger account between ARACS and BRAC to record expenses that may be paid by one company for the other, but there is no cash settlement of that account. Similarly, CCRG allocates a share of its general corporate overhead to ARACS and to BRAC depending on each subsidiaries' share of the combined Avis/Budget revenue. These costs are reflected on inter-company accounts as CCRG receivables from ARACS and CCRG receivables from BRAC. Cendant also charges CCRG monthly for services it provides, which are recorded and the balance accumulated on an inter-company account ledger.

The evidence clearly establishes that numerous individuals serve, or have served, in multiple capacities as officers and directors of both Cendant and one or more of the defendant subsidiaries, either simultaneously or by rotation through various positions.

D. BUDGET ACQUISITION

ARACS personnel participated in the due diligence investigation culminating in the acquisition of Budget, including evaluation of the marketing department and contracts with third-parties, and human resources and employee contracts. While RAC argues that Avis personnel also participated in other aspects of the due diligence investigation, *e.g.*, evaluation of the Budget fleet, computer and information technology, the evidence submitted in support of that argument does not support a finding that it was done by ARACS personnel.[12]

RAC also argues that the assets of the "Avis parties" were used to secure the financing for the Budget acquisition. Although it appears that initially ARACS

---

[12] While there appears to be a significant amount of confusion regarding whom was employed by who, and RAC tends to refer to "Avis" and "Avis parties" without identification of the precise defendant, the evidence proffered by RAC shows that the investigation was conducted by personnel of either CCRG or AGH, *e.g.*, Duncan Cocroft, David Blaskey and Joseph Kirrane, not ARACS personnel.

administered the Budget funds flow, there is no evidence that ARACS assets were used in acquiring financing for the Budget acquisition.

E. OPERATION OF AVIS AND BUDGET

Since acquiring Budget, CCRG jointly manages and operates both the Avis and Budget brands. Numerous departments and operations have been, or are intended to be, consolidated in CCRG, including: yield management, sales and marketing, price setting analysis, fleet management, vehicle acquisition, revenue, business systems, data storage, insurance and risk management, human resources, training, finance/audit/accounting, vehicle repair and maintenance, and information technology. As a practical matter, essentially the entire senior management team of ARACS was transferred to CCRG, performing for CCRG the tasks they had performed for ARACS. With few exceptions, the names, departments, titles and addresses in the 2004 CCRG directory are identical to those in the 2002 Avis/Cendant directory. Budget's physical facilities have also been substantially integrated with Avis' physical facilities, with the aim of consolidating as many facilities as possible.

The CCRG consolidated sales force markets both Avis and Budget brands in an effort to acquire corporate accounts. The primary goal of the CCRG business plan is to obtain new business for both brands. Although shifting business from Avis to Budget or Budget to Avis does not necessarily help CCRG meet its overall business plan, CCRG will shift business from one to the other to meet client specific needs. The CCRG sales force has failed or refused to bid Avis to corporate accounts that do business in Alaska at least in part because these entities had an existing relationship with Budget.

Prior to the acquisition of Budget by Cendant, Avis and Budget competed for corporate accounts. Since Budget was acquired by Cendant, Avis and Budget do not directly compete in that neither attempts to take away a corporate account held by the other by undercutting the price; CCRG policy is to offer an Avis price that is slightly above an equal Budget position—two different brands offering the customer either a value choice or a premium choice. In a sense Avis and Budget continue to compete, albeit on different price levels, for the primary position on corporate accounts, of which only one may be successful and the other would be excluded from getting that

business.  Although CCRG considers Avis to be a "premium" brand and Budget a "value" brand and prices Avis above Budget for similar vehicles, it has not conducted any study or analysis of the additional costs associated for the "premium" service provided by Avis.  There are also instances in which CCRG will bid Avis at a price lower than that offered by Budget in order to ensure that Avis gets the business instead of Budget.  On the local (Alaska) level, the Avis and Budget licensees continue to compete for market share.

Although CCRG sets prices for corporately owned Avis and Budget locations, licensees generally establish their own prices for rentals by the general public. Corporate accounts negotiated by CCRG set guaranteed prices that may be charged at participating locations for vehicles rented by account holders.  Whether licensees match these guaranteed prices is voluntary.  While participating licensees are prohibited from charging corporate accounts more than the negotiated contract price, they may charge lower "general public" rates.  Through the use of corporate accounts, CCRG is able to control the rates charged by participating licensees to the extent of a corporate agreement.  Non-participating licensees may charge the corporate account holder whatever price the licensee chooses, *i.e.*, the rate offered to the general public, and may negotiate directly with the corporate account holder.  Participating Avis and Budget licensees, on the other hand, may not negotiate separate "special city pricing" rates for corporate accounts.  Those must be approved by CCRG.

CCRG lumps media advertising money for both Avis and Budget together, and shifts between brands based upon marketing needs and profitability.  When it is perceived that placement in a particular media outlet would benefit both brands, the marketing department makes a "judgment call" to decide which brand gets the spot.  In marketing (including advertising) Avis and Budget CCRG's "two brand" strategy directs its marketing focus for each brand, with Avis as the high cost, high service, premium or luxury brand and Budget as the low cost, relatively low or skinny service, and low price brand.  Marketing targets different customer bases: Budget promotions focus on price or value; for Avis the focus is on the non-price conscious, a loyalty tactic, *e.g.*, frequent renter awards.  In this context, CCRG targets Hertz and National as competitors of Avis,

and Dollar, Thrifty, and Alamo as competitors of Budget.  Based upon market studies, CCRG targets advertising efforts for Avis and Budget to those groups most likely to utilize the particular brand.

Essentially the entire computer technology and systems previously utilized in the Avis operation were adopted or adapted for use in connection with Budget operations, including the "Wizard" System.  CCRG has also adopted the previous Avis audit system and Licensee Composite system for use in both the Avis and Budget operations.

Having a single back office system was meant to "save money through the elimination of the current Budget system with the implementation of the more efficient Avis back office system."[13]  Cendant expected to realize annual savings of $12.9 million by integrating the IT systems of Avis and Budget.

Neither Avis nor Budget have any corporate owned locations in Alaska; all Avis and Budget operations in Alaska are conducted by Avis or Budget licensees, respectively.  The "Wizard" system is a computer program utilized under a license agreement with WizCom International, Inc. (also a Cendant Subsidiary).  Although RAC argues that RAC and the Budget Licensees in Alaska utilize a portion of the "Wizard" system to store rental rates and to take, store and transmit reservations, neither use the entire "Wizard" system.

## VI.  ISSUES PRESENTED

The motions raise several issues.

1.    The extent to which each of the defendants may be liable for the acts of the other defendants (piercing of the corporate veils);[14]

2.    Whether the acquisition and continued operation of Budget breached the contracts to which RAC was a party, either as to their express or implied terms;

---

[13] Plaintiff's Motion for Partial Summary Judgment on Counts I and II of the First Amended Complaint [Breach of Contract], Exhibit 36 "Project Charter – Back Office" (Docket 164-49).

[14] Although at Docket 284 the Court denied on procedural grounds the motion and cross-motion raising this issue, it is still necessary to decide it in the context of the remaining pending motions at bar.

3.      Whether the manner in which the Avis and Budget brands are marketed and operated violates—

(a) the Alaska Unfair Trade Practices Act (AS § 45.50.471),

(b) the Alaska Uniform Trade Secrets Act (AS § 45.50.910), and

(c) the federal Sherman Act (15 U.S.C. § 1, *et seq.*) or its Alaska counterpart (AS § 45.50.562);

4.      Whether the Defendants, or any of them, made material misrepresentations that induced RAC to enter into any agreement; and

5.      Whether the manner in which Avis and Budget are operated constitutes tortious interference with RAC's prospective economic advantage with the car rental public.

## VII.  APPLICABLE LAW

Generally, a federal court exercising diversity jurisdiction applies the law of the forum state,[15] including its choice of law rules.[16]  When interpreting state law, this Court is bound by the decisions of the state's highest court.  In the absence of a decision by the highest state court, this Court "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance."[17]  In deciding choice of law questions, Alaska generally looks to the Restatement.[18]

## VIII.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the

---

[15] *Conestoga Servs. Corp. v. Executive Risk Indem., Inc.*, 312 F.3d 974 (9th Cir.2002).

[16] *Fields v. Legacy Health Systems*, 413 F.3d 943, 950 (9th Cir.2005).

[17] *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 473 (9th Cir.2001); *Paulman v. Gateway Ventures Partners III L.P.* (*In re Filtercorp, Inc.*), 163 F.3d 570, 578 (9th Cir.1998).

[18] *See Peterson v. Ek*, 93 P.3d 458, 464 (Alaska 2004) (adopting RESTATEMENT (SECOND) CONFLICT OF LAWS, § 187); *Palmer G. Lewis Co., Inc. v. ARCO Chemical Co.*, 904 P.2d 1221, 1227 (Alaska 1995) (adopting RESTATEMENT (SECOND) CONFLICT OF LAWS, § 188).

moving party is entitled to judgment in its favor as a matter of law.[19]  Support and opposition to a motion for summary judgment is made by affidavit made on personal knowledge of the affiant, depositions, and answers to interrogatories setting forth such facts as may be admissible in evidence.[20]  In response to a properly supported motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial.[21]  The issue of material fact required to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a trier of fact or judge to resolve the parties' differing versions of the truth at trial.  In order to show that a genuine issue of material fact exists, a non-moving plaintiff must introduce probative evidence that establishes the elements of the complaint.[22]  Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment."[23]  There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion.[24]

IX. DISCUSSION

A.  PIERCING THE CORPORATE VEIL.

The outcome of several issues depend upon the liability of each of the defendants for the acts of one, or more, of the others.  The facts concerning the operations of the various defendants and their interrelationship are summarized above in V.C.

---

[19] FED. R. CIV. P. 56(c); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (*en banc*); *Taylor v. List*, 880 F.2d 1040, 1044 (9th Cir.1989).

[20] FED. R. CIV. P. 56(e)

[21] *Id.*; *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055-56 (9th Cir.2002).

[22] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

[23] *Id.* at 255.

[24] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

RAC argues that, under the facts of this case, the Court should disregard the corporate separateness of the defendants, effectively collapsing them into a single enterprise.  The parties disagree over whether the Court should apply Alaska, New York, or Delaware law to the issue of piecing the corporate veil.

RAC's position on the issue of piercing the corporate veil is that Alaska law should apply, and that Alaska law would apply the most significant contacts rule under either contract or tort choice of law rules.[25]  The License Agreement specifically provides that it is governed by New York law.  The Amendatory Agreement likewise contains a specific provision that it is governed by New York law.  The Agency Settlement does not contain a choice of law provision.

If the choice of law provisions in the License Agreement and the Amendatory Agreement are effective, it is clear that they are governed by New York law.[26]  The Court finds unpersuasive RAC's argument that, because no party to the agreement presently has its principal office in New York, the New York choice of law should be disregarded.  At the time the agreements were entered into, Avis had its principal place of business in New York.  Accordingly, at the time the contract was made there was a rational basis for the selection of New York law.[27]  There is no evidence in the record that indicates that the parties intended to revoke or modify that agreement.

With respect to the Agency Settlement, there is no clear cut choice of law provision.  However, the agreement involves parties of at least 10 separate states with only the licensor as the common denominator, which, because the venue of the case was in the Eastern District of New York, presumably had its principal place of business there.  Thus, the Court finds it is logical to assume in the absence of contrary evidence that the parties, had they considered the issue, would have chosen the law of New York

---

[25] Although it purports to reserve the right to argue theories of agency, RAC specifically eschews that argument at this point.

[26] *Peterson v. Ek, supra*; *Palmer G. Lewis Co., Inc. v. ARCO Chemical Co., supra.*

[27] *See* RESTATEMENT (SECOND) CONFLICT OF LAWS, § 187, cmt. f (1988).

to govern the agreement or, alternatively, New York law would apply under the most significant contacts test.[28/]

Defendants argue that piercing the corporate veil, a matter of corporate structure and governance, is governed by the law of the place of incorporation, in this case Delaware.

The general rule, in determining the liability of shareholders for the corporate acts, is that the law of the state of incorporation governs.[29/]  Although the Alaska Supreme Court has not specifically addressed the issue,[30/] its general application of the Restatement leads the Court to conclude that, absent extraordinary circumstances, it would follow the Restatement in this case.

But, whether the law of Alaska, Delaware, or New York is applied, the result, under the facts of this case is the same and the Court need not reach the issue.  While RAC has made a substantial showing that Cendant controls its subsidiaries, at least sufficient to create a triable issue of fact, RAC has failed to establish the one element essential to pierce the corporate veil using the "alter ego" theory under either Alaska, Delaware, or New York law, that the corporate structure: has been "used to defeat public convenience, justify wrong, commit fraud or defend crime";[31/] "cause[d] fraud or similar injustice [and] [e]ffectively, the corporation [is] a sham and exist[s] for no other

---

[28/] As a multi-state agreement, to prevent the possibility of inconsistent interpretations the law of a single state must be applied.  New York is the only state having a common nexus to the agreements of all the parties. It was the domicile of the licensor and the venue of the lawsuit that the agreement settled.

[29/] *See* RESTATEMENT (SECOND) OF CONFLICTS, § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts."); FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS, § 43.72.

[30/] In *Nerox Systems, Inc. v. M-B Contracting Co., Inc.*, 54 P.3d 791, 802 n.45 (Alaska 2002), the Court declined to address the issue as it had not been properly presented to the trial court.  Neither party has cited a case in which the Alaska Supreme Court reached the issue and the Court's independent research has not revealed any such case.

[31/] *Murat v. F/V Shelikof Strait*, 793 P.2d 69, 76 (Alaska 1990); *Eagle Air, Inc. v. Corroon & Black/Dawson & Co., Inc.,* 648 P.2d 1000, 1004 (Alaska 1982).

purpose than as a vehicle for fraud";[32] or "was the instrument of fraud or otherwise resulted in wrongful or inequitable consequences · · · that it led to inequity, fraud or malfeasance."[33]  There is simply no evidence that the various subsidiary corporations were formed with the intent or the purpose of defeating public convenience or justifying or commiting a wrong, including fraud, against anyone, let alone RAC.

Alaska does recognize, as an alternative to the "alter ego" theory, that the corporate veil may be pierced and liability imposed on a parent corporation for the obligations of a subsidiary on the basis of a "mere instrumentality" test.[34]  In that situation, six factors are applied, not all of which must exist:[35] "(1) whether the shareholder owns all or most of the stock; (2) whether the shareholder subscribed to all of the capital stock or caused the incorporation; (3) whether the corporation is grossly undercapitalized; (4) whether the shareholder uses the property of the corporation for his or her own benefit; (5) whether the directors of the corporation act independently of the shareholder; and (6) whether the formal legal requirements of the corporation are observed."  As noted above, if this test applied, RAC has provided evidence sufficient for a reasonable trier of fact to find that the parent corporations were liable for the obligations of their subsidiaries.  But even applying the Alaska "mere instrumentality" approach does not reach the result sought by RAC.  That approach would only permit RAC to recover its damages from a parent corporation as a joint and several obligation.

Perhaps more importantly, neither Alaska, Delaware, nor New York have applied the alter ego theory in the manner advocated by RAC, *i.e.*, to collapse an entire corporate family of parent and subsidiaries into a single enterprise.  All three states

---

[32] *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch.1999); *see also McKesson HBOC, Inc. v. New York State Common Retirement Fund, Inc.*, 339 F.3d 1087, 1095 (9th Cir.2003) (citing and applying *Wallace*); STEPHEN B. PRESSER, PIERCING THE CORPORATE VEIL, § 2:8 (discussing Delaware law).

[33] *TNS Holdings, Inc. v. MKI Sec. Corp.*, 703 N.E.2d 749, 751 (N.Y.1998); *see also* STEPHEN B. PRESSER, PIERCING THE CORPORATE VEIL, § 2:36 (discussing federal court interpretations of New York law).

[34] *See Nerox Power Systems, Inc. v. M-B contracting Co., Inc., supra*, 54 P.3d 802 n. 43, citing *Uchitel Co. v. Telephone Co.*, 646 P.2d 229, 234 (Alaska 1982).

[35] *Nerox*, 54 P.3d at 801–802 (internal quotation marks omitted).

17

have pierced the corporate veil to make a parent corporation liable for the obligations of its subsidiary.  However, RAC has not cited a reported case in any of the three jurisdictions in which the subsidiary was held liable for the obligation, let alone the acts, of the parent or a sister corporation and independent research by the Court has not revealed any such case.  In order for liability for the acts to flow downstream (or "cross-stream") as advocated by RAC, it will have to be under traditional agency principles, not using the alter ego theory by piercing the corporate veil; a position RAC, although purportedly reserving it, has specifically eschewed.[36]

B.  BREACH OF CONTRACT ACTIONS [COUNTS I, II, III, IV AND IX].

As noted above, there are three agreements that RAC contends have been breached by the acquisition, management and operation of BRAC: the 1965 License Agreement between RAC and Avis; the 1976 Amendatory Agreement between RAC and ARACS; and the 1997 Agency Settlement between certain Avis licensees and Cendant, ARACS, AGH, and ACRG.  That RAC and ACRG are parties to and bound by the License Agreement and the Amendatory Agreement is undisputed.[37]  However, Defendants dispute that RAC is a signatory to the Agency Settlement.  RAC also contends that it's a third-party beneficiary to a Master License Agreement between Wizard and ACRG as licensors and ARACS as licensee, which it alleges has been breached through the purchase, operation and management of Budget.

Under New York law interpretation of a contract is a matter of law to be determined by the court,[38] including a determination of whether or not it is ambiguous.[39] A contract is not ambiguous unless the agreement is reasonably susceptible to more

---

[36] Notwithstanding that RAC has eschewed the agency theory, the Court will, with respect to each cause of action, independently evaluate whether sufficient evidence, viewed in the light most favorable to RAC, exists to support a finding of agency.

[37] As noted above, the record indicates that in or prior to July 1997 ACRG acquired the Avis franchise and system and is the current licensor.

[38] *805 Third Ave. Co. v. M.W. Realty Associates.*, 448 N.E.2d 445, 451 (N.Y.1983).

[39] *W.W.W. Associates, Inc. v. Giancontieri*, 566 N.E.2d 939, 642 (N.Y.1990).

than one interpretation on its face.[40/]  The objective is to determine the parties' intentions from the contract language as a whole;[41/] adjudicating the parties' rights according to the contract's unambiguous provisions, giving words and phrases employed their ordinary meaning.[42/]  Extrinsic and parol evidence may not be used to create an ambiguity.[43/]  It is only if there is an ambiguity in the terminology used and there is a determination that the intent of the parties depends upon the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from the extrinsic evidence that determination is made by a jury.[44/]

    1.  License Agreement and Amendatory Agreement [Count I].

    RAC argues that in operating both Avis and Budget in the manner they are operated, "Defendants" have violated RAC's License Agreement.  However, the sole defendant that is a party to the License Agreement and Amendatory Agreement is ACRG.  That agreement provides: "Licensor hereby grants to Licensee, subject to the terms and conditions hereof, an exclusive License to use the System in the conduct of a vehicle rental business for renting cars only."

    The License Agreement defines "system" as:

    Whereas, Licensor is the exclusive owner of, and has the right to use and license others to use, a plan or system for conducting the business of renting motor vehicles, without drivers, hereinafter called "vehicle rental business", [sic] which plan or system consists, among other things, of uniform methods of operation, accounting, advertising service and publicity, courtesy and credit card service, kind and amount of insurance protection, method of procuring insurance protection and equipment, style and character of equipment, furnishings and appliances used in the conduct of said business, methods of procuring business and referral of business, and the right to use the name "Avis," "Avis System," "Avis Rent A Car System," "Avis Rent A Truck System" and "Avis Truck Rental

----

    [40/] *Chimart Associates v. Paul*, 489 N.E.2d 231, 233 (N.Y.1986).

    [41/] *See South Road Associates, LLC v. Int'l. Bus. Mach. Corp.* 826, N.E.2d 806, 809 (N.Y.2005).

    [42/] *Laba v. Carey*, 277 N.E.2d 641, 644 (N.Y.1971).

    [43/] *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 248 N.E.2d 576, 580 (N.Y.1969).

    [44/] *Hartford Acc. & Indemn. Co. v. Wesolowski*, 305 N.E.2d 907, 909 (N.Y.1973).

19

Service" all of which constitute a part of said system, which system is generally know [*sic*] as Avis Rent A Car System and is sometimes referred to hereinafter as the "System";

*   *   *   *

The License Agreement reserves to the Licensor:

the right to change the System and to change or amend the methods, rules and regulations of said system, upon giving notice thereof to Licensee.

More specifically it provides:

5.    RIGHT OF LICENSOR TO CHANGE SYSTEM

Licensor expressly reserves the right to change when and as it chooses, the system or any part thereof, including any forms, bulletins procedures, or standard Rental Agreements and the System as so changed or amended, from time to time, shall for all purposes be deemed to be the system referred to in this Agreement. Any and all improvements in said System developed by Licensee shall be and become the sole and absolute property of Licensor, and Licensor may incorporate the same in said System and shall have the sole and exclusive right to copyright, register and/or patent such improvements in its own name, and Licensee shall have no right to use such improvements, except as it may be licensed to use the System here-under; provided, however, that in the event of the termination of' this license, Licensee may continue to use any form or improvement which Licensee has itself developed, but Licensee must not thereby represent that it is in any manner a licensee of or connected with Licensor or the System, and Licensor and other Licensees of the System may continue to use such forms of improvement.

RAC covenanted:

3.12 Association With Other Systems.

Not to be or become associated, directly or indirectly or through any corporation or other entity which it owns or controls or in any other manner, in any location with an international, national, or regional vehicle rental system other than the Avis System or with any other entity in competition with Avis in the vehicle rental business.

Under the terms of the License Agreement, RAC also bound itself to cooperate with the Licensor in advertising, promoting and developing recognition of the "Avis system."

The Licensor bound itself to make available to RAC the privilege to consult with appropriate Licensor personnel on business operations, make available standard Avis materials, make available a directory including the Licensee's addresses and telephone

20

numbers, assist the Licensee in procuring equipment, supplies, and services, and make available various forms, bulletins, and procedures for use in conducting the business. The Licensor also agreed that during the life of the License Agreement the Licensee had the right to use the "Avis" name.  Not one of these covenants has been violated.

RAC argues that the "system" to which it has an exclusive right to use in its specified locations is all encompassing and includes the "back office" functions being performed by CCRG.  RAC also argues that ¶ 3.10 creates a reciprocal obligation to promote the Avis brand and no other, and ¶ 3.12 precludes association with any other car rental business.  Thus, according to RAC, the License Agreement has been breached.

RAC also points to the Amendatory Agreement, which provides:

> It is further agreed that so long as these License Agreements remain in effect, no other license or operation in any other city and area of Alaska will be issued or allowed by Avis unless and except Avis shall first have given Licensee the right and opportunity to first acquire such license or operation, in accordance with the terms set forth in (a) above wherein Licensee may apply for and obtain addition of new cities and areas. This shall apply as well to a license or operation earlier held by Avis or a third person, or a proposed licensee or operation, which has been discontinued or not activated as proposed.

RAC argues this provision, giving it a right of first refusal, reaffirmed and expanded RAC's right to the exclusive use of the system in Alaska.

First, as Defendants correctly point out, no act complained of is being committed by ACRG.  As noted above, CCRG is not the alter ego of ACRG and there is no evidence from which a reasonable trier of fact could determine that CCRG was acting as the agent of ACRG, except, perhaps, as a collection agent for the royalty payments from Avis licensees, including RAC.

Reading the Contract as a whole, as the Court must do under New York law, the right to determine what constitutes the "system" is reserved to the Licensor.  Although RAC characterizes the "back office" functions being performed by CCRG as being proprietary to ACRG, there is no evidence in the record that establishes that as a fact. Nor is there any evidence in the record that ACRG considered any of the methods by which it performed those functions as constituting a trade secret.  The Court disagrees

with RAC that ¶¶ 3.10 and 3.12 create reciprocal obligations.  They are clearly and unequivocally obligations of the Licensee alone; not the Licensor.

With respect to the right of first refusal provision, as Defendants correctly point out, to the extent it might otherwise be applicable it is effectively superceded by the Agency Settlement, to which RAC claims to be a party (and, as discussed further below, the Court agrees).

The Court concludes that, as a matter of law, there has been no breach of either the 1965 Agreement or the 1976 Amendatory Agreement.  Therefore, Defendants are entitled to judgment on Count I.

2.  Agency Settlement Agreement [Count II].

RAC argues that the joint operation of Budget and Avis violates the Agency Settlement.  Defendants contend that RAC is not a party to the Agency Settlement.  One argument advanced by Defendants is whether, as a matter of law, acceptance of the offer made 41 months after the offer was tendered was timely.  Defendants also challenge eligibility or qualification to join the Agency Settlement.  Additionally, Defendants argue the acceptance was equivocal.  In the cover letter transmitting its acceptance RAC stated:

> It is our understanding that, except that its specific terms may clarify and provide for additional rights and obligations, the SETTLEMENT AGREEMENT AND RELEASE does not alter or amend our License Agreements with AVIS, INC. dated February 1, 1965 as amended by our January 15, 1976 agreements with AVIS, INC. and AVIS RENT A CAR SYSTEM, INC.

New York law is clear: "If an offer specifies the time of its duration, it must be accepted within that time; however, where no time is specified for the offer's duration, it must be accepted within a reasonable time.  What is a reasonable time is a question of fact, dependent on the nature of the contract."[45]  Also, under New York law: "As a

---

[45] *Silbermann v. Citibank, N.A.*, 599 N.Y.S.2d 588, 590 (N.Y.A.D.1993).

general rule, in order for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous and unequivocal."[46]

Initially, the Court rejects the contention of Defendants that RAC was not eligible to join the Agency Settlement.  Contrary to the arguments of Defendants, it was not limited to holders of "Exclusive License Agreements" ("ELA").  The very terms of the Agency Settlement, § V.A., state that it is offered to "all Avis System licensees/franchisees."  Whether or not RAC has an "Exclusive License Agreement" is irrelevant, it is clearly an "Avis System licensee."[47]

The Court also rejects the argument that the cover letter transmitting the joinder made the acceptance less than clear, unambiguous or unequivocal.  The cover letter's language simply stated RAC's understanding of the effect of the joinder, not that its understanding was a condition of its joinder.  The Statement of Joinder is itself clear, unambiguous and unequivocal.  Perhaps more importantly, no defendant has even hinted that RAC's understanding was incorrect, and a reading of the Agency Settlement supports RAC's understanding.

As to the timeliness, although the 41-month delay may appear unduly lengthy, the facts and circumstances establish that it is not.  First, there is no evidence in the record before this Court that RAC was notified at anytime prior to the time this action was initiated that its joinder was untimely.  Second, as RAC notes, in papers filed in this Court the defendants have acknowledged, at least inferentially, that RAC is party to the Agency Settlement.  Finally, the record shows that at least six Avis licensees who joined after July 2001 are acknowledged to be parties to the Agency Settlement: Clark Car & Truck Rental (June 17, 2002); New Hanover Rent A Car, Inc. (November 9, 2002); Hart Leasing, Inc. (August 9, 2004); Hendricks Enterprises, Inc. (August 17, 2004); Twin City Tire Co. (September 24, 2004); and Sonju Enterprises, Inc. (December 14, 2004).

---

[46] *King v. King*, 617 N.Y.S.2d 593, 594 (N.Y.A.D.1994); *see also* RESTATEMENT (SECOND) LAW OF CONTRACTS, § 57.

[47] Thus, the Court need not, and does not, reach the issue of whether the RAC License Agreement is an Exclusive License Agreement.

Defendants have produced no evidence, other than the lapse of time, that the joinder was untimely.  Based upon the record before the Court it must find that, as a matter of law, RAC's joinder in the Agency Settlement was timely.  Consequently, RAC is a party to the Agency Settlement, entitled to its benefits and bound by its terms.

The other parties to the Agency Settlement were divided into two groups: (1) the "Avis parties" comprised of HFS Car Rental (now Avis Car Rental Group "ACRG"), Avis Rent A Car, Inc. (now Avis Group Holdings, Inc. "AGH"), and Avis Rent A Car System, Inc. (ARACS), their successors and assigns; and (2) the "parent" HFS, Inc. (now Cendant) and its affiliates.[48/]  The provisions relevant to this action include:

I. CONFIRMATION OF SCOPE OF ELAs AND NON-COMPETITION WITHIN THE EXCLUSIVE TERRITORIES

A. The Avis Parties acknowledge and confirm that the scope of the ELAs includes, within the terms of the ELAs and without limitation, any and all past, present and/or future segments, tiers, niches and/or any other term that may be used to describe subdivisions, parts or portions (collectively "Segments") of the market for the rental of passenger cars without drivers. Each of the Licensees have and shall continue to have, subject to the provisions of the ELAs, the unlimited right to engage in the License Car Rental Business in any and all present and future Segments of the car rental market, within their respective Exclusive Territories.

B. The Avis Parties agree that they cannot Acquire an Additional Company or any Location thereof within any of the Exclusive Territories or otherwise compete with any of the Licensees within their Exclusive Territories. The preceding sentence does not prohibit the Avis Parties' sale or lease of Yield Management Technology to an Additional Company so long as the use of such technology remains independent, separate and apart from data and/or services utilized in the Car Rental Business.

IV. PROVISIONS RESPECTING THE PARENT

A.    The Parent hereby acknowledges, ratifies and adopts the provisions of Section I.A. above.

B.    The Licensees acknowledge that the Parent has the right to Acquire an Additional Company so long as the management and operations of the Additional Company are wholly separate and independent from the management and operations of the Avis Parties, the

---

[48/] An "affiliate" is broadly defined in ¶ 3 as any entity controlled by any means whatsoever, direct or indirect.

Car Rental Business and the Licensee Car Rental Business. The election or appointment of an individual to serve as a director of the Avis Parties and an Additional Company shall not be deemed to contravene the separateness and independence of the Additional Company so long as such individual is not an officer, consultant or employee of the Additional Company or any of the Avis Parties. The provision of similar or like services to the Avis Parties and an Additional Company shall not be deemed to contravene the separateness and independence of the Additional Company so long as such services are equivalent and independent of the Avis Parties' or the Additional Company's participation.

C.    Should the Parent Acquire an Additional Company, the Parent and the Avis Parties agree that:

1.    the sales, marketing and reservation activities, operations and personnel of the Avis Parties will function and be maintained separate and apart from those of the Additional Company;

2.    the sales, marketing and reservation activities, operations and personnel of and for the Avis System will not be utilized to market, provide and/or make available car rental services other than those provided within the Avis System and such sales, marketing and reservation activities, operations and personnel will exercise their best efforts to promote the Avis System;

3.    neither the Avis Parties and the Licensees on the one hand, nor the Additional Company on the other hand, will be required or directed to undertake any act or omission by which they/it will be disadvantaged for the benefit of the others;

4.    the Avis Parties will not refer customers to any Additional Company; and

5.    the Avis Parties and the Parent will not share, disclose or otherwise use any business information and data whatsoever belonging, referring or relating to any of the Licensees for the benefit of any Additional Company without the prior express permission of the Licensee(s) in question.

D.    Should the Parent Acquire an Additional Company that ceases at any time to be separate or independent from the Avis Parties, the Car Rental Business and/or the Licensee Car Rental Business, then in addition to the provisions and obligations set forth in Section 1V.C. above, the Parent and the Avis parties further agree that:

1.    The Additional Company may not introduce any new competitive threats into the marketplace within an Exclusive

Territory after the date of this Agreement. For the purposes of this Agreement, the term "competitive threat" means the opening of any new Location of the Additional Company in any of the Exclusive Territories where the Additional Company does not already have a Location and/or the addition of any new Locations in an Exclusive Territory in which the Additional Company already has existing Locations. This paragraph does not prohibit or otherwise limit the rights of an existing franchisee/licensee of the Additional Company from exercising any valid, preexisting rights to expand and/or open new Locations; however, if the franchisee/license does not already possess such rights, the Additional Company may not grant new or additional rights to expand, open new Locations and/or otherwise create a competitive threat.

2.    If the Additional Company already has one or more Locations within any of the Exclusive Territories (a "Conflicting location"), the Parent agrees that with respect to every Conflicting location which is not operated, owned or managed by a franchisee/licensee of' the Additional Company or in respect of which a franchisee/licensee of the Additional Company does not have a contractual right to operate, own or manage such Location, the licensee in whose Exclusive Territory the Conflicting Location exists ("Affected Licensee") will be presented a right of first refusal with regard to a franchise, license or right to operate (collectively "Franchise") such Conflicting Location on terms at least as favorable as the terms upon which such Franchise would be made available to others. Upon the expiration of any term of a Franchise granted pursuant to this paragraph, the Affected Licensee will have the right to renew the Franchise in question on terms at least as favorable as the terms upon which such Franchise would be made available to others for so long as an Affected Licensee maintains a valid ELA.

3.    With regard to each Conflicting Location as to which an Affected Licensee either cannot be offered a right of first refusal under Section IV.D.2. above with regard to a Franchise, or if the Affected Licensee chooses not to exercise such right, the Parent shall offer and the Affected Licensee can accept or decline:

a.    an arrangement whereby the Affected Licensee will have the opportunity to participate in any cost savings with the Additional Company that may be achieved through a sharing or consolidation of resources, including vehicle fleet, on mutually agreeable terms and conditions to the extent such an arrangement is commercially feasible; or

26

b.    a one-time, lump sum payment to the Affected Licensee, in a mutually acceptable amount to be negotiated and determined in good faith, in exchange for a release of any claims that may exist as a result of the operation of the Conflicting Location; or

c.    any mutually acceptable combination of (a) and (b) above.

\* \* \* \*

6.    Although this Section IV.D. contemplates possible situations in which an Additional Company has ceased to be separate or independent from the Avis Parties, the Car Rental Business and/or the Licensee Car Rental Business, it is not intended to and shall not be deemed to or contradict any other provisions of this Agreement.

F. Should the steps and limitations provided for in Section IV.D of this Agreement fail to resolve a Future Dispute, the Parties hereto reserve all rights to pursue their claims, defenses and assertions through Litigation at any time, subject always to Sections I. and IV. (inclusive of all applicable definitions and provisions used and/or incorporated therein), which shall remain binding and conclusive in the event of any Future Dispute. The Avis Parties and the Parent understand and confirm that in connection with any such Future Dispute that they shall not be permitted to claim (and the judge, fact finder, mediator, arbitrator, or tribunal may not find) that the ELAs do not cover, apply to or encompass any and all alleged Segment(s) of the market for the rental of passenger cars without drivers.

Part V "ADDITIONAL AGREEMENTS" provides in relevant part:

C.    All Parties agree that no inference may be drawn from this Agreement as to the existence or scope of the Parties' alleged rights beyond the express terms set forth herein, and that, with the exception of Sections I. and IV. above, nothing herein shall be deemed a waiver or admission as to any of the matters at issue in the Agency Dispute. Further, the provisions of Section IV.D. hereof do not and shall not be deemed to constitute or imply an agreement by the Licensees that Parent can acquire, own, manage, create and grant any licensees/franchisees a license to operate an Additional Company under any conditions, circumstances or arrangement other than as set forth in Section IV.B., and all claims and assertions as to the Parties' rights with respect to such other conditions, circumstances or arrangement are expressly preserved. Nothing set forth in the Agreement shall be construed an admission or waiver by Parent of its alleged right to acquire an Additional Company under any circumstances, conditions or arrangements whatsoever.

D.    Sections IV.C.1. and IV.C.2. shall not prejudice the ability of the Parent to utilize consolidated or collocated reservation facilities to make reservations for both the Avis System and any Additional Company, so long as any reservation activities and operations employ separate personnel and telephone numbers for the respective activities and operations and no cross-selling occurs.

Also of import are two additional definitions:

7.    "Avis System" means the system used in and for the creation, management, promotion and operation of the Car Rental Business.

8.    "Car Rental Business" means the business of renting passenger motor vehicles without drivers under the service mark and trade name "Avis".

More specifically, RAC points to the following:

▸    § I.B. expressly prohibited the participation by ARACS in the due diligence process preceding the acquisition of Budget.

▸    § IV.B, ¶IV.C.1., and ¶ IV.C.2. prohibit integrating marketing, reservation activities, operations, or sharing any personnel for Avis and Budget.

▸    The operation of Budget in the territories in which exclusive rights were granted RAC constitutes prohibited competition in violation of § I.A.

▸    The combined market, sales and reservations operations refer potential customers to Budget in violation of ¶ IV.C.4.

▸    ¶ IV.C.5 prohibits the disclosure of any Avis business information.

The overall intent of the Agency Settlement is fairly easy to ascertain: Cendant may acquire a car rental agency that could compete with the Avis trade name as long as it does not impinge upon the exclusive rights granted to the Avis Licensees. Unfortunately, the agreement is somewhat inartfully drafted and, as with many compromise agreements, difficult to reconcile conflicting provisions, *i.e.*, one provision that appears to permit what another provision appears to prohibit. In construing the Agency Settlement the Court will follow the New York rule that where there is a conflict between a general provision and a specific provision, the specific governs.[49]

---

[49] *Muzak Corp. v. Taft Hotel Corp.*, 133 N.E.2d 688, 690 (N.Y.1956); RESTATEMENT (SECOND) OF CONTRACTS, § 203(c).

Interpretation is further complicated by the fact that the agreement encompasses three separate segments: those that bind the "Avis parties" alone; those that bind the "parent" alone; and those that bind both.

The evidence before the Court clearly establishes that Budget was acquired by Cendant and is operated by BRAC, a subsidiary of CCRG. Most, if not the majority, of RAC's arguments are premised upon the assumption that CCRG is the alter ego of the "Avis parties." This premise is, as discussed in IX.A., above, incorrect. In addition, there is a complete lack of any evidence that CCRG acts as the agent of the "Avis parties." CCRG and BRAC are, however, affiliates of Cendant and, therefore, bound by the terms of the Agency Settlement to the same extent as Cendant.

It is indisputable that the Budget Licensees in Alaska compete with RAC. It is also indisputable that the competition, to the extent that it exists between RAC and the Budget Licensees, predated the acquisition of Budget by Cendant. The evidence further establishes that no defendant directly competes with RAC in Alaska, *i.e.*, there are no corporately-owned facilities operated within the state. While the Court agrees that if the same services provided by CCRG were provided by an "Avis party" it would violate the Agency Settlement, it does not necessarily follow, *a fortiori*, that in providing those services CCRG also violates the Agency Settlement. The Court also rejects RAC's arguments to the extent they are based upon the theory that creating CCRG was nothing more than a thinly-disguised means of avoiding the restrictions of the Agency Settlement. There is nothing in the Agency Settlement that precludes Cendant or any subsidiary of Cendant, other than the specifically named "Avis parties," from acquiring and operating Budget. Indeed, Cendant could only avoid running afoul of the Agency Settlement by operating Budget through a separate subsidiary. The issue is whether the Budget operation is being conducted in a manner consistent with the Agency Settlement.

The Court may dispose of four of the RAC arguments summarily. Nothing in § I.B. can be construed as precluding the use of ARACS personnel in conducting the due diligence investigation preceding the acquisition of Budget by Cendant. The fact that ARACS personnel participated in this phase can not be construed as being in

29

competition with the Licensees.  The operation by CCRG through its subsidiary, BRAC, is not competition by the "Avis parties," as they are defined in the Agency Settlement, and as precluded by § I.A.  There is no evidence that any information belonging, referring, or relating to RAC is being disclosed to BRAC or the Budget Licensees in Alaska.  Paragraph IV.C.5 is, by its express terms, limited to information "belonging, referring or relating to" Licensees, not information that deals generally with the Avis operation overall by the Avis parties or Cendant and its affiliates.  Finally, there is no evidence that the "Avis parties," as they are defined in the Agency Settlement, are referring customers to Budget.  Paragraph I.C.4., by its express terms, is limited to the "Avis parties" and does not extend to Cendant or its affiliates, other than the "Avis parties."  Likewise, ¶ IV.C.1. is by its express terms limited to the "Avis parties."

The Court agrees with RAC that by looking to the first sentence of § IV.B. ("so long as the management and operations of the Additional Company are wholly separate and independent") and ¶ IV.C.2. in isolation, a rational trier of fact could find that the operations of CCRG violated those provisions.  However, the Court must look at the agreement as a whole, giving effect to all of its terms.  Accordingly, as Defendants correctly argue, the Court must examine the effect of those provisions that create exceptions to the broad proscriptions of the first sentence of §  IV.B. and ¶ IV.C.2.[50]

The last sentence of § IV.B. permits Cendant and CCRG to provide "similar or like services to the Avis Parties and an Additional Company * * * so long as such services are equivalent and independent of the Avis Parties' or the Additional Company's participation."  All the unified services provided by CCRG and Cendant,[51] which are provided to both Avis and Budget and are equivalent and performed

---

[50] The Court agrees with RAC that ¶ IV.C.2. applies to Cendant and CCRG.  While ¶ IV.C.1. is limited to "Avis parties," ¶ IV.C.2. applies to the "Avis System," which, by definition, includes personnel associated with managing, promoting, and operating the car rental business under the trade name "Avis."

[51] Yield management, sales and marketing, price setting analysis, fleet management, vehicle acquisition, revenue, business systems, data storage, insurance and risk management, human resources, training, finance/audit/accounting, vehicle repair and maintenance, and information technology.

independently of the Avis parties and Budget, fall within that exception.  Thus, there is no breach of the provisions of § IV.B.

However, the Court's inquiry does not stop there.  Paragraph IV.C.2. is a more specific provision; therefore, it, not § IV.B., controls as to sales, marketing and reservation activities.  Paragraph IV.C.2. prohibits the use of the same personnel for selling, marketing or making reservations for both Avis and Budget.  Section V.D., on the other hand, also applies and, to some extent, relaxes the restrictions of ¶ IV.C.2 on making reservations.  However, § V.D. only permits the use of common facilities in making reservations; it does not permit the use of the same personnel in making reservations and specifically requires separate telephone numbers.[52]

The evidence in the record clearly and unequivocally establishes that the same CCRG personnel sell and market both Avis and Budget brands.  Based on that evidence a rational trier of fact could only find that in so doing CCRG has breached the provisions of ¶ IV.C.2.  RAC is entitled to summary judgment in its favor on Count II of the First Amended Complaint as against CCRG as to liability.[53]

Defendants also argue that the Agency Settlement provides for exclusive remedies in the event of a breach, referring to §§ IV.D. and F.  The Court disagrees.  A close and careful reading of § IV.D. indicates that it only applies when the Additional Company ceases to be operated independently of the Avis parties, the Car Rental Business, and/or the Licensee Car Rental Business, all of which are specifically defined terms.  The facts before the Court do not reflect that the conditions that trigger § IV.D. exist in this case.

The Court, however, also disagrees with RAC's assertion that it is entitled to damages equal to the value of the Budget franchise/license in Alaska.  RAC is entitled to

---

[52] The Court finds somewhat incongruous the argument that Budget is not being operated separate and apart from Avis on the one hand in the motion at Docket No. 164 (breach of contract) and its argument that the marketing of the two is overly segmented in the motion at Docket 170 (anti-trust).

[53] There is no evidence of the amount of damages, if any, that RAC incurred as result of this breach.  Accordingly, damages remain a triable issue of fact. FED. R. CIV. P. 56(c).

whatever damages it actually incurred as a result of the breach of the Agency Settlement—no more, no less.

3. Breach of Implied Covenants [Counts III and IV].

Under New York law there is implied in every contract a covenant of good faith and fair dealing, which precludes one party from taking any action that would prevent the other party from receiving the fruits of the contract.[54]  However, this covenant is limited and may not be applied in a manner inconsistent with the other terms of the contract.[55]

To the extent RAC seeks to enforce the implied covenant with respect to the License Agreement or Amendatory Agreement it fails for the same reason as did its breach of contract causes of action, *i.e.*, none of the complained acts were committed by ACRG, the other party to those agreements, nor can the acts of the other defendants be attributed to ACRG.  As to the Agency Settlement, first there is no evidence that RAC was prevented from performing its obligations under the Agency Settlement in any material respect, whatever they may have been.  Second, RAC offers no evidence that it was deprived of any benefits under the agreements and none appear from the evidence in the record.  RAC appears to argue that it was entitled to be free of competition from any Additional Company acquired in the areas in which it was granted an exclusive Avis license.  However, reading the Agency Settlement as a whole does not lead to that result.  The agreement clearly, explicitly and unequivocally provides for the possible acquisition of a competitor by Cendant and its continued separate and independent operation by Cendant after its acquisition.  No new Budget licenses have been issued since Cendant acquired Budget so RAC's right of first refusal has never been triggered. To hold that the implied covenant of good faith and fair dealing was breached would render the Agency Settlement internally inconsistent.

Defendants are entitled to judgment on Counts III and IV of the First Amended Complaint.

---

[54] *Dalton v Educational Testing Serv.*, 663 N.E.2d 289, 291 (N.Y.1995).

[55] *Murphy v. American Home Prod. Corp.*, 448 N.E.2d 86, 91 (N.Y.1983).

4. <u>Breach of Master License and Master Motor Operating License [Count IX]</u>.[56]

In July 1997 ARACS, Wizard and HFS Car Rental, Inc. (now "ACRG") entered into a Master License Agreement. Under the terms of that agreement, Wizard and HFS Car Rental granted ARACS a non-exclusive license to operate vehicle rental businesses under the trade name "Avis" in territories where there were no previously existing exclusive license agreements with other licensees. RAC claims that it is a third-party beneficiary to that agreement. Defendants argue that RAC is not a third-party beneficiary and refer to the Master License Agreement, which specifically provides:

> Notwithstanding anything to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Licensor, Licensee, their officers, directors, partners, and such of their respective successors and assigns as may be contemplated by Section 15 hereof, any rights or remedies under or by reason of this Agreement.

The Master License Agreement contains a choice of law provision designating New York as the applicable law. Under New York law a third-party beneficiary may sue on a contract; however, an intent to benefit the third party must be shown and in the absence of such intent the third party is merely an incidental beneficiary without a right to sue.[57] In this case not only is there a lack of an indication that the parties intended to confer a benefit on RAC,[58] the agreement quite unequivocally indicates a contrary intent.

Defendants are entitled to judgment in their favor on Count IX of the First Amended Complaint.

C. ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT [COUNT VI].

AS § 45.50.471 provides:

(a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful.

---

[56] RAC has withdrawn its claim that it is a third-party beneficiary of the Master Motor Operating License Agreement.

[57] *Port Chester Elec. Contr. Co. v. Atlas*, 357 N.E.2d 983, 985–86 (N.Y.1976).

[58] RAC's reference to the deposition testimony of Karen Sclafani does not support its assertion that it was intended to benefit the licensees beyond the general protection of the integrity of the service mark "Avis."

(b) The terms "unfair methods of competition" and "unfair or deceptive acts or practices" include, but are not limited to, the following acts:

. . .

(3) causing a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval, or another person's affiliation, connection, or association with or certification of goods or services;

(4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

. . .

(6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(7) disparaging the goods, services, or business of another by false or misleading representation of fact;

. . .

(10) making false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions;

(11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and which misleads, deceives or damages a buyer or a competitor in connection with the sale or advertisement of goods or services;

(12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been mislead, deceived or damaged;

. . .

(14) representing that an agreement confers or involves rights, remedies or obligations which it does not confer or involve, or which are prohibited by law;

. . .

(c) The unlawful acts and practices listed in (b) of this section are in addition to and do not limit the types of unlawful acts and practices actionable at common law or under other state statutes.

The first hurdle that RAC must overcome is the effect of the Interstate Commerce Clause.[59/] Under that clause, a state may not regulate conduct that takes place wholly outside its borders even if that conduct has effects within the state.[60/] The acts of which RAC complains all occurred outside of the State of Alaska. However, even assuming that RAC surmounts the first hurdle, the conduct of which it complains does not constitute an unfair trade practice under the Alaska UTPA.

"Two elements must be proved to establish a prima facie case of unfair or deceptive acts or practices under the Alaska Act: (1) that the defendant is engaged in trade or commerce; and (2) that in the conduct of trade or commerce, an unfair act or practice has occurred."[61/] The first element has clearly been established. The only issue is whether an unfair act or practice has occurred.

The Alaska Supreme Court has provided broad guidelines for determining what constitutes an unfair act or practice, stating:[62/]

> An act or practice is deceptive or unfair if it has the capacity or tendency to deceive. Actual injury as a result of the deception is not required. Intent to deceive need not be proved. All that is required is a showing that the acts and practices were capable of being interpreted in a misleading way. * * * * An act or practice need not be "deceptive" to be "unfair." Unfairness will be determined by a variety of factors, including: (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

What does the evidence establish? CCRG operates two car rental businesses through two subsidiaries: ACRG (Avis) and BRAC (Budget). It consolidates at the parent level certain administrative and operational functions that are common to both. It uses a

---

[59/] U.S. CONST., Art. I, § 8, cl. 3.

[60/] *See Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989); *Edgar v. MITE Corp.*, 457 U.S. 624, 640–643 (1982) (plurality).

[61/] *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 534 (Alaska 1980).

[62/] *Id.*, at 534–35 (footnotes omitted).

unified sales and marketing force to market both in three ways: (1) establishing corporate accounts where it sets the maximum price that may be charged to an account holder by corporately-owned locations and participating licensees; (2) does not use one sister company to "raid" a corporate account of the other sister company; and (3) targets advertising for Avis and Budget based upon which segment of the market is most likely to utilize Avis (marketed as a "premium" brand) or Budget (marketed as a "price" or "value" brand).  CCRG does not set the prices that RAC or its Budget licensee competitors can charge the general public, nor does it compel RAC to participate in the corporate accounts negotiated by CCRG.

RAC does not identify any trade practice of any defendant that is deceptive or misleading.  The evidence does not support an inference that there would be any confusion between the Budget and Avis brands; indeed the evidence overwhelmingly supports the sole inference that no reasonable consumer could consider Avis and Budget to be synonymous or similar.

First, one must identify which defendant or defendants are competitors of RAC. RAC's competitors are the Budget licensees, not any of the Defendants.[63]  Second, no reasonable mind could find that the acts of the Defendants in this case are immoral, unethical, oppressive or unscrupulous.  Third, the acts of Defendants in this case are not unlawful nor do they offend any identified public policy.[64]  The most that can be said about the acts of Defendants is that, as noted above, in utilizing the same personnel for marketing and sales, CCRG has breached a contractual obligation under the Agency Settlement.  The fact that an act is a breach of a contractual obligation does not, *ipso facto*, render it an unfair trade practice.

RAC having failed to produce evidence sufficient to permit a reasonable jury to find a violation of the Alaska Unfair Trade Practices and Consumer Protection Act,

---

[63] Although both ARACS and BRAC compete with RAC on the same level, *i.e.*, directly rent cars to the general public through "company stores" as RAC contends, they do not compete in the same geographic area, the "relevant market."

[64] As noted below, Defendants have not violated any anti-trust law.

Defendants are entitled to judgment in their favor on Count VI of the First Amended Complaint.

D.  ALASKA UNIFORM TRADE SECRETS ACT [COUNT VII].

AS § 45.50.910(a) authorizes a court to "enjoin actual or threatened misappropriation of trade secrets."  Alaska statutes define a "trade secret" as information that:[65]

> (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
>
> (B) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

"Misappropriation" is defined as:[66]

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who
>
>> (i) used improper means to acquire knowledge of the trade secret; or
>>
>> (ii) at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it or who owed a duty to the person seeking relief to maintain its secrecy or limit its use, or was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>
>> (iii) before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake;

This cause of action suffers from the same Constitutional limitation as does the Alaska Unfair Trade Practices Act violation cause of action, *i.e.*, it attempts to apply

---

[65] AS § 45.50.940(3).

[66] AS § 45.50.940(2).

Alaska law to acts that occur wholly outside the state. Also, like the Alaska UTPA, the evidence fails to establish a violation of the Alaska statute.

The issue is: what trade secret is being misappropriated? RAC argues that since sales and marketing are now consolidated, Budget is privy to the pricing information of Avis and RAC. RAC points to the fact that both RAC and one of its competitors, a Budget licensee, submitted requests for lower prices in connection with a bid for a corporate account, which, because of the consolidation, resulted in the RAC pricing information being made available to Budget's sales agents and the Budget pricing made available to Avis' sales agents.[67] Accepting that as true does not reach the result RAC seeks. While the Court agrees that pricing may be a trade secret, RAC points to no evidence in the record that the pricing information in this case constitutes a trade secret. In particular, there is no evidence that the information, which was submitted to CCRG in connection with soliciting a corporate account, was either (1) intended to be a trade secret or (2) even if intended as a trade secret, that reasonable steps were taken under the circumstances to maintain secrecy. Moreover, there is no evidence that the pricing information submitted by either RAC or the Alaska Budget licensee was "misappropriated," *i.e.,* obtained by an improper means or improperly disclosed or used.

RAC has failed to establish a violation of the Alaska Trade Secrets Act. Defendants are entitled to judgment in their favor on Count VII of the First Amended Complaint.

E. ANTI-TRUST [COUNT X].

The facts in this case are clear that the acquisition of Budget by Cendant and its subsequent operation through CCRG has reduced competition in the rental car market between the Avis and Budget brands. This, RAC argues, constitutes an anti-trust violation of the Sherman Act and its Alaska counterpart.[68] The fact that competition is reduced is not, however, sufficient to establish an anti-trust violation standing alone.

---

[67] RAC actually said it was made available to its (RAC's) sales force. The Court assumes that RAC misspoke and the information was made available to the Avis corporate sales force not to RAC's

[68] 15 U.S.C. § 1, *et seq.*; AS § 45.50.562.

RAC advances two theories.[69] First, RAC argues that the agreements between CCRG and the Avis and Budget licensees whereby the licensees "opt into" participation in the national corporate accounts constitutes a horizontal restraint on competition, a *per se* violation. Second, RAC argues that the national sales program (corporate accounts) constitutes an illegal vertical price restraint.[70]

The first hurdle that RAC has failed to overcome is that, as a matter of law, a concerted activity between a parent and a subsidiary corporation can not constitute a combination or conspiracy under the Sherman Act.[71] RAC attempts to circumvent this by arguing that the Avis and Budget licensees are unwilling co-conspirators, thereby creating the necessary conspiracy or combination.[72] In this RAC also fails.

Although the nature of an entity and its ability to combine and conspire is a question of fact,[73] where the material facts are undisputed summary judgment is appropriate.[74] The threshold requirement of concerted activity is missing among multiple

---

[69] The Court rejects as irrelevant RAC's argument regarding the agreement between Cendant and the Canadian Bureau of Competition. Whatever may be the law in Canada or the position of its regulatory agency, this Court must make its determination based on the law of this country, not that of Canada.

[70] As RAC recognizes, the Supreme Court has rejected vertical maximum price fixing as a *per se* violation of the Sherman Act and applied the "rule of reason." *State Oil Co. v. Khan*, 522 U.S. 3 (1997). RAC's argument that the national programs at issue in this case are minimum prices outside the scope of *Khan* is unsupported by the facts in the record. Moreover, the Supreme Court has recently held that vertical price setting is not a *per se* violation, but subject to the "rule of reason." *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. ___, ___, 127 S.Ct. ___, ___, 2007 WL 1835892 *14–15 (June 28, 2007), overruling *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911) (holding that vertical minimum resale price maintenance agreements were *per se* illegal). In addition, it has long been the rule that vertical price setting does not cause an anti-trust injury to a competitor unless predatory. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339–345 (1990).

[71] *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770-74 (1984).

[72] *See Perma Life Mufflers, Inc. v. Int'l Parts. Corp.*, 392 U.S. 134 (1966), *overruled on other grounds*, *Copperweld Corp. v. Independence Tube Corp, supra*.

[73] *Murray v. Toyota Motor Distributors, Inc.,* 664 F.2d 1377, 1379 (9th Cir.1982).

[74] *See Los Angeles Memorial Coliseum Comm'n v. National Football League.,* 726 F.2d 1381, 1387 (9th Cir.1984) (the organization and the nature and extent of cooperation among the clubs was a matter of record so a directed verdict was appropriate given that reasonable minds

(continued...)

corporations operated as a single entity when corporate policies are set by one individual or by a parent corporation.[75] Applying this principle, the Ninth Circuit in *Williams v. I.B. Fischer Nevada*[76] explicitly held that, under the facts of the case before it, which are substantially similar to those presented in the case at bar, a franchiser and franchisee constituted a common enterprise incapable of conspiring to violate § 1 of the Sherman Act. The facts relied on by the Ninth Circuit, as recited in the published decision by the district court are as follows:[77]

> In a fast-food franchise the franchisor does everything to promote a uniform, non-competitive environment between the franchises: Each franchise serves substantially the same products; the products are served to the public in the same manner; the franchisor develops products and services for all franchises; the employees dress alike; the decor of each franchise is similar; the franchises are advertised as a single enterprise with a single logo; and the franchisor contracts with each franchise for exclusivity within a certain geographic area to minimize competition between the franchises.

Contrary to the arguments of RAC, the Avis and Budget operations are internally indistinguishable from the *Fischer Nevada* decision. In addition, as in *Fischer Nevada*, the national accounts agreements between CCRG and the licensees, whether an Avis licensee or a Budget licensee, do not involve anyone outside the "franchise family."

---

[74](...continued)
could not differ on the issue).

[75] *General Business Systems v. North American Philips Corp.,* 699 F.2d 965, 980 (9th Cir.1983); *see also Thomsen v. Western Elec. Co., Inc.*, 680 F.2d 1263, 1266-67 (9th Cir.1982) (holding that where the parent controls virtually all important policies and practices and the concerted action restrains no trade other than that of the parent and its subsidiaries, § 1 of the Sherman Act is not violated).

[76] 999 F.2d 445, 447 (9th Cir.1993). RAC argues that this Court should disregard *Fischer Nevada* as being contrary to *Copperweld* and *Perma Life.* The Court disagrees. Not only is *Fischer Nevada* consistent with *Perma Life* and *Copperweld*, but *Copperweld* tends to reinforce *Fischer Nevada*. Moreover, a decision by a panel of the Ninth Circuit is controlling on this Court unless it is either overruled by the Ninth Circuit sitting *en banc* or is irreconcilable with the reasoning or theory of higher authority. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir.2003). Neither factor is present in this case.

[77] 794 F.Supp. 1026, 1031 (D. Nev.1992).

A crucial question is whether the entities alleged to have conspired maintain an economic unity and whether they are actual or potential competitors.[78]  With respect to the national accounts, as noted above, the facts of this case clearly and unequivocally establish that no co-defendant in this case is a competitor of RAC within RAC's exclusive territories (the relevant geographic market).  The evidence in this case also establishes that the economic interests of RAC and CCRG are not divergent.  Both seek to increase the market share for the Avis brand.  Indeed, RAC has acknowledged that national accounts are vital to its business survival:

> In fact, Alaska Rent-A-Car has tried to negotiate directly with national customers, but has been unsuccessful because the institutional customers wanted a national accounts program which is uniform throughout the nation. However, approximately 50% of Alaska Rent-A-Car's business is derived from national accounts. The election of whether to participate in the national accounts program is in reality a "Hobson's choice" for Alaska Rent-A-Car. To maintain a profitable business, Alaska Rent-A-Car must participate in the national accounts program.

RAC also acknowledges that the same is true for Corporate Sales, the Budget licensee in Alaska.  Thus, the interests of Corporate Sales (as well as other Budget licensees) are not divergent.  Accordingly, neither of these parallel operations constitute a combination within the scope and meaning of § 1 of the Sherman Act.

RAC presents an interesting conspiracy theory that may be dubbed the "triangular conspiracy," *i.e.*, that RAC and Corporate Sales are conspiring to fix prices through an intermediary, CCRG.  One flaw in that argument is that, as RAC acknowledges, neither RAC nor Corporate Sales have any control over the marketing activities or pricing policy set by CCRG, which is, therefore, acting unilaterally.  The second and perhaps more serious flaw is that CCRG owns both the Avis and Budget trademarks.  Although CCRG refers to it as its "two-brand strategy," this case is more akin to intra-brand than inter-brand competition.  Although the two "brands" are operated through separate wholly-owned subsidiaries, if CCRG were to itself directly operate both Avis and Budget, its practices of bidding, marketing and advertising, while it would likely violate the Agency

---

[78] *Jack Russell Terrier Network of Northern California v. American Kennel Club, Inc.*, 407 F.3d 1027, 1034 (9th Cir.2005).

Settlement, would not constitute an anti-trust violation.  The Supreme Court has made clear that in applying the Sherman Act that substance, not form, controls.[79]  The fact that CCRG has elected to operate Avis and Budget through two wholly-owned subsidiaries does not change the substance—it is limiting competition with itself.

RAC's reliance on the retail price maintenance cases is misplaced.[80]  CCRG does not set the price at which RAC can sell its product.  Each corporate account involves a contractual rate negotiated by CCRG with a single customer on behalf of either the Avis brand or the Budget brand, and may vary depending upon the customer.  Each licensee may either elect to participate or decline to participate in the national account.  If the licensee "opts-out" as a participant, the licensee may negotiate directly with the corporate account customer.  If the licensee "opts-in" as a participant, although the licensee may not charge more than the rate negotiated by CCRG, it may offer the corporate account customer a lower rate, if such a rate is offered to the general public.  Local compliance with the national corporate account is necessary to assure the national customer that the negotiations with CCRG have value, which benefits both CCRG and the participating licensee.  This is acknowledged by RAC.  This arrangement does not constitute a violation of the Sherman Act.[81]

Moreover, the Supreme Court, in recently holding that the *per se* rule does not apply to a lawful, economically integrated joint venture, made clear that the Sherman Act applies solely to unreasonable restraints of trade.[82]  Although the relationship in this case is not that of a joint venture or partnership, there is a significant degree of economic integration between CCRG and the licensees.  The Court finds that the *per se* rule

---

[79] *Copperweld Corp. v. Independence Tube Corp., supra*; *United States v. Sealy, Inc.*, 388 U.S. 350, 353 (1967).

[80] The Court has considered the authorities cited by RAC, *e.g.*, *Bostick Oil Co. v. Michelin Tire Co.*, 702 F.2d 1207 (4th Cir.1983), *Greene v. General Foods Corp.* 517 F.2d 635 Cir.1975), and *Ryco Mfg. Co. v. Eden Services, Inc.,* 823 F.2d 1215 (8th Cir.1987) and finds them not only not controlling and distinguishable, but, in light of later controlling decisions, unpersuasive.

[81] *See Wisconsin Music Network, Inc. v. Muzak Ltd. P'ship*, 5 F.3d 218, 222-23 (7th Cir.1993).

[82] *Texaco, Inc. v. Dagher*, 547 U.S. ___, ___, 126 S.Ct. 1276, 1278 (2006).

should not apply to this similarly integrated economic unit.  This holding is further supported by directly applicable Supreme Court precedent.  Not only has the Supreme Court clearly signaled that *per se* violations are to be rarely applied, as noted above, this term, overruling prior precedent, it specifically held that the *per se* rule does not apply to vertical price restraints in any event; they are to be judged by the rule of reason.[83]  With respect to the price fixing allegations, in the absence of evidence that in bidding on national accounts CCRG has attempted to drive RAC out of the relevant market by pricing that is either below (i) that necessary to sell the product or (ii) cost, RAC has not suffered an anti-trust injury, irrespective of whether a maximum or minimum price is set.[84]

RAC's other arguments, *e.g.*, segmentation of the market and preventing Avis and Budget from competing against each other, fail because the actions of CCRG with respect to bidding on corporate accounts, marketing and advertising are unilateral on the part of CCRG without the participation of either the Avis or Budget franchisees/licensees. Defendants contend and RAC does not seriously dispute that Avis and Budget compete on separate levels of the car rental market, *i.e.*, Avis competes with Hertz and National while Budget competes with Thrifty and Dollar.  In this context, Avis competes with Budget like a first class seat in an airplane competes with a coach seat.  Just as airlines sell first class and coach tickets to different segments of the traveling public based upon the personal preferences or circumstances of the traveler so do Avis and Budget rent cars to separate segments based upon the personal preferences or circumstances of the renter.  There is no authority to support the contention that the fact that CCRG through its marketing, is committing an anti-trust violation.[85]  RAC's arguments that it is somehow

---

[83] *Leegin Creative Leather Prod., Inc. v. PSKS, Inc., supra.*

[84] *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 584 n. 8 (1986); *Weyerhaeuser Co. v. Ross-Simmons Hard Wood Co., Inc.*, 549 U.S. ___, ___, 127 S.Ct. 1069, 1074 (2007) (holding that the same predatory test applied to pricing applies to bidding).

[85] Indeed, the Court surmises that if CCRG did not use its marketing forces and advertising dollars in a manner designed to maximize return, RAC would, quite understandably and legitimately, complain that was a misuse of that portion of its franchise fee used to support a national marketing program.

"constrained" from those segments of the market that CCRG targets for Budget are simply not supported by the evidence.  RAC may use its advertising dollars to target any segment of the car rental market it may deem appropriate and it is not constrained, either directly or indirectly, from renting motor vehicles to any member of the public, irrespective of that member's personal preference or circumstances.

The evidence fails to establish the existence of a conspiracy or combination in restraint of trade or commerce.  Alternatively, to the extent there may be a combination, although the actions of CCRG reduce the competition between the Avis and Budget "brands," the evidence establishes that they increase the competition between CCRG and the owners of the Hertz, National, Thrifty and Dollar brands.  In substance, if not form, this fits within the rationale that, under the "rule of reason," actions that restrict intra-brand competition but promote inter-brand competition do not violate the Sherman Act.[86]

RAC has failed to establish a violation of § 1 of the Sherman Act.

The Alaska Supreme Court is generally guided by federal Sherman Act cases when construing Alaska's anti-trust act.[87]  RAC has not cited any Alaska case that would compel a different result under Alaska law than the result reached under the Sherman Act, and independent research by the Court has not revealed any such decision. Accordingly, the Court holds that the result is the same under Alaska law.

Accordingly, Defendants are entitled to judgment in their favor on Count X of the First Amended Complaint.

F. FRAUD/MISREPRESENTATION [Count XI].

RAC claims fraud/misrepresentation on two grounds.  First, it alleges that the "we try harder" motto adopted by Avis years ago was allegedly a false statement of fact. Second, although not clearly articulated, RAC argues that there was no intent to honor the Agency Settlement.

---

[86] *See, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 54–58 (1977); .

[87] *Odom v. Lee*, 999 P.2d 755, 761 (Alaska 2003).

First, the Court must determine the applicable law.  If the law applicable to the interpretation of the contract applies, New York law provides the rule of decision.  On the other hand, if the choice of law is determined under the most significant contacts approach for fraud claims,[88] Alaska would likely apply its own law.  Fortunately, the result is the same irrespective of which law is applied.

To establish fraud in the inducement under Alaska law RAC must prove four elements: (1) a misrepresentation; (2) fraudulent or material; (3) inducement; and (4) justifiable reliance.[89]  "Promissory fraud requires a showing of (1) a promise, (2) scienter, or the present intent of not following through on that promise, (3) intention to induce reliance, (4) justifiable reliance, and (5) damages."[90]  "A statement made as to future intentions and actions is not a misrepresentation if accurate when made, even if future events render it inaccurate."[91]

Under New York law, "[t]here must be a representation of fact, which is either untrue and known to be untrue or recklessly made, and which is offered to deceive the other party and to induce them to act upon it, causing injury."[92]  New York also recognizes the common-law tort of promissory fraud in cases where there is a misrepresentation of a material fact, scienter, deception and injury.[93]

---

[88] RESTATEMENT (SECOND) CONFLICT OF LAW, § 148(2) (factors considered are "(a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicil, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant").

[89] *Johnson v. Olympic Liquidating Trust,* 953 P.2d 494, 497 (Alaska 1998); RESTATEMENT (SECOND) OF CONTRACTS, § 164(1) (1981).

[90] *Yoon v. Alaska Real Estate Comm'n,* 17 P.3d 779, 782 (Alaska 2001); RESTATEMENT (SECOND) OF TORTS, § 525.

[91] *Valdez Fisheries Dev. Ass'n, Inc. v. Alyeska Pipeline Serv. Co.,* 45 P.3d 657, 672 (Alaska 2002).

[92] *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 250 N.E.2d 214, 217 (N.Y.1969).

[93] *See State v. Cortelle Corp.,* 341 N.E.2d 223, 225 (N.Y.1975).

The sole material difference between New York and Alaska law is that New York requires fraud in the inducement to be proved by clear and convincing evidence,[94] while Alaska law uses the preponderance of the evidence standard.[95]

Even accepting, *arguendo*, that "we try harder" is a statement of fact, RAC does not obtain the result it seeks. First, RAC has introduced no evidence that at the time the statement was made it was untrue. The evidence adduced by RAC is directed towards establishing that "we try harder" was a promise made to Avis licensees, including RAC, that Avis had no intention of performing, *i.e.*, fraud in the inducement or promissory fraud.[96] RAC alleges that in reliance on this allegedly false promise, it entered into the 1965 License Agreement and the 1976 Amendatory Agreement.

RAC's arguments fall short on at least two points. First, the evidence, viewed in the light most favorably to RAC, does not show that the statements, to the extent they were made prior to any action taken in reliance thereon, were inaccurate when made. Second, the acts that RAC alleges made the statement false were all made by a person or entity other than ACRG. Try as it may, by continuously ascribing actions to "Avis," RAC cannot escape the fact that the actions of which it complains were committed by Cendant or CCRG, not "Avis." Cendant acquired Budget and BRAC is, as is Avis, operated as a subsidiary of CCRG. There is not a scintilla of evidence to support a finding that Avis or ARACS made any fraudulent statement or promise.

The Agency Settlement presents a somewhat different question. The terms of it, insofar as it concerns the acquisition and operation of another car rental agency, are binding on Cendant and CCRG as well as the "Avis parties." The issue here is whether Cendant in executing the Agency Settlement in September 1997 entered into that agreement with no present intent to perform. The only evidence, other than the

---

[94] *Callahan v. Miller*, 599 N.Y.S.2d 145, 146 (N.Y.A.D.1993); *see also Jo Ann Homes at Bellmore, Inc. v. Dworetz, supra*, 250 N.E.2d at 218 ("[t]he proof required to sustain the fraud cause of action is far more demanding than that needed to prove a breach of contract").

[95] *Dairy Queen of Fairbanks, Inc. v. Traveler's Indemn. Co. of Am.*, 748 .2d 1169, 1171 (Alaska 1988).

[96] The Court assumes, because it is not seeking to avoid the agreements, that RAC is asserting promissory fraud not fraud in the inducement.

language of the Agency Settlement itself, of a representation made to RAC was that it had nothing to lose by joining the agreement.  RAC has not asserted that this representation was false.

RAC relies on the deposition testimony of Robert Salerno, formerly president of ARACS and currently president of CCRG, as establishing that *he* had no intent to honor the Agency Settlement.  First, the testimony to which RAC refers simply establishes the deponent's understanding of the agreement that he participated in negotiating.  Whether that understanding was correct (as Defendants contend) or incorrect (as RAC contends) it is not evidence that there was no intent to perform.  Second, unfortunately for RAC, it was Cendant, not ARACS, that acquired Budget.  The Salerno testimony does no more than reiterate the plain language of the Agency Settlement: The "Avis parties" could not acquire and operate another car rental business but the "parent" could.  The evidence in the record clearly establishes that Cendant acquired Budget, controls CCRG, and made the decision to move the ARACS management team to CCRG to perform the same functions for Avis and Budget as had previously been performed for Avis alone.

RAC having failed to offer sufficient evidence for a reasonable trier of fact to find any specie of fraud, Defendants are entitled to judgment in their favor on Count X.

G.  INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE [COUNT XI]

RAC argues that in operating Budget as a competitor, thereby diverting prospective customers from RAC to the Budget franchisees, CCRG is interfering with its prospective economic advantage.  The Alaska Supreme Court has held:[97]

> To make out a prima facie case for [intentional interference with prospective economic advantage], the plaintiff must show: (1) the existence of a prospective business relationship between the plaintiff and a third party; (2) knowledge by the defendant of the prospective relationship, and intent to prevent its fruition; (3) conduct by the defendant interfering with the relationship; (4) failure of the prospective relationship to culminate in pecuniary benefit to the plaintiff; (5) causation of the plaintiff's damages by the defendant's conduct; and (6) absence of privilege or justification for the defendant's action.

---

[97] *J & S Services, Inc. v. Tomter*, 139 P.3d 544, 551 (Alaska 2006).

"[W]here there is a direct financial interest in a contract, the essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective."[98]  While, as RAC correctly argues, no defendant is a party to the contract between RAC and the individual car renter, RAC reads the privilege exception too narrowly.  It is not necessary that the Defendants be a party to the contract, it is only necessary that they have a direct financial interest.  CCRG, as the recipient of the franchise fee, which is admittedly dependent upon the ability of RAC to generate revenue from the car rental business, certainly has a direct financial interest in it.  In addition, CCRG through its ownership of both the Avis and Budget "brands," has a direct financial interest in any car rental that is consummated by either Avis or Budget.  RAC not only admits, but affirmatively contends, that CCRG is acting in its own best financial interests, not that of Avis or RAC.  There is no evidence in this case of spite, malice or an improper objective.  A reasonable mind could not find that the actions of any defendant were not privileged.[99]

RAC has failed to establish a *prima facie* case for intentional interference with prospective economic advantage.  Defendants are therefore entitled to judgment in their favor on Count XII of the First Amended Complaint.

H.  INJUNCTIVE RELIEF [COUNT VIII]

RAC seeks to enjoin the Defendants from operating in direct competition with it, utilizing the "Avis system" to operate Budget, diluting RAC's rights to the use and further damage to Avis intellectual property, causing consumer confusion, and from further violations of the contractual agreements.

---

[98] *Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 444 (Alaska 2004); *see Bendix Corp. v. Adams*, 610 P.2d 24, 31 (Alaska 1980) (applying same test in a interference with an existing contract case).

[99] As noted above, contrary to the assertions of RAC, the actions of Cendant and CCRG are not anti-competitive, do not violate any statute, nor are they criminal.

The basis for injunctive relief in federal courts has always been irreparable harm and inadequacy of legal remedies.[100]  In this case, given the Court's rulings on the other causes of action, neither element has been established.

I. BREAK-UP OF CENDANT CORPORATION.

In its motion at Docket No. 178 RAC requests the Court permanently enjoin (1) the proposed breakup of Cendant Corporation into four separate publicly held corporations and (2) from showing an affiliation between Avis and Budget.  Although the motion seeks a permanent injunction, in substance because it seeks the entry of injunctive relief prior to the entry of a final judgment in the case, RAC is seeking a preliminary inunction.  A preliminary injunction is appropriate where a plaintiff demonstrates either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in their favor.[101]  First, other than enjoining the showing of an affiliation between Avis and Budget, the relief requested goes far beyond the scope of the allegations in the complaint so it is difficult, it at all possible, to measure RAC's probability of success on the merits.  Second, RAC has failed to make even a minimal showing that it will suffer irreparable harm if the restructuring by Cendant is allowed to proceed or CCRG is renamed.  There is simply no basis upon which this Court can enjoin the otherwise legitimate corporate restructuring.

---

[100] *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57 (1975); *Beacon Theatres Inc. v. Westover,* 359 U.S. 500, 506–507 (1959).

[101] *E. & J. Gallo Winery v. Andina Licores, S.A.*, 446 F.3d 984, 990 (9th Cir.2006).

## X.  CONCLUSION

Based on the foregoing,

1.      Plaintiff's Motion for Partial Summary Judgment on Counts I and II of the First Amended Complaint [Breach of Contract] at Docket No. 164 is GRANTED, in part, and DENIED in part;

2.      Plaintiff''s Motion for Partial Summary Judgment on Antitrust at Docket No. 170 is DENIED;

3.      Plaintiff's Motion for Partial Summary Judgment on Breach of the Implied Covenant at Docket No. 172 is DENIED.

4.      Plaintiff's Motion for Declaratory and Injunctive Relief Relating to the Breakup of Cendant Corporation at Docket 178 is DENIED.

5.      Defendants' Motion for Summary Judgment or Alternatively for an Order Limiting the Issues for Trial on Count II at Docket No. 180 is GRANTED, in part, and DENIED, in part.

6.      Plaintiff's Motion for Partial Summary Judgment on Count VI of the First Amended Complaint [Violation of Alaska Unfair Trade Practices and Consumer Protection Act (AS 45.50.471)] at Docket No. 182 is DENIED.

7.      Plaintiff's Motion For Summary Judgment on Permanent Injunctive Relief And Specific Performance at Docket No. 183 is DENIED.

IT IS ORDERED THAT:

1.    The First Amended Complaint is DISMISSED, with prejudice, in its entirety as to Defendants Avis Group Holdings, Inc., Avis Rent A Car System, Inc., Avis Car Rental Group, Inc., and Budget Rent a Car System, Inc.; and

2.    The First, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, Eleventh, and Twelfth Causes of Action of the First Amended Complaint are DISMISSED, with prejudice.


Dated:        July 27, 2007

s/ Timothy M. Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE