Jeffrey M. Feldman
ALASKA BAR NO. 7605029
FELDMAN ORLANSKY & SANDERS
500 L Street, Suite 400
Anchorage, Alaska 99501
907.272.3538
907.274.0819 (Fax)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

|  |  |  |
|---|---|---|
| ALASKA RENT-A-CAR, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CENDANT CORPORATION, AVIS RENT A | ) | |
| CAR SYSTEM, INC., AVIS GROUP | ) | |
| HOLDINGS, INC.,    CENDANT CAR | ) | |
| RENTAL GROUP, INC., AVIS CAR | ) | |
| RENTAL GROUP, INC., and BUDGET | ) | |
| RENT A CAR SYSTEM, INC. | ) | Case No. 3:03-cv-00029-TMB |
| | ) | |
| Defendants. | ) | |
| | ) | |

## REPLY IN SUPPORT OF MOTION REGARDING THE SCOPE OF ALASKA RENT-A-CAR'S DAMAGES

In response to the court's ruling that defendants breached ¶ IV.C.2 of the parties' Agency Settlement Agreement,[1] Alaska Rent-A-Car moved to confirm that it is entitled to present a two-part compensatory damages case and seek equitable relief.[2]  Though no award of damages will enable Alaska Rent-A-Car to cure defendants' defective performance,[3] Alaska Rent-A-Car moved, first, to recover damages for (a) its lost profits and lost market share, and (b) the independent value of the contractual prohibitions set out in ¶ IV.C.2; and second, to obtain

---

[1]     *See* Memorandum Decision and Order, dated July 27, 2007 at 31 [Docket 335].

[2]     *See* Motion Regarding the Scope of Alaska Rent-A-Car's Damages [Docket 363].

[3]     *See, e.g.*, Memorandum of Law in Support of Motion Regarding the Scope of Alaska Rent-A-Car's Damages at 14-15 [Docket 364].

equitable disgorgement of a share of any profitable cost savings that defendants unjustly reaped as a result of their opportunistic breach of the agreement.[4]

Defendants now object to Alaska Rent-A-Car's compensatory damage case on the untenable grounds that ¶ IV.C.2 (a) was only partially breached and (b) had no independent value, and they ask the court to deny Alaska Rent-A-Car's request for equitable relief—though they do not deny either that their breach was profitable or that it resulted in unjust enrichment—on the demonstrably incorrect ground that equity affords neither protection, nor relief from opportunistic behavior.[5]

Because the court correctly rejected defendants' narrow view of ¶ IV.C.2,[6] and Alaska Rent-A-Car's damages claims and request for equitable relief are amply supported by established law, Alaska Rent-A-Car's motion should be granted in full.

## DISCUSSION

I. **ALASKA RENT-A-CAR IS ENTITLED TO RECOVER THE PROFITS AND MARKET SHARE IT LOST AS A CONSEQUENCE OF DEFENDANTS' TOTAL BREACH OF ¶ IV.C.2 AGENCY SETTLEMENT AGREEMENT.**

Alaska Rent-A-Car moved first to confirm that it may recover the value of the profits and market share it lost as a direct consequence of defendants' breach of ¶ IV.C.2.[7]  Defendants agree that the court's ruling entitles Alaska Rent-A-Car to recover damages for the harm that resulted from defendants' breach,[8] but assert (a) that Alaska Rent-A-Car may be seeking a "duplicative recovery," and (b) that the court concluded that ¶ IV.C.2 had been only partially breached.  Neither assertion is correct.  Alaska Rent-A-Car will not seek a duplicative recovery and the court correctly recognized that defendants breached ¶ IV.C.2, not just by assigning personnel to work jointly for Avis and Budget, but also to the extent that defendants impermissibly allow Budget to use the "sales, marketing and reservation activities," "operations," and "personnel" of and for the Avis System.

---

[4]    *See id.* at 16-17, 18, and 18-19.

[5]    *See* Opposition to Alaska Rent-A-Car, Inc.'s Motion Regarding the Scope of Damages at 3-4, 7-8, 10-12 [Docket 365].

[6]    *See* Opinion at 30-31.

[7]    *See* Memorandum at 16.

[8]    *See* Opposition at 8 (referencing Opinion at 31-32).

**A.    Alaska Rent-A-Car Will Present Evidence of Its Lost Market Share To Establish Its Lost Future Profits And Is Not Seeking a Duplicative Recovery.**

Defendants' first objection is based on needless worry and a confusion of terms. While acknowledging that Alaska Rent-A-Car is entitled to recover its "net value of profits,"[9] defendants assert that Alaska Rent-A-Car may not independently recover for lost market share because "the value of profits lost and the value of market share lost measure the same alleged damage."[10] This is, at best, a semantic dispute.

By seeking confirmation that it may recover "the value of profits and market share lost as a direct consequence of defendants' breach of ¶ IV.C.2,"[11] Alaska Rent-A-Car intended only to distinguish between past and future damages—it used "lost profits" as a shorthand for past damages and referenced "lost market share" as a metric of what its future damages will be.[12] The court need not weigh in on the appropriateness of that usage, however, because Alaska Rent-A-Car recognizes that lost market share is necessarily recoverable only as an element of a lost-profits calculation,[13] and will not seek a duplicative recovery.

**B.    The Court Correctly Determined That Defendants Breached ¶ IV.C.2 in Total By Allowing Budget to Use The Avis System's "Sales, Marketing and Reservation Activities, Operations and Personnel."**

Defendants' more substantive (and radical) objection to Alaska Rent-A-Car's motion is based on the contention that the court conclusively determined that ¶ IV.C.2 had been breached only in part. While conceding that Alaska Rent-A-Car is entitled to compensatory damages, defendants attempt to limit the scope of the damages that Alaska Rent-A-Car may recover by arguing that the court held that defendants violated only one of the several prohibitions set out in ¶ IV.C.2—the specific prohibition on "employment of the 'same personnel' to sell and market

---

[9]    *Id.* at 7 (quotation marks omitted).

[10]    *Id.*

[11]    Memorandum at 16.

[12]    This should have been apparent to defendants from the text of the reports submitted by Alaska Rent-A-Car's expert witnesses, which discussed these categories of damages at length.

[13]    *See, e.g.*, Patrick L. Anderson, Anderson Economic Group, Valuation and Damages Analysis of Alaska Rent-A-Car, Inc., at 83 (October 20, 2006) (noting that future lost profits can be established by reference to eroded market share); *id.* at D-8 (presenting such a calculation).

for both brands."[14] This argument is based on a misreading of the court's opinion, and demonstrates a profound (and perhaps wishful) misunderstanding of the Agency Settlement Agreement.

>    **1.    The Court Correctly Found, By Addressing § IV.B  and ¶ IV.C.2 In Detail, That Defendants Breached ¶ IV.C.2 In Full.**

To resolve Alaska Rent-A-Car's second cause of action, the court analyzed two provisions of the Agency Settlement Agreement in some detail.  First, it confirmed that, while § IV.B of agreement entitles defendants to acquire a Budget-like "additional company" and to provide some "similar or like services" to the both Avis and the additional company, it also <u>mandates</u> that the "management and operations" of the additional company must be kept "wholly separate and independent" from Avis's, and that Avis may not "particpat[e]" in the provision of any services to the additional company:

> The Licensees acknowledge that <u>the Parent has the right to Acquire an Additional Company</u> **<u>so long as the management and operations of the Additional Company are wholly separate and independent</u>** from the management and operations of the Avis Parties, the Car Rental Business and the Licensee Car Rental Business. . . . <u>The provision of similar or like services to the Avis Parties and an Additional Company shall not be deemed to contravene the separateness and independence of the Additional Company</u> **<u>so long as such services are equivalent and independent of the Avis Parties' or the Additional Company's participation</u>**.[15]

Second, the court also addressed ¶ IV.C.2.[16]   Paragraph IV.C.2 more specifically precludes defendants from using the "[1] sales, marketing and reservation activities,

---

[14]      Opposition at 7 (characterizing ¶ IV.C.2 of the Agency Settlement Agreement).

[15]      Agency Settlement Agreement, § IV.B (emphasis added).

[16]      Opinion at 31.  The court did not discuss ¶ IV.C.1, which by its own terms applies only to the "Avis Parties," on the basis of its conclusion that the creation of CCRG was not a "means of avoiding the restrictions of the Agency Settlement" and that there is a "complete lack of any evidence that CCRG acts as the agent of the 'Avis Parties.'"  *Id.* at 29.

Alaska Rent-A-Car has already noted its disagreement with the court on the first point, *see* Memorandum at 3-4, and it continues to believe that ¶ IV.C.1 of Agency Settlement plainly presumed that Avis would continue to have "sales, marketing and reservation activities, operations, and personnel" *of its own*, such that the wholesale outsourcing of those functions to CCRG (done for the express purpose of enabling Budget to have access to them as well) itself violated the agreement.  *See also* n.20, below.

[2] operations and [3] personnel of and for the Avis System" to "market, provide, and/or make available car rental services" outside of the Avis System, and requires "such . . . activities, operations and personnel" to exercise their "best efforts" for Avis:

> C. Should the Parent Acquire an Additional Company, the Parent and the Avis Parties agree that: . . .
>
> 2.    **the sales, marketing and reservation activities, operations and personnel** of and **for the Avis System will not be utilized** to market, provide and/or make available car rental services other than those provided within the Avis System **and** such sales, marketing and reservation activities, operations and personnel **will exercise their best efforts to promote the Avis System**[.][17]

---

But it now also bears mentioning, respectfully, that the court's second observation was incorrect. Avis's Cost Sharing Services Agreement *expressly* appoints Cendant and CCRG to serve as Avis's agent "for the limited purpose of contracting and negotiating with . . . third parties necessary or desirable" for defendants to provide, among other things, "commercial sales, pricing, revenue management, marketing and promotions":

> Avis hereby appoints Cendant and [CCRG], individually, as Avis' agent for the limited purpose of contracting and negotiating with those third parties necessary or desirable for the provision of its Services to Avis and, subject to the terms of this Agreement, executing contracts with such third parties on Avis' behalf.

Cost Sharing Services Agreement at § 7(a) *Delegation and Assignment* (emphasis added). *See also* Exhibit A to *id. Services* at § 21:

> The following services constitute the Services which Cendant or [CCRG] currently provides, or will provide, to Avis . . .
>
> 21.    COMMERCIAL SALES, PRICING, REVENUE MANAGEMENT, MARKETING AND PROMOTIONS.
>
> [CCRG] will establish its overall commercial sales and pricing strategies including for, among other things, corporate and other commercial accounts, associations, tours, conventions, groups, referred suppliers and mini-leases. . . . [CCRG] will also provide Avis with all needed guidance for Avis' compliance with said strategies. . . .
>
> [CCRG] will also establish its overall strategy for the marketing and promotion of Avis and will provide, create and, as appropriate, procure[] advertising and marketing materials, media buying and placement, market research and outside advertizing agency services.   [CCRG] will also provide management and administrative support for Avis' preferred partner marketing alliances. In addition, Cendant will provide event marketing services for special events that Avis conducts, or in which Cendant participates, which include participation by Avis.

(emphasis added).  *Cf.* Opinion at 7 (discussing this provision and noting that defendants have entered into a similar agreement with Budget).

[17]    Agency Settlement Agreement at ¶ IV.C.2 (emphasis added).

2.    **The Court Correctly Found That ¶ IV.C.2 Is a "More Specific Provision" that Controls, and Is Not Limited By The "Exception" Set Out in § IV.B.**

Applying § IV.B and ¶ IV.C.2 to this case, the court found that a rational trier of fact could conclude that the "management and operations" of Budget have not been kept "wholly separate and independent" from Avis's, such that the first sentence of § IV.B and ¶ IV.C.2 could have been breached,[18] but that the "broad proscriptions" set out in first sentence of § IV.B and ¶ IV.C.2 must be tested against the "exception[]" set out in the last sentence of § IV.B.[19] Turning to the exception, the court then ruled that § IV.B had not been breached because the "unified services" that defendants provide to Avis and Budget "are equivalent and performed independently of . . . Avis":

> The Court agrees with [Alaska Rent-A-Car] that by looking to the first sentence of § IV.B. ("so long as the management and operations of the Additional Company are wholly separate and independent") and ¶ IV.C.2 in isolation, <u>a rational trier of fact could find that the operations of CCRG violated those provisions.</u> However, the Court must look at the agreement as a whole, giving effect to all of its terms. . . .
>
> The last sentence of § IV.B. permits Cendant and CCRG to provide "similar or like services to the Avis Parties and an Additional Company * * * so long as such services are equivalent and independent of the Avis Parties' or the Additional Company's participation." <u>All the unified services provided by CCRG and Cendant, which are provided to both Avis and Budget and are equivalent and performed independently of the Avis parties and Budget, fall within that exception. Thus, there is no breach of the provisions of § IV.B.</u>[20]

---

[18]    *See* Opinion at 30.

[19]    *Id.* at 30.  The court also discussed the exception set out in § V.D, which permits the defendants "to utilitze consolidated or collocated reservation facilities, so long as any reservation activities and operations employ separate personnel and telephone numbers for the respective activities and operations and no cross-selling occurs."  *Id.* at 31.

[20]    *Id.* at 30-31 (footnote omitted and emphasis added).  Alaska Rent-A-Car continues to disagree with the court's apparent determination that "[a]ll of the unified services provided by Cendant and CCRG" have been provided "independent of [Avis's] participation." *Id.;* Agency Settlement Agreement at § IV.B.  As the court itself recognized, many of the services that defendants now provide originated with Avis and are now available to Budget only because Avis was complicit in defendants' plan to transfer most of Avis's functions and capabilities to CCRG.

*See, e.g.*, *id.* at 7 (defendants now establish Avis's "overall strategies for commercial sales, pricing, marketing and promotions"); *id.* at 10 ("essentially the entire senior management team of ARACS was transferred to CCRG, performing for CCRG the tasks they had performed for ARACS"); *id.* at 12 ("Essentially the entire computer technology and systems previously utilized in the Avis operation were adopted or adapted for use in connection with Budget

The court earlier noted that the "unified services" defendants provide are the "departments and operations [of Avis and Budget] that have been, or are intended to be, consolidated in CCRG," including "sales and marketing":

> Since acquiring Budget, CCRG jointly manages and operates both the Avis and Budget brands. Numerous departments and operations have been, or are intended to be, consolidated in CCRG, including: yield management, sales and marketing, price setting analysis, fleet management, vehicle acquisition, revenue, business systems, data storage, insurance and risk management, human resources, training, finance/audit/ accounting, vehicle repair and maintenance, and information technology.[21]

Though it found that the existence of the "same or like services" exception precluded a finding that defendants had breached § IV.B, the court noted that its "inquiry does not stop there."[22] It recognized that ¶ IV.C.2 is a "more specific provision" and that, although the provision of unified services such as "sales and marketing" did not violate § IV.B.,[23] ¶ IV.C.2 "controls as to sales, marketing, and reservation activities."[24] Further, because ¶ IV.C.2 also expressly prohibits use of "personnel of and for the Avis System . . . to market, provide and/or make available car rental services other than those provided within the Avis System"[25] — and "evidence in the record clearly and unequivocally establishes that the same CCRG personnel sell and market both Avis and Budget"[26] — the court held that a rational trier of fact "could only find" that defendants breached the provisions of ¶ IV.C.2:

> Paragraph IV.C.2. is a more specific provision; therefore, it, not § IV.B., controls as to sales, marketing and reservation activities. Paragraph IV.C.2.

---

operations, including the 'Wizard' System. CCRG has also adopted the previous Avis audit system and Licensee Composite system for use in both the Avis and Budget operations.").

Provision to Budget of services that were once owned and administered solely by Avis defeats the purpose of § IV.B and cannot be fairly considered to be provision "independent of [Avis's] participation." Agency Settlement Agreement at § IV.B. Alaska Rent-A-Car may seek reconsideration of this point and expressly reserves its right to pursue the issue on appeal.

[21] Opinion at 10; *see also id.* at 30 n.51 (defining "unified services" by reference to the underlined list).

[22] *Id.* at 31.

[23] *See Id.* at 30, 30 n.51. *But see* n. 15, above.

[24] Opinion at 31.

[25] Agency Settlement Agreement at ¶ IV.C.2.

[26] Opinion at 31.

---

> prohibits the use of the same personnel for selling, marketing or making reservations for both Avis and Budget. . . .
>
> The evidence in the record clearly and unequivocally establishes that the same CCRG personnel sell and market both Avis and Budget brands. <u>Based on that evidence a rational trier of fact could only find that in so doing CCRG has breached the provisions of ¶ IV.C.2.</u> RAC is entitled to summary judgment in its favor on Count II of the First Amended Complaint as against CCRG as to liability.[27]

Critically, the court concluded that the "similar or like services" exception set out in § IV.B is a general provision that has no limiting effect on ¶ IV.C.2.[28]   Defendants' unification of Avis and Budget's "sales and marketing" operations therefore necessarily violates the plain language of the more-specific prohibitions set out in ¶ IV.C.2, which the court determined to be operative.[29]   Further, the court's resolution of the interplay between the last sentence of § IV.B and ¶ IV.C.2 makes clear that the court's discussion of "CCRG personnel" served merely as a ready and convenient means of conclusively establishing the defendants' liability.   Indeed, the court's use of the plural word "provisions" in its ultimate holding confirms that the ruling is plainly *not* limited to a single portion of ¶ IV.C.2, and that the court recognized and understood that defendants' "use of the same CCRG personnel to sell and market both Avis and Budget" breaches *at least two* of the prohibitions set out in ¶ IV.C.2.  (If not "operations," at least ¶ IV.C.2's separate bans on comingling the Avis System's [1] "sales, marketing, and reservation activities" and [2] "personnel" with those of another company's.[30])

In short, defendants' insistence that the court "did not find that CCRG violated ¶ IV.C.2 in any way other than its employment of the 'same personnel'"[31] is demonstrably wrong.  The

---

[27]    *Id.* at 29.  *Cf.* First Amended Complaint at ¶ 83 ("Defendants' . . . operation of Budget and Avis jointly, having joint personnel and management, reservation systems, marketing, [and] use of technology, all constitute breaches of contract.")

[28]    *See id.* at 30-31 ("[T]he Court must examine the effect of [the] provisions that create exceptions to the broad proscriptions of the first sentence of § IV.B and ¶ IV.C.2 [i.e., the last sentence of § IV.B and § V.D]. . . .   Paragraph IV.C.2 is a more specific provision [and] controls[.]").

[29]    *See id.* at 30-31, 30 n.51.

[30]    *Id. Cf.* Agency Settlement Agreement at ¶ IV.C.2 ("the <u>sales, marketing and reservation activities</u>, <u>operations</u> and <u>personnel</u> of and for the Avis System <u>will not be utilized to market, provide and/or make available car rental services other than those provided within the Avis System</u>") (emphasis added).

[31]    Opposition at 7.

court's discussion of the defendants' most obviously impermissible use of CCRG employees merely established defendants' liability—it did not define its outer bounds.

**C.    Alaska Rent-A-Car Is Entitled To Recover For The Full Extent To Which The "Sales, Marketing And Reservation Activities," "Operations" And "Personnel" Of And For The Avis System Have Been And Currently Are Being Used By Budget To "Market, Provide And/Or Make Available Car-Rental Services."**

Defendants' view of the court's ruling appears also to reveal the defendants' profound misunderstanding of the Agency Settlement Agreement.

The drafters of the Agency Settlement Agreement took pains to make clear that the scenario in which defendants could properly acquire a Budget-like additional company was a strictly limited one: defendants could permissibly acquire an additional rental-car company <u>only</u> if the additional company did not compromise Avis's independence.  The parties expressed that understanding through the requirement that the "management and operation" of Avis and the additional company be kept "wholly separate and independent,"[32] and the three codified exceptions to the near-absolute separation required by the Agreement prove the rule: the agreement relaxes its separation requirements <u>only</u>:

- to allow defendants to reap the cost-savings of co-locating Avis and the additional company's reservation personnel in the same building; but it takes care to emphasize that defendants cannot realize additional savings by allowing Avis and an additional company's "reservation activities and operations" to be conducted by the same personnel,[33]

- to permit some individuals to serve simultaneously as a director of Avis and an additional company; but the Agreement expressly prohibits any person with direct knowledge of either company's day-to-day affairs from doing so by barring all "officer[s], consultant[s], [and] employee[s]" from engaging in the practice,[34]

and

---

[32]    Agency Settlement Agreement at § IV.B.

[33]    *Id.* at § V.D ("Sections IV.C.1. and IV.C.2. shall not prejudice the ability of the Parent to utilize consolidated or collocated reservation facilities to make reservations for both the Avis System and any Additional Company, <u>so long as any reservation activities and operations employ separate personnel and telephone numbers for the respective activities and operations and no cross-selling occurs.</u>" (emphasis added)).

[34]    *Id.* at § IV.B ("The election or appointment of an individual to serve as a director of the Avis Parties and an Additional Company shall not be deemed to contravene the separateness and independence of the Additional Company so long as such individual is not an officer, consultant or employee of the Additional Company or any of the Avis Parties.").

- to permit the provision of "like or similar services"[35] to the both companies, so long as the services are independent of either company's involvement; but the Agreement then affirmatively and more specifically prohibits Avis's "sales, marketing and reservations activities, operations and personnel" from being used by the additional company to "market, provide and/or make available car rental services."[36]

Defendants assertion that they violated only ¶ IV.C.2's single prohibition on "employment of the 'same personnel' to sell and market for both brands"[37] consequently not only fails to make sense of the court's ruling, but also ignores the overarching principle that defendants cannot materially compromise the independence of Avis—through the provision of "similar or like services" or by any other means—without violating the Agency Settlement Agreement.[38]  The Agreement was intended to allow Avis's conglomerate parent to expand its corporate holdings, not to strip Avis of its ability to independently self-govern.

Understanding that principle, and in accordance with the court's ruling, Alaska Rent-A-Car sought to confirm that it may present evidence to establish that defendants improperly:

- consolidated and coordinated the sales, marketing and reservation activities of and for the Avis System with Budget's sales and marketing reservation activities, reducing product differentiation and resulting in less aggressive promotion of Avis, as well as improved and lower-priced Budget products,

- provided the Avis System's reservation system, and other back-office operational systems, to Budget, rapidly improving the quality of Budget and its licensees while simultaneously eliminating the need for Budget to independently develop or acquire comparable systems,[39] and

- continue to dedicate the same sales, marketing, reservation, and management personnel to promote and provide services to both the Avis and Budget Systems,

---

[35]    *Id.* at § IV.B.

[36]    *Id.* at ¶ IV.C.2.  *See also* Opinion at 30-31.

[37]    *Cf.* Opposition at 7 (characterizing ¶ IV.C.2 of the Agency Settlement Agreement).

[38]    Defendants are themselves capable of paying lip service to the point, though appear to honor it only in the breach. *See, e.g.*, Cost Sharing Services Agreement at § 4 (characterizing the services provided by defendants to Avis, without expressly acknowledging that they largely eliminate Avis's ability to self-govern, as intended only to meet Avis's "management support and administrative need[s]").

[39]    These requests are phrased in recognition of the fact that not all of the "unified services" provided to Avis are prohibited by ¶ IV.C.2.  Low-level "accounting" or "information technology" support, for instance, are not directly used to "market, provide, and/or make available car rental services," and consequently appear to fall outside of ¶ IV.C.2's ambit.

resulting in a loss of focus and ensuring that "best efforts" are not exercised to promote the Avis System.[40]

Each of these areas of conduct violates the Agency Settlement Agreement and remains a valid basis for an award of damages.

## II.    ALASKA RENT-A-CAR IS ENTITLED TO RECOVER THE INDEPENDENT VALUE OF THE CONTRACTUAL PROHIBITIONS SET OUT IN ¶ IV.C.2 WHICH DEFENDANTS, THROUGH THEIR ACTIONS, ELIMINATED.

To complete its compensatory damages case, Alaska Rent-A-Car noted that ¶ IV.C.2 had an independent value—"much as a prohibition in a noncompete agreement has value"—that Alaska Rent-A-Car is entitled to recover.[41]  It noted that the level of cost savings that defendants reaped as a result of their breach is probative of the provision's lost value, and properly may be explored at trial.[42]

Defendants object to this aspect of Alaska Rent-A-Car's compensatory damages case by arguing (a) that ¶ IV.C.2 had no value beyond what can be measured in lost profits,[43] and (b) that its cost savings "do not equate" to any loss experienced by Alaska Rent-A-Car.[44]  Both points are incorrect.  New York courts have long recognized that contractual provisions may possess a value independent of any lost-profits measures that plaintiffs are entitled to recover.[45]

The point arises most frequently in cases (not unlike this one) involving skimped or incomplete contractual performance.  *American Standard, Inc. v. Schectman*,[46] for instance, involved the owners of a pig-iron manufacturing plant who, after deciding to close the plant,

---

[40]    Memorandum at 19. *Cf.* Agency Settlement Agreement at ¶ IV.C.2 ("the <u>sales, marketing and reservation activities</u>, <u>operations</u> and <u>personnel of and for the Avis System</u> <u>will not be utilized to market, provide and/or make available car rental services other than those provided within the Avis System</u>") (emphasis added).

[41]    Memorandum at 18.

[42]    *Id.*

[43]    *See* Opposition at 9 (asserting that "[t]he lost economic value of the contract prohibition is . . . the actual damage incurred by RAC as a result of the breach" and that "[s]uch damages would be [only] the net dollars in profit, if any, RAC lost due to the fact of 'the same employees'").

[44]    *Id.*

[45]    Alaska Rent-A-Car's presentation here follows the court's indicated belief that the Agency Settlement Agreement is governed by New York law.  *See* Opinion at 15, 22. Defendants' reliance on and discussion of Alaska law is misplaced.

[46]    439 N.Y.S.2d 529 (N.Y. App. Div. 1981).

entered into an agreement with a demolition and excavating contractor.[47]  Under the terms of the agreement, the contractor took on duties to remove certain buildings and to "grade" the plant owner's land—it agreed to "remove all foundations, piers, headwalls, and other structures, including those under the surface and not visible . . . to a depth of approximately one foot below . . . specified grade lines."[48]

The contractor successfully removed the buildings, but ultimately breached the parties' agreement by refusing to complete the grading.[49]  Notwithstanding its clear breach, the contractor argued that the plant owners were entitled to no recovery because the breach caused no appreciable diminution in the market value of the plant owners' land, and the plant owners, in fact, succeeded in selling their land for very close to its appraised market value.[50]

The court rejected the argument.  It held that in cases where a contractor's performance is "defective or incomplete," an aggrieved party is entitled to recover a measure of damages equal to the "cost of completion"— *regardless* of whether the performance has any marketable value to the non-defaulting party:

> The general rule of damages for breach of a construction contract is that the injured party may recover those damages which are the direct, natural and immediate  consequence of the breach. . . .  In the usual case where the

---

[47]     *See id.* at 531:

> Until 1972, plaintiffs operated a pig iron manufacturing plant on land abutting the Niagara River in Tonawanda. On the 26-acre parcel were, in addition to various industrial and office buildings, a 60-ton blast furnace, large lifts, hoists and other equipment for transporting and storing ore, railroad tracks, cranes, diesel locomotives and sundry implements and devices used in the business. Since the 1870's plaintiffs' property, under several different owners, had been the site of various industrial operations. Having decided to close the plant, plaintiffs on August 3, 1973 made a contract in which they agreed to convey the buildings and other structures and most of the equipment to defendant, a demolition and excavating contractor, in return for defendant's payment of $275,000 and his promise to remove the equipment, demolish the structures and grade the property as specified.

[48]     *Id.*

[49]     *Id.* at 530.

[50]     *See id.* at 531 (noting that the contractor argued that the trial court "erred in rejecting his proof that plaintiffs suffered no loss by reason of the breach because it makes no difference in the value of the property whether the old foundations are at grade or one foot below grade and in denying his offer to show that plaintiffs succeeded in selling the property for $183,000—only $3,000 less than its full fair market value").

contractor's performance has been defective or incomplete, <u>the reasonable cost of replacement or completion is the measure.</u>

. . .

>    In the case before us, plaintiffs chose to accept as part of the consideration for the promised conveyance of their valuable plant and machines to defendant his agreement to grade the property as specified and to remove the foundations, piers and other structures to a depth of one foot below grade to prepare the property for sale. . . . <u>That the fulfillment of defendant's promise would (contrary to plaintiffs' apparent expectations) add little or nothing to the sale value of the property does not excuse the default.</u>

. . .

>    <u>Defendant's completed performance would not have involved undoing what in good faith was done improperly but only doing what was promised and left undone.</u> That the burdens of performance were heavier than anticipated and the cost of completion disproportionate to the end to be obtained does not, without more, alter the rule that <u>the measure of plaintiffs' damage is the cost of completion.</u>[51]

In other cases, New York courts have referred to this measure of damages as the "cost to cure":

>    As to liability, the court previously determined that the defendant deliberately departed from the contract plans and specifications, and hence <u>the more onerous cost-to-cure measure of damages was deemed appropriate</u>. The defendant may not now avoid the consequences of his deliberate failure to comply with the contract terms merely because it would be expensive to properly cure his breach.[52]

    In this case, Alaska Rent-A-Car similarly contracted for defendants to keep certain aspects of Avis and Budget separate, and for certain functions to be carried out by separate Avis personnel.[53] Defendants agreed to the arrangement, but have since improperly comingled many of Avis and Budget's functions, and now impermissibly allow the same personnel to promote, market, and provide car-rental services to both Avis and Budget.[54]  Beyond its entitlement to recovery for lost profits and market share, Alaska Rent-A-Car is entitled to recover damages for the value of ¶ IV.C.2 that defendants through their "defective performance" eliminated—whether or not corrected performance would have any marketable value to Alaska Rent-A-Car.[55]  A New York court would measure that lost value by ascertaining what it would cost the defendants to

---

[51]    *Id.* at 532-33.

[52]    *Kaiser v. Fishman*, 590 N.Y.S.2d 230, 233 (N.Y. App. Div. 1992) (citation omitted).

[53]    *See* Agency Settlement Agreement at ¶ IV.C.2.

[54]    *See* Opinion at 31.

[55]    *Cf. American Standard*, 439 N.Y.S.2d at 532.

cure their breach—and evidence of the cost savings that defendants are improperly reaping as a result of their defective performance is directly probative of that amount. Otherwise, defendants reap an unwarranted windfall.

### III.    IF PAYMENT OF COMPENSATORY DAMAGES FAILS TO RENDER DEFENDANTS' OPPORTUNISTIC BREACH UNPROFITABLE, ALASKA RENT-A-CAR IS ENTITLED TO DISGORGEMENT OF A SHARE OF THE DEFENDANTS' UNJUSTLY OBTAINED PROFITS.

Recognizing that its two-part damages case cannot provide it with fully compensatory relief (because no award of damages will enable Alaska Rent-A-Car to cure defendants' defective performance), Alaska Rent-A-Car also requested equitable relief.[56] If an award of compensatory damages fails to render the defendants' opportunistic breach unprofitable, Alaska Rent-A-Car noted that it is entitled to require disgorgement of a share of the cost savings that the defendants unjustly reaped.[57] Defendants object and assert that Alaska Rent-A-Car is not entitled to pursue this kind of equitable recovery because it (a) differs from the forms of equitable relief that Alaska Rent-A-Car previously requested,[58] and (b) is not a valid contract remedy.[59] Neither is true.

### A.    New York Law Recognizes Disgorgement of Profits As An Equitable Remedy and Alaska Rent-A-Car Prayed For Equitable Relief.

Defendants' first objection is easily discharged. Alaska Rent-A-Car unambiguously invoked this court's equitable powers when it filed this lawsuit now more than five years ago,[60] and it again prayed for equitable relief when it filed its amended complaint.[61]

New York law[62] recognizes that disgorgement is "an equitable remedy distinct from restitution"[63] and that a court, as "[a]n exercise of its equity powers," may "order wrongdoers to disgorge their fraudulently obtained profits."[64]

---

[56]    *See, e.g.*, Memorandum at 14-15.

[57]    *See id*. at 7-15.

[58]    *See* Opposition at 5 ("RAC did not seek the value of any cost savings by CCRG in its damages motion [and] should not be permitted to advance such new theories now").

[59]    *See id.* at 4, ,9, 10.

[60]    *See* Complaint, filed Jan. 1 2003.

[61]    *See* First Amended Complaint, April 5, 2004 at 69-70 ("Plaintiff requests . . . permanent injunctive relief . . . [and] such other relief as the court finds just and equitable.")

[62]    Here again, Alaska Rent-A-Car has tailored this discussion to the court's indicated belief that the Agency Settlement Agreement is governed by New York law. See Opinion at 15-16, 16 n.28. *Cf.* n.45, above.

Defendants' assertion that Alaska Rent-A-Car should nevertheless not now be allowed to pursue an equitable disgorgement remedy because Alaska Rent-A-Car "did not seek the value of any cost savings by CCRG in its damages motion"[65] ignores Alaska Rent-A-Car's entirely valid prayer for relief, and is more than a little odd given defendants' own earlier insistence that Alaska Rent-A-Car's recovery for breach of the Agency Settlement Agreement should be limited to the relief specified in § IV.D.3 of the Agreement—a provision that expressly permits an aggrieved party to "participate in any cost savings . . . that may be achieved through [defendants'] sharing or consolidation of resources."[66]

More fundamentally, the objection also misunderstands the purpose of the Alaska Rent-A-Car's damages motion.  The purpose of the motion was not to enumerate all forms of relief

---

[63]    *People, ex rel. Spitzer v. Applied Card Systems, Inc.*, __ N.E.2d __, 2008 WL 2519797 at *12 (N.Y. June 26, 2008); *see also id.* at n.17 (noting that the Attorney General sought "disgorgement as an alternative measure of relief").

[64]    *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) (applying the principle in an action brought under federal securities law).

[65]    Opposition at 5.

[66]    *See* Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment Or, Alternatively, For An Order Limiting the Issues for Trial at 21-23 [Docket 181] (arguing that Alaska Rent-A-Car's remedies should be limited to those set out in § IV.D.3).  *See also* Agency Settlement Agreement at § IV.D.3:

> D. Should the Parent Acquire an Additional Company that ceases at any time to be separate or independent from the Avis Parties, the Car Rental Business and/or the Licensee Car Rental Business, then in addition to the provisions and obligations set forth in Section IV.C. above, the Parent and the Avis parties further agree that: . . .
>
> 3.    With regard to each Conflicting Location as to which an Affected Licensee either cannot be offered a right of first refusal under Section IV.D.2. above with regard to a Franchise, or if the Affected Licensee chooses not to exercise such right, the Parent shall offer and the Affected Licensee can accept or decline:
>
> a.    an arrangement whereby the Affected Licensee will have the opportunity to participate in any cost savings with the Additional Company that may be achieved through a sharing or consolidation of resources, including vehicle fleet, on mutually agreeable terms and conditions to the extent such an arrangement is commercially feasible[.]

(Emphasis added.)  *But cf.* Opinion at 31 (holding that § IV.D has not been triggered).

that Alaska Rent-A-Car might be entitled to pursue,[67] but to establish Alaska Rent-A-Car's affirmative entitlement to certain forms of relief so that the parties could dispense with unnecessary argument about remedies that Alaska Rent-A-Car was less interested in pursuing; it was an attempt to limit the scope of this litigation.[68] As defendants themselves noted, Alaska Rent-A-Car could not have sought to establish the full scope of relief that it is entitled to receive before the court issued its summary judgment ruling.[69]

Alaska Rent-A-Car's damages motion was not its single opportunity to request relief, and Alaska Rent-A-Car's present request for equitable relief is timely, based on, and well supported by its pleadings.

> **B.    Equity Affords Protection And Relief From A Contractual Party's Opportunistic Behavior By Requiring the Disgorgement of Unjustly Obtained Profits.**

Defendants' substantive objection to Alaska Rent-A-Car's request for equitable relief is that disgorgement is not a valid contract remedy.[70] Although tacitly admitting that Alaska Rent-A-Car's right to recovery is supported by § 39 of the draft Restatement (Third) of Restitution and Unjust Enrichment, defendants assert that disgorgement of cost savings in a contractual setting is either (1) not established,[71] or (2) affirmatively at odds with current law.[72] Neither is true.

> **1.    Section 39 of the Restatement Codifies Existing Law.**

---

[67]    *See, e.g.*, Motion and Memorandum in Support of Motion for Summary Judgment on Permanent Injunctive Relief and Specific Performance at 37, 48 (separately requesting equitable injunctive relief and seeking specific performance of the Agency Settlement Agreement).

[68]    *See, e.g.*, Reply to Defendants' Opposition to Motion for Summary Judgment for Damages at 1, n.1 [Docket 266] ("Alaska Rent-A-Car realizes that a finding of liability and causation are necessary prerequisites to an award of damages. The court can nonetheless narrow the scope of litigation by ruling on an appropriate methodology of damage calculation.").

[69]    *See* Defendants' Opposition to Plaintiff's Motions for Summary Judgment for Damages, Permanent Injunctive Relief and Specific Performance at 1 (arguing that the motions were "premature" because Alaska Rent-A-Car had not yet demonstrated its entitlement to summary judgment).

[70]    *See* Opposition at 11.

[71]    *See id.* at 6.

[72]    *Id.* at 2, 9, 11.

Defendants first attempt to dismissively characterize "the concept of opportunistic breach" set out in draft § 39 of the Restatement[73] as nothing more than a "flight of academic fancy."[74] The objection ignores both the text and purpose of the Restatement provision and is meritless.

Restatements of the Law do not suggest unprecedented revisions to American jurisprudence; they collect and make sense of existing cases in order to, among other things, "clarif[y] and simplif[y] the law" and "secure the better administration of justice."[75]  Legal principles presented in a Restatement may be newly distilled, but they are always amply supported by citations to past judicial decisions and are never entirely "new."[76]

The Restatement provision most discussed by Alaska Rent-A-Car follows this pattern. Section 39 of the latest draft of the Restatement (Third) of Restitution and Unjust Enrichment is innovative only in that it has identified the general, underlying rule of law that makes sense of existing decisions; its illustrations "are all based on real cases," and, as the Reporter who drafted the section recently confirmed, are not merely "recommendations for how . . . life ought to be organized":

> [Section] 39 on restitution for opportunistic breach of contract is something of an innovation. The innovation consists in the attempt to state a general rule; <u>it is not an attempt to dictate outcomes that have never been thought of before. The Illustrations are all based on real cases; they are not recommendations for how we think life ought to be organized.</u>[77]

---

[73]    *See* Restatement (Third) of Restitution and Unjust Enrichment § 39 *Profit Derived From Opportunistic Breach* (T.D. No. 4, 2005).

[74]    Opposition at 6 (quotation marks omitted).

[75]    *See, e.g.*, American Law Institute *Welcome to ALI*, available at http://www.ali.org/:

> Founded in 1923, ALI has a membership consisting of judges, practicing lawyers, and legal scholars from all areas of the United States as well as some foreign countries, selected on the basis of professional achievement and demonstrated interest in the improvement of the law.
>
> ALI, through a careful and deliberative process, drafts and then publishes various Restatements of the Law, model codes, and legal studies to promote the clarification and simplification of the law and its better adaptation to social needs, to secure the better administration of justice, and to encourage and carry on scholarly and scientific legal work.

[76]    *Cf.* Opposition at 2 (accusing Alaska Rent-A-Car of "seeking to create new law").

[77]    The American Law Institute Annual Proceedings, 82 Annual Meeting: 2005 Proceedings *Discussion of Restatement of the Third, Restitution and Unjust Enrichment*, 2005 A.L.I. Proceedings 249 (comments of the Reporter). *Cf.* Restatement § 39 cmt. d. ("Traditional

The accuracy of the Reporter's statement is borne out by the numerous citations to case law set out in the text of § 39 itself.[78]

> ### 2.    The Rule Now Codified In § 39 Can Be Applied To The Agency Settlement Agreement and Is Not Inconsistent With the Principle of "Efficient Breach."

Defendants also suggest that the equitable relief requested by Alaska Rent-A-Car cannot be awarded in this case because rule now codified in § 39 conflicts with both (a) Alaska law,[79] and (b) the widely discussed notion of "efficient" breach.[80]   The first point is largely irrelevant, and neither is true.

> ### a.    The Rule Codified In Section 39 Can Be Applied to Defendants' Breach of the Agency Settlement Agreement.

Because the court indicated that interpretation and application of the Agency Settlement Agreement is governed by New York law,[81] the relevant question is not whether the rule described in § 39 is compatible with Alaska law, but New York's[82]— and § 39's compatibility with New York law is relatively easy to demonstrate.

---

contract law contains no rule identifying the cases in which disgorgement is an appropriate remedy for breach. Particular instances have traditionally been explained by reference to special features of the transactions in question, without resort to any more general theory.").

[78]    *See generally* RESTATEMENT § 39 at Reporter's note (collecting numerous citations).

[79]    *See* Opposition at 4.

[80]    *See id.* at 11.

[81]    *See* Opinion at 15-16 & 16 n.28 ("As a multi-state agreement, to prevent the possibility of inconsistent interpretations the law of a single state must be applied. New York is the only state having a common nexus to the agreements of all the parties. It was the domicile of the licensor and the venue of the lawsuit that the agreement settled.").

[82]    That being said, it should not go unmentioned that § 39 is entirely compatible with Alaska law as well.  Defendants' assertion to the contrary is based solely on citations to *Gildersleeve Logging Co. v. Northern Timber Corp.*, 670 P.2d 372 (Alaska 1983).  *See* Opposition at 4, 11.  In *Gildersleeve*, the Alaska Supreme Court confirmed that the primary aim of a contract damages remedy is to "put the injured party in as good a position as that party would have been [in] had the contract been performed," 670 P.2d at 377 (citation omitted), and noted that an award of compensatory damages on the facts of the case would be sufficient to give the non-breaching party the "benefit of its bargain." *Id.* at 381.  The court then further held that where an award of damages calculated by either of two methods will fully compensate the non-breading party, "the method which is least expensive to the wrongdoer should be adopted." *Id.*

Even if Alaska law applied to the Agency Settlement Agreement, *Gildersleeve* would have virtually no impact on Alaska Rent-A-Car's request for equitable relief because the holding

Section 39 is in good measure *derived* from New York law: it draws heavily on reported decisions from New York, and uses the facts and outcomes of at least three New York cases to illustrate how the rule it codifies should be correctly applied.[83]  To be sure, none of the decisions from New York cited in § 39 use the term "opportunistic breach," but they confirm that New York courts have long been willing to respond to those breaches that may now be labeled "opportunistic" under § 39 by ordering parties to disgorge unjustly obtained profits.  *See, e.g.*, *Y.J.D. Restaurant Supply Co., Inc. v. Dib*, 98 Misc.2d 462, 464, 413 N.Y.S.2d 835, 836 (N.Y.Sup., 1979) (ordering a defendant to disgorge all profits obtained from the quick sale of a business that defendant opened in violation of a covenant not to compete with plaintiff):

> [T]he plaintiff herein is entitled to recover the full profit made by the defendant on the sale of his competing business, which he opened unlawfully. It is a well established doctrine that equity will not aid any scheme or project which might lead to undeserved profit. . . .
> [T]he defendant herein should not profit from his own misconduct.

(emphasis added).

### b.    Section 39 Is Entirely Compatible With The Theory of "Economic Breach."

Second, defendants also suggest that the court cannot follow the rule described in § 39 because it conflicts with the theory of "economic breach."[84]  This objection, too, is entirely unfounded.

Commentary to § 39 makes clear that the rule does not apply to those "efficient breaches" that have received judicial approval: because a breach may be profitable and "efficient" without

---

in *Gildersleeve* presumed a scenario in which damages would fully compensate the non-breaching party. *Id.* Alaska Rent-A-Car's resort to equity, by contrast, begins with the premise that no award of damages in this case will enable Alaska Rent-A-Car to obtain the benefit of its bargain. *See* Memorandum at 7.  *Gildersleeve* thus has no relevance either to Alaska Rent-A-Car's equitable claim, or to the rule described in § 39.  (Because this court is not presented with two equally compensatory means of calculating damages, *Gildersleeve*, if applicable, would also have no obvious effect on Alaska Rent-A-Car's damages case.)

[83]    *See* RESTATEMENT § 39 at Reporter's Note (noting, for example, that Illustration 5 is based in part on *American Standard, Inc. v. Schectman*, 439 N.Y.S.2d 529 (N.Y. App. Div. 1981); that Illustration 6 is based in part on *Y. J. D. Restaurant Supply Co., Inc. v. Dib*, 98 Misc.2d 462, 464 (N.Y. Sup. 1979); and that Illustration 14 is based in part on *Kaiser v. Fishman*, 590 N.Y.S.2d 230, 233 (N.Y. App. Div. 1992)).

[84]    Opposition at 11.

also being "opportunistic,"[85] by its own terms "[t]he rule of § 39 does not automatically punish an efficient breach with a disgorgement remedy."[86]  Indeed, an illustration included in the commentary to the rule addresses the point specifically.[87]

Further, even the most zealous advocates of the doctrine of efficient-breach theory recognize that the theory has its limits.  The term "opportunistic breach," in fact, was first popularized in the case law by Judge Posner, a leading advocate of the law and economics school:

> Not all breaches of contract are involuntary or otherwise efficient. Some are opportunistic; the promisor wants the benefit of the bargain without bearing the agreed-upon cost, and exploits the inadequacies of purely compensatory remedies[.][88]

---

[85]     RESTATEMENT §39 at Reporter's Note.

[86]     *Id.* at cmt. i.

[87]     See *id.* at illustration 13:

> Seller agrees to manufacture and deliver to Buyer 1000 widgets at $1000 each. Seller's normal cost of production is $250 per widget. Before the date fixed for delivery, problems with Seller's manufacturing equipment increase Seller's cost of production to $350 per widget. Seeking to minimize its own cost of performance, Seller acquires similar widgets from Supplier at $300 each and tenders them to Buyer. Although Seller's conduct is evidently self-interested, it is consistent, under the circumstances, with reasonable commercial standards of fair dealing in the trade (U.C.C. § 2–103(b)). Buyer accepts the goods but notifies Seller that they are nonconforming and sues for breach of warranty. Buyer proves at trial that the goods did not conform to the contract and that each of Supplier's widgets was worth $10 less than a comparable widget manufactured by Seller. Seller's breach of contract is deliberate and profitable (saving $50,000 by comparison with the cost to Seller of making a conforming tender), but it is not opportunistic: on the facts assumed, there is no reason to conclude that Buyer's entitlement will be inadequately protected by an ordinary damage remedy. Buyer is entitled to damages of $10,000 (U.C.C. § 2–714(2)), but Buyer is not entitled to Seller's saved expenditure of $50,000.

(emphasis added). *See also id.* at Reporter's Note (citing POSNER, ECONOMIC ANALYSIS OF Law 118–119 (4th ed. 1992)) (noting that Illustration 13 accounts for the "staple of commentators' accounts of circumstances in which a party's intentional breach of contract should not be regarded as a wrong); *id.* at Illustration 16.

[88]     *Patton v. Mid-Continent Systems, Inc.*, 841 F.2d 742, 751 (7th Cir. 1988) (Posner, J.) (emphasis added).  *See also Tuf Racing Products, Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585 (7th Cir. 2000) (Posner, J.) ("A party can stand on his contract rights; what he cannot do is resort to opportunistic or otherwise improper behavior in an effort to worm his way out of his contractual obligations.").

And Judge Posner, too, has endorsed the imposition of disgorgement remedies in those circumstances where a promisor "take[s] advantage of the vulnerability of the promisee," a fact that other federal courts have taken note of:

> It makes a difference in deciding which remedy to grant whether the breach was opportunistic. If a promisor breaks his promise merely to take advantage of the vulnerability of the promisee in a setting . . . where performance is sequential rather than simultaneous, we might as well throw the book at the promisor. . . . An attractive remedy in such a case is restitution [where] the promisor broke his promise in order to make money—there can be no other reason in the case of such a breach. We can deter this kind of behavior by making it worthless to the promisor, which we do by making him hand over all his profits from the breach to the promisee; no lighter sanction would deter.[89]

### 3.     The Rule Codified in Section 39 Is Substantively Correct.

Last, it is worth mentioning that by objecting to Alaska Rent-A-Car's disgorgement request on the narrow bases that it is either (1) insufficient established,[90] or (2) foreclosed by the limitations of existing precedent,[91] defendants have nowhere denied that the rule now codified in § 39 is substantively desirable as a matter of common law.  Indeed, defendants cannot have made that point persuasively.

Section § 39 of the draft Restatement is the product of intense scholarship and research,[92] and since its publication has been uniformly praised.[93]   It remains "tentative" because the

---

[89]     See, e.g., *American Capital Corp. v. U.S.*, 59 Fed. Cl. 563, 587 (Fed. Cl. 2004) (quoting RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW § 4.8 (5th ed. 1998)) (emphasis added).

[90]     *See* Opposition at 6.

[91]     *Id.* at 2, 9, 11.

[92]     *See* Memorandum at 8-14 (citing a number of leading articles).

[93]     *See, e.g.*, THE AMERICAN LAW INSTITUTE ANNUAL PROCEEDINGS, 82 ANNUAL MEETING: 2005 PROCEEDINGS *Discussion of Restatement of the Third, Restitution and Unjust Enrichment*, 2005 A.L.I. Proceedings 249, 256 (May 16, 2005) (comments of Professor Douglas Laycock of University of Texas) (section 39 is "enormous accomplishment"); *id.* at 257 (comments Justice Rudolph Kass of the Massachusetts Appeals Court) (the section is "admirable"); *id.* at 259 (comments of Professor Candace Saari Kovacic-Fleischer of American University School of Law) ("I would also like to second the other speakers who have complimented [the Reporter] on this Section"); *id.* at 262 (comments of Professor Neil B. Cohen of Brooklyn Law School) ("the Section. . . is well deserving of all the praise that's been thrown your way"); *id.* at 266 (comments of Professor William F. Young of Columbia University) ("Like some others who spoke, I am a warm admirer of this Section").  *See also* James Steven Rogers, *Restitution for*

American Law Institute subjects Restatement provisions to an elaborate process of comment and review,[94] but there is little reason to doubt that the section will ultimately be adopted and finalized in a largely unmodified form.  It is commonly recognized to state a general principle that courts and commentators have long struggled to articulate.[95]

The key point to emphasize at this stage, though, is that the court does not need to wait on ALI to take further action.  Courts have not hesitated to rely on tentative Restatement provisions in the past,[96] and in the absence of any reason to doubt that the rule set out in § 39 is desirable and just, this court should do so as well: "Where grounds calling for the exercise of equitable power to furnish a remedy exist, the court should not hesitate to act."[97]

### C. Defendants Do Not Deny That Their Breach Was Profitable and Opportunistic.

Last, it must also be noted that defendants have not denied that their breach was profitable and opportunistic, but have argued only that equity presently affords neither protection, nor relief from opportunistic behavior in a contractual setting.  The law does not so cynically insulate economically opportunistic wrongful conduct, however.

Defendants have not correctly described the current state of equity jurisprudence,[98] but even if they had, the court would nevertheless be obligated to afford Alaska Rent-A-Car a remedy.  Defendants' deliberate, money-driven opportunism was and is unjust and, if no rules existed to address the situation, the law of New York would require the court to establish new rules:

---

*Wrongs and the Restatement (Third) of the Law of Restitution and Unjust Enrichment*, 42 WAKE FOREST L. REV. 55, 66 (2007) (footnote omitted) ("The substantive approach taken in Section 39 of the proposed restatement has been widely applauded.  That is a view that I share.").

[94]     *See, e.g.*, AMERICAN LAW INSTITUTE *Welcome to ALI*, available at: http://www.ali.org/ (noting that Restatements are published only after "a careful and deliberative process").

[95]     *See, e.g.*, n.93, above.

[96]     *See, e.g*, *Crider v. Zurich Ins. Co.*, 380 U.S. 39, at 50 n.8 (1965) (citing RESTATEMENT (SECOND) CONFLICT OF LAWS, Tentative Draft No. 4, § 117m (1957) (holding that the view expressed in the tentative draft was "significant"); *Morejon v. Rais Const. Co.*, 851 N.E.2d 1143, 1144 (N.Y. 2006) (citing RESTATEMENT (THIRD) OF TORTS: *Liability for Physical Harm* § 17 (Tentative Draft No. 1, Mar. 28, 2001) as authority).

[97]     *McHugh v. Paley*, 63 Misc.2d 1092, 1095 (N.Y.Sup. 1970).

[98]     *See* section III.B, above.

> It is the duty of a court of equity to adapt. . . . It should not, by too strict an adherence to forms and rules established under different circumstances, decline to administer justice and enforce rights for which there is no other remedy.[99]

See also New York and Brooklyn Suburban Inv. Co. of New York v. Leeds, 100 Misc.2d 1079, 1091 (N.Y.Sup. 1979) (quoting 20 N.Y.JUR. EQUITY §§ 79 & 83):

> Equity is to provide a remedy rather than suffer a wrong to be without a remedy. Equity will adapt established rules to any situations and grant relief even though a case is novel and there is no precise precedent for the relief to be granted where grounds causing for the exercise of equitable powers to furnish a remedy exist. When called upon to exercise equitable powers courts of equity are not so incompetent or so powerless as to be unable to cope with the ingenuity of the cunning and the astute, and with the inertia of others. The rules of equity are susceptible of necessary expansion to reach new conditions in order that the court may make an adjudication which good conscience demands.

(emphasis added).[100]

## IV.    ALASKA RENT-A-CAR IS ENTITLED TO SUBMIT UPDATED EXPERT REPORTS AND TO CONDUCT THE LIMITED ADDITIONAL DISCOVERY THAT ITS EXPERTS NEED TO COMPLETE THEIR WORK.

Alaska Rent-A-Car also noted that it will need to conduct limited additional discovery in order for its experts to update their reports in response to the court's ruling.[101]   Defendants do not deny that Alaska Rent-A-Car is entitled to submit revised expert reports, but insist that Alaska Rent-A-Car "should not be permitted to have a 'do-over' of expert discovery."[102]   Alaska Rent-A-Car does not disagree.

Alaska Rent-A-Car is not interested in obtaining a "do over" of discovery, but asks merely to be allowed to conduct the limited discovery that its experts need to update and adjust

---

[99]    McHugh, 63 Misc.2d 1092 at 1095 (quoting 20 N.Y.JUR., EQUITY § 90) (emphasis added).

[100]    Cf. Constitution Realty, LLC v. Oltarsh, 309 A.D.2d 714, 715-716 (N.Y. App. Div. 2003) ("a court of equity may adapt its relief to the exigencies of the case, and, when nothing more is required, may order a sum of money to be paid to the plaintiff, or give him a personal judgment therefor, to be enforced by execution").

[101]    See, e.g., Memorandum at 16-17 n.38. ("The original reports submitted by the expert witnesses addressed the full range of damages available under all of the claims asserted in the plaintiff's complaint.  With the court having dismissed various claims, a revised report is required to identify the damages resulting solely from the claim on which the court granted summary judgment in favor of the plaintiff.")

[102]    Opposition at 12.

their reports to comport with and track the court's summary judgment and damages rulings.  This will fairly allow Alaska Rent-A-Car to prepare for trial along the lines described in this motion, and it will result in expert witness analyses that are tailored to reflect the court's rulings and therefore will avoid unnecessary confusion and delay at trial.

All parties—and the court—have an interest in that outcome.

## CONCLUSION

Alaska Rent-A-Car moved to confirm that it is entitled to present a two-part compensatory damages case and seek equitable relief.  Though no award of damages will enable Alaska Rent-A-Car to cure defendants' defective performance, Alaska Rent-A-Car moved, first, to recover (a) its lost profits and market share, as well as (b) the independent value of the contractual prohibitions set out in ¶ IV.C.2; and second, to obtain equitable disgorgement of a share of any profitable cost savings that defendants unjustly reaped as a result their opportunistic breach of the agreement.

Alaska Rent-A-Car's requests conform to the court's order and are amply supported by established law.  Its motion should be granted in full.

Dated:  July 7, 2008

/s/ JEFFREY M. FELDMAN
Jeffrey M. Feldman
Email:  feldman@frozenlaw.com
AK Bar No. 7605029
William D. Falsey
AK Bar No. 0511099
**FELDMAN ORLANSKY & SANDERS**
500 L Street, Suite 400
Anchorage, Alaska 99501
Tel.:  (907) 272-3538
Fax:  (907) 274-0819

**BANKSTON GRONNING O'HARA, PC**
601 West 5th Avenue, Suite 900
Anchorage, Alaska 99501

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of July, 2008, a copy of the foregoing document was served electronically on J. Dienelt, J. Givens, C. Gronning, B. Heller, B. Zan Nault, D. Ruskin, H. Trickey, and D. Vallentine.

s/ Jeffrey M. Feldman