

REST 3d RESTI § 39
Restatement (Third) of Restitution & Unjust Enrichment § 39 (T.D. No. 4, 2005)

Page 1

C

Restatement of the Law — Restitution
Restatement (Third) of Restitution And Unjust Enrichment (Tentative Drafts) FNa
Current through March 2008

Copyright © 2000-2008 by the American Law Institute

Part II. Liability In Restitution
Chapter 4. Restitution And Contract
Topic 3. Restitution In Cases Of Profitable Breach

§ 39. Profit Derived From Opportunistic Breach

Tentative Draft No. 4

Tentative Draft No. 4:

(1) If a breach of contract is both material and opportunistic, the injured promisee has a claim in restitution to the profit realized by the defaulting promisor as a result of the breach. Liability in restitution with disgorgement of profit is an alternative to liability for contract damages measured by injury to the promisee.
  (2) A breach is "opportunistic" if
    (a) the breach is deliberate;
    (b) the breach is profitable by the test of subsection (3); and
    (c) the promisee's right to recover damages for the breach affords inadequate protection to the promisee's contractual entitlement. In determining the adequacy of damages for this purpose,(i) damages are ordinarily an adequate remedy if they can be used to acquire a full equivalent to the promised performance in a substitute transaction; and(ii) damages are ordinarily an inadequate remedy if they cannot be used to acquire a full equivalent to the promised performance in a substitute transaction.
  (3) A breach is "profitable" when it results in gains to the defaulting promisor (net of potential liability in damages) greater than the promisor would have realized from performance of the contract. Profits from breach include saved expenditure and consequential gains that the defaulting promisor would not have realized but for the breach. The amount of such profits must be proved with reasonable certainty.
  (4) Disgorgement by the rule of this Section will be denied
    (a) if the parties' agreement authorizes the promisor to choose between performance of the contract and a remedial alternative such as payment of liquidated damages; or
    (b) to the extent that disgorgement would result in an inappropriate windfall to the promisee, or would otherwise be inequitable in a particular case.

Comment:
  *a. General principles and scope; relation to other sections.* In exceptional cases, a party's profitable breach of contract may be a source of unjust enrichment at the expense of the other contracting party. The law of restitution treats such cases in the same way that it treats other instances of intentional and profitable interference with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

REST 3d RESTI § 39  Page 2
Restatement (Third) of Restitution & Unjust Enrichment § 39 (T.D. No. 4, 2005)

another person's legally protected interests, authorizing a claim by the injured party to the measurable benefit realized as a result of the defendant's wrong. The claim described in this Section is accordingly an instance of restitution for benefits wrongfully obtained. It is identical in principle to the claims described in Chapter 5, §§ 40–44 (authorizing a disgorgement remedy in cases of profitable torts and equitable wrongs), and it is properly understood and delimited by analogy to those claims.

The rule of this Section has been placed in Chapter 4 rather than Chapter 5 in order to group together, for clarity of exposition, the divergent and contrasting themes of restitution in a contractual context. But § 39 differs from the other sections of the present Chapter in fundamental respects. See Chapter 4, Introductory Note (Tentative Draft No. 3, 2004). Unlike §§ 31–36 (id.), the present Section recognizes an alternative claim in unjust enrichment by an injured party who might instead assert a claim to enforce the contract. Unlike the rules of §§ 37–38 (id.), which employ restitutionary techniques to yield contract remedies independent of unjust enrichment, a primary object of § 39 is to prevent the unjust enrichment of the defendant at the expense of the plaintiff. Like the other rules of restitution for benefits wrongfully obtained, § 39 describes a *disgorgement* remedy: a claimant under this Section may recover the defendant's profits from breach, even if they exceed the provable value to the claimant of the defendant's defaulted performance. Restitution exceeding the claimant's loss is authorized nowhere else in Chapter 4, though it is a distinguishing feature of the rules stated in Chapter 5.

Judged by the usual presumptions of contract law, a recovery for breach that exceeds the plaintiff's damages is anomalous on its face. Standard contract remedies afford specific or compensatory relief, and a breach of contract—whatever the actor's state of mind—is not usually treated in law as a wrong to the injured party, comparable to a tort or breach of equitable duty. There is substantial truth, though not of course the whole story, in the Holmesian paradox according to which the obligation imposed by contract lies in a choice between performance and payment of damages. The observation is most accurate in those transactional contexts where damages can be calculated with relative confidence as a full equivalent of performance.

By contrast, there are numerous legal relations, including but not limited to those created by contract, in which a legal entitlement might receive inadequate protection if the holder were limited to provable damages as a remedy for violation. Traditional equitable remedies—part of the inheritance of the modern law of unjust enrichment—supplement the protection afforded by a liability in damages, precisely at those points where the difficulty of proving damages poses a systematic risk of inadequate protection to the interests in question. The clearest examples of this function of modern restitution are the claims to disgorgement of profits (available as an alternative to damages) in cases of intentional interference with property rights (§§ 40–42) or breach of equitable duties (§ 43). In a contractual context, traditional equitable remedies afford analogous protection to certain entitlements—reinforcing the protection afforded by the legal remedy of damages for breach—whenever a party's contract rights may be protected by injunction or specific performance. The law of restitution affords a comparable protection after the fact, awarding the gains from a profitable breach of a contract that the defendant can no longer be required to perform. See Comment *c*.

The restitution claim here described is infrequently available, because a breach of contract that satisfies the cumulative tests of § 39 is distinctly rare. See Comment *g*. At the same time, the cases in which such a remedy is appropriate are generally uncontroversial and in some instances even well known. The innovation of the present Section consists, not in proposing that defendants in such cases be liable to disgorge profits derived from breach, but in stating a rule to generalize these commonly accepted outcomes.

There are cases of unintentional breach of contract, outside the scope of this Section, in which the measure of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

recovery applied in this Section may furnish an appropriate measure of contract damages. See Comment *h*.

*b. The function of disgorgement.* The common rationale of every instance in which restitution allows a recovery of profits from wrongdoing, in the contractual context or any other, is the reinforcement of an entitlement that would be inadequately protected if liability for interference were limited to provable damages. See Chapter 5, Introductory Note. Cases in which restitution reaches the profits from a *breach of contract* are those in which the promisee's contractual position is vulnerable to abuse. Vulnerability in this context stems from the difficulty that the promisee may face in recovering, as damages, a full equivalent of the performance for which the promisee has bargained. A promisor who was permitted to exploit the shortcomings of the promisee's damage remedy could accept the price of the promised performance, then deliver something less than what was promised. Such an outcome results in unjust enrichment as between the parties. The mere possibility of such an outcome undermines the stability of any contractual exchange in which one party's performance may be neither easily compelled nor easily valued.

By condemning this form of opportunism, the rule of § 39 reinforces the contractual position of the vulnerable party and condemns a form of conscious advantage-taking that is the equivalent, in the contractual context, of an intentional and profitable tort. A restitution claim in response to a profitable tort typically operates to protect property from deliberate interference: standard examples include the claim to profits from trespass or infringement. See §§ 40 and 42. The rule of § 39 extends an analogous protection to contract rights, where what the wrongdoer seeks to acquire is not "property" but the modification or release of his own contractual obligation. The two situations have much in common. Assuming a case—in either context—in which the appropriate course of action would be to negotiate regarding legal entitlements, the wrongdoer takes without asking. The opportunistic calculation in either setting is that the wrongdoer's anticipated liability in damages is less than the anticipated cost of the entitlement, were it to be purchased from the claimant in a voluntary transaction. Restitution (through the disgorgement remedy) seeks to defeat this calculation, reducing the likelihood that the conscious disregard of another's entitlement can be more advantageous than its negotiated acquisition.

The broader function of disgorgement in the Illustrations that follow is not merely to frustrate conscious wrongdoers but to reinforce the stability of the contract itself, enhancing the ability of the parties to negotiate for a contractual performance that may not be easily valued in money. The result is to expand the range of transactions for which parties may effectively bargain. The point is seen by considering the position of the parties at the bargaining stage. Where the value of the promised performance is easily demonstrated, it may be plausible to attribute to the parties an understanding that the promisor shall be free, as a practical matter, to elect between performance and payment of damages. In other transactions, represented by the Illustrations to Comment *e*, the proposition that the promisor should be free to choose whether or not to perform would be incompatible with fundamental objectives of the promisee, ultimately making it impossible to fix a price for the promisor's contractual obligation. Absent an enforceable agreement on liquidated damages, the bargain in question is then less likely to be made.

*c. The analogy to injunction or specific performance.* Not by coincidence, contracts within this description are also those in which the promisee would most often be entitled to protection by injunction, or to a remedy by specific performance; or in which well-advised parties would most often provide by contract (where permitted to do so) for liquidated damages or specific enforceability. Disgorgement by the rule of this Section serves the same contract-reinforcing objectives as the devices just mentioned, at a different stage of contractual performance.

"Inadequacy of legal remedies" is the historic prerequisite to specific performance of a contract. This require-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ment is still generally observed, but it is no longer understood to be, in itself, a substantial barrier to specific relief if the plaintiff has a legitimate reason for seeking such a remedy. As a general rule, damages are an adequate remedy only if they can be used to replace the promised performance in a substitute transaction. Where such a replacement transaction is available, the promisee's remedy in contract damages makes disgorgement unnecessary; and the promisor's breach will not be opportunistic by the present definition. See § 39(2)(c)(i). Where by contrast the defaulted performance cannot be replaced—either because a market substitute does not exist, or because provable damages would not suffice to buy it—protection of the promisee's contractual entitlement will normally justify specific relief.

The fact that a promisee might have obtained a remedy by injunction or specific performance is thus a significant indication of the propriety of disgorgement by the rule of this Section. A court that would have granted such relief at an earlier stage of performance will almost certainly find that damages are inadequate for purposes of § 39(2)(c).

Section 39 does not propose a direct link between disgorgement for breach of contract and the theoretical availability of injunction or specific performance, because the rules governing these different remedies are not parallel in all respects. Specific performance is often denied, even when damages are less than a fully adequate remedy, because of costs or difficulties associated with the remedy in a particular case, either to the defendant or to the court. These concerns with disproportionate costs, impracticability, personal service contracts, difficulty of supervision, and the like, will rarely be at issue in a claim under this Section for a money judgment against an opportunistic breacher. It follows that an opportunistic breach (as defined in § 39(2)) is in most instances a breach that a court on timely application would be prepared to enjoin, unless there were some unusual cost or difficulty with the injunction. Conversely, if the case is one in which a court would refuse specific performance simply because damages are a fully adequate remedy—and without reference to the unusual cost or difficulty of specific performance in the particular case—the breach is unlikely to be opportunistic within the meaning of this Section.

*d. Opportunistic breach.* As defined in this Section, an opportunistic breach of contract involves a deliberate choice by the defaulting promisor to improve the terms of the transaction in the promisor's favor, exploiting the vulnerability of a promisee whose contractual expectations would be inadequately protected by a remedy limited to damages. The first two elements of the definition—requiring that a breach be both deliberate and profitable—will serve in practice to exclude most contractual defaults, but these characteristics are likely to be self-evident features of any breach to which this Section applies. It is the third part of the definition that presents difficulties. If the promisee's contractual expectations are adequately protected by an award of damages, there is no opportunism. By contrast, if value to the promisee of the promisor's (defaulted) performance plus recoverable damages for breach is significantly less than the value to the promisee of the performance required by the contract, the effect of the promisor's deliberate breach is to subject the promisee to an unacceptable forced exchange. Profit realized as a result is unjust enrichment in the hands of the defaulting promisor.

Traditional contract law contains no rule identifying the cases in which disgorgement is an appropriate remedy for breach. Particular instances have traditionally been explained by reference to special features of the transactions in question, without resort to any more general theory. To facilitate analysis of such cases, this Section proposes a general theory of disgorgement in contract cases (namely, that it is a remedy for opportunistic breach); a definition of opportunism in this context (deliberate and profitable breach where the promisee's entitlement is inadequately protected by a damage remedy); and a practical test for the one element of that definition (inadequacy of damages) that has traditionally been the most problematic.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Drawing on the approach most commonly employed in modern decisions on specific performance, § 39(2)(c) proposes that the adequacy of damages can usefully be tested—in the majority of cases, if not as an unvarying rule—by the availability vel non of market-based substitutes for the promised performance. A promisee who can utilize a damage award to obtain the very thing that was promised is not vulnerable to opportunistic breach. By contrast, where the nature of the transaction is such that no substitute for the promised performance could be obtained on any market, a remedy for breach that was restricted to damages would leave the contractual exchange insecure from its inception.

While the answer will sometimes be clear, any conclusion about the adequacy of damages in a particular case requires a complex judgment by the court, assessing both the promisee's contractual entitlement and the extent to which it is effectively protected by the availability of the damage remedy. A "full equivalent to the promised performance" that will satisfy the test of adequacy need not be a perfect equivalent, and the damage remedy may be adequate even though the promisee bears some of the cost of resolving the dispute. The test of what constitutes a "full equivalent" will necessarily depend, not only on a judgment about the circumstances of the transaction, but on evolving standards of good-faith contractual performance.

*e. When disgorgement is available.* The cases in which the law allows disgorgement for breach of contract are susceptible of various, particularized explanations; while the purpose of § 39 in identifying "opportunistic breach" is to frame a more general rule that will identify them all. It has been suggested, for example, that a contractual entitlement to acquire specific property may sufficiently resemble *ownership* of the property (by the doctrine of equitable conversion or otherwise) that it is natural to treat a breach of the contract of sale as an interference with the property right—justifying recourse to the restitution claim that would be available in a property case. See Illustrations 1 and 2, and compare § 40. The more general rule of this Section offers a complementary explanation. In cases of this kind, where specific performance is routinely available, it has long been assumed that damages are inadequate to protect the contractual entitlement of the promisee. Plainly, a promised conveyance of real property (or any other unique good) is a performance for which there is no market-based substitute.

In other contexts as well, contract rights sometimes resemble noncontractual entitlements that are protected against interference by the law of restitution; liability in disgorgement for opportunistic breach affords the same protection by a different analysis. Thus a promise not to disclose or employ confidential information is the usual form by which trade secrets are protected; allowing restitution for breach of the contract is equivalent to restitution for misappropriation of the trade secret. See Illustration 3 and compare § 42. Again, if one party's contractual obligation to another assumes a fiduciary or confidential character, disgorgement for breach of the contract might be justified by observing that it resembles a liability to account for profits derived from a breach of fiduciary duty. See Illustration 4 and compare § 43. Both cases involve circumstances in which a remedy in damages affords inadequate protection to the contractual entitlement of the promisee; one way to demonstrate this inadequacy is to observe that in neither case would damages allow the promisee to purchase a performance. After the fact it is impossible to achieve a state of the world in which the promisor has not violated the trade secret, or breached the fiduciary duty, and it is idle to talk of purchasing a full equivalent of performance in such cases.

**Illustrations:**
   1. Vendor and Purchaser agree on a sale of Blackacre for $100,000. Two weeks before the scheduled closing date, Vendor conveys Blackacre to a second purchaser for $110,000. Purchaser is entitled to recover $10,000 from Vendor by the rule of this Section. Purchaser need not prove the value of Blackacre on the scheduled closing date; nor could Vendor reduce or avoid his liability under this Section by proving that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

market value of Blackacre on that date was something less than $110,000.2. Vendor and Purchaser agree on a sale of Blackacre for $100,000. The contract expressly provides that existing timber and gravel are to be conveyed with the property. Vendor removes timber and gravel, which he sells for a net gain of $10,000. Purchaser takes title and commences an action against Vendor. Under local law, the contract of sale gives Purchaser no interest in the property prior to conveyance: accordingly, Purchaser has no action for conversion, being limited to the available remedies for breach of contract. Purchaser is entitled to recover $10,000 from Vendor by the rule of this Section. It is irrelevant that the removal of timber and gravel did not appreciably diminish the value of Blackacre.3. Analyst develops a pricing model enabling it to appraise complex financing leases that it acquires at auction for investor clients. Bank and Analyst discuss the possibility of Bank's retaining Analyst to acquire such leases as an agent for Bank. To enable Bank to evaluate its services, Analyst communicates full details of its pricing model; Bank promises that it will neither disclose the information nor bid on its own in future lease auctions. Advising Analyst that it has decided against investing in leases, Bank surreptitiously enters its own bid at auction and purchases leases in competition with Analyst. The nondisclosure and noncompetition agreement is valid and enforceable, and Bank's breach of contract is deliberate. Bank argues that Analyst has not proved damages: Analyst was only the third highest bidder, so Analyst would not have won the auction even if Bank had not participated. Analyst has a claim in restitution to the profits realized by Bank from the purchase of leases in breach of its contract with Analyst.4. Agent is employed by an agency of the United States for work that involves access to classified information. By the express terms of his contract of employment, Agent undertakes to maintain the confidentiality of such information and to refrain from publishing information obtained in the course of his employment without the prior consent of the agency. Acting in deliberate disregard of his contractual obligations, Agent publishes a book about his government service without seeking or obtaining the necessary consent. The book reveals confidential information whose publication is potentially harmful to the United States, though the resulting injury is impossible to quantify. By the rule of this Section, the United States is entitled to the profits (in the form of royalties or otherwise) earned by Agent from publication of the book. Agent's breach of contract may simultaneously constitute a breach of fiduciary duty (§ 43), but it is not necessary that Agent's obligations be characterized as fiduciary under local law to justify liability under this Section.

In a further set of cases, the nature of the underlying transaction makes it easy to surmise that the plaintiff has (in effect) paid the defendant in advance for the performance that the defendant has failed to render. Where the facts permit such an inference, disgorgement for breach of contract resembles rescission for breach with restitution of a prepaid purchase price. See Illustrations 5–7 and compare § 37 (Tentative Draft No. 3, 2004). The same cases provide further illustrations of the test here proposed for adequacy of the promisee's remedy in damages. Illustration 5 is a case in which the cost of acquiring an equivalent performance from another would exceed the promisee's damages as measured by the court. If the promisor has breached an undertaking to refrain from specified conduct, as in Illustration 6, it will normally be impossible to enter a substitute transaction that will undo the promisor's contractually prohibited conduct.

Illustration 7 might be directly explained, within the terms of § 39, as a case in which the parties' bargain would be inherently insecure if its enforcement were limited to damages for breach. (Such a rule invites the promisor to speculate by bargaining for one performance and rendering another, calculating that its saved expenditure will exceed the measurable difference in end result. This form of speculation—however well-informed or "efficient"—exposes the promisee to unquantifiable risks against which the promisee had attempted to protect itself by contract.) It is also a case in which damages will not suffice, after the fact, to purchase a substitute for the performance originally promised.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Illustrations:**

    5. Landowner and Mining Company enter a contract for strip-mining. The agreement authorizes Mining Company to remove coal from Blackacre in exchange for payment of a specified royalty per ton. A further provision of the agreement, included at Landowner's insistence, obliges Mining Company to restore the surface of Blackacre to its preexisting contours on the completion of mining operations. Mining Company removes the coal from Blackacre, pays the stipulated royalty, and repudiates its obligation to restore the land. In Landowner's action against Mining Company it is established that the cost of restoration would be $25,000, and that the diminution in the value of Blackacre if the restoration is not performed would be negligible. The contract is not affected by mistake or impracticability. The cost of restoration is in line with what Mining Company presumably anticipated, and the available comparisons suggest that Mining Company took this cost into account in calculating the contractual royalty. Landowner is entitled to recover $25,000 from Mining Company by the rule of this Section. It is not a condition to Landowner's recovery in restitution that the money be used to restore Blackacre.6. Buyer pays Seller $500,000 cash in exchange for (i) Seller's existing business as a going concern and (ii) Seller's promise not to compete with Buyer for a period of three years. The restraints thus imposed on Seller are reasonable, and the promise not to compete is enforceable under local law. Acting in deliberate disregard of his contractual obligations, Seller operates a new business in competition with Buyer for the final year of the three-year term, realizing profits of $50,000. Buyer is entitled to recover $50,000 from Seller by the rule of this Section. It is not a condition of restitution that Buyer prove damages as a result of Seller's breach.7. City contracts with firefighters' Association for fire-protection services to be furnished during the ensuing 12 months. The contract specifies the number of men, horses, and wagons to be kept in readiness at specified times and places, and the contract price is negotiated as a function thereof. After the 12 months have elapsed and the full contract price has been paid, City discovers that Association consistently devoted fewer men, horses, and wagons to City's fire protection than the numbers required by contract. Association acted in deliberate breach of its contractual obligations, calculating—accurately as it turned out—that the resources specified by contract were in excess of City's firefighting needs. In consequence, Association saved $100,000 over the life of its contract with City; while City suffered no increased loss from fire as a result of Association's disregard of the contract specifications. City is entitled to recover $100,000 from Association by the rule of this Section.

    In a final set of transactions, the existence of an explicit negative covenant points to the limited nature of rights granted to the paying party under the contract. Its function in this context may be to enable the promisee to sell the rights reserved at an additional price to be negotiated in the future (see Illustrations 8-9), or simply to protect against potential injuries that are difficult to quantify (see Illustration 10). If the remedy for breach were limited to provable damages in either setting, the defaulting promisor would obtain the benefit of rights that were neither bargained nor paid for; while the promisee would be manifestly unable to purchase a substitute for the promised performance with the damage award. The inadequacy of judicially determined damages is particularly evident in cases involving breach of a negative covenant, where the promisee has evidently bargained for the right either to set his own price for the conduct in question or to prohibit it altogether.

**Illustrations:**

    8. Landlord leases Blackacre to Tenant at an annual rent of $100,000.The lease provides that Tenant shall not sublet the property without Landlord's prior consent. Tenant sublets Blackacre for one year at an annual rent of $110,000. Landlord learns of this transaction after the sublease has expired and commences an action in restitution. Landlord is entitled to recover $10,000 from Tenant by the rule of this Section. It is not a condition of recovery that Landlord prove damages as a result of Tenant's breach.9.The licensing agreement

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

between the Owner of a soft-drink trademark and its Bottler provides that products produced under license shall be manufactured in strict conformity to Owner's specifications, one of which calls for the use of cane sugar as the sweetening ingredient. In the course of renegotiating various aspects of the licensing agreement, Bottler asks to be allowed to substitute artificial sweeteners for sugar in the manufacture of certain licensed products. The parties fail to reach agreement on this point, and the amendment to the licensing agreement resulting from their negotiations omits any modification of the product specifications. Acting in deliberate disregard of its contractual obligations, Bottler substitutes low-cost artificial sweetener for sugar in the manufacture of licensed products. The products manufactured from these different materials are for all practical purposes indistinguishable. By the time the practice comes to light, Bottler has saved $5 million by the use of the less expensive ingredients. Owner may require Bottler to disgorge $5 million by the rule of this Section. It is not a condition of recovery that Owner prove damages as a result of Bottler's breach.10. Attempting to stabilize the market for new automobiles at a time of postwar shortage, members of a dealers' trade association impose resale restrictions in their contracts with retail customers. Dealer sells Customer a new automobile for $5000. Customer agrees not to resell the car within two years of purchase except to Dealer. Should Customer wish to sell during this period, Dealer agrees to repurchase the car from Customer at a scheduled percentage of its original price. The price at which the car may be subsequently resold by Dealer is limited to the repurchase price paid to Customer, plus a 10 percent commission. One month after taking delivery of the car, Customer resells it on the black market for $10,000. The price fixed by contract for repurchase of the car by Dealer is $4000; the damage to Dealer from Customer's breach cannot exceed $400 (Dealer's lost commission from a costless resale). Assuming that the contractual restrictions on Customer's resale of the car are valid and enforceable, the rule of this Section authorizes Dealer to recover $6000 from Customer on a theory of unjust enrichment.

*f. Measure of recovery.* The purpose of the disgorgement remedy for breach of contract is to eliminate the possibility that an intentional and opportunistic breach will be more profitable to the performing party than negotiation with the party to whom performance is owed. For this reason, "profit realized as a result of the breach" includes the gains that motivated the promisor's decision to breach the contract. If the defaulting promisor's liability in restitution were limited to the amount that might have been paid to obtain the necessary contractual modification in a voluntary transaction, there would be inadequate incentive to bargain over the entitlement in question. See Illustration 11.

The rule of this Section operates to make breach unprofitable, but it does not punish a breach of contract by requiring forfeiture of the entire profit from the transaction as a whole. See Comment *g*, Illustration 12. Profit "realized as a result of the breach" is the marginal gain to the breaching party that is the direct and foreseeable consequence of the decision to breach. As in other applications of the disgorgement remedy, the decision how far to follow consequential gains (such as profits from reinvestment) is guided by a test of remoteness. See § 51, Comment __.

**Illustration:**
   11. Landowner sells part of his land to Developer for subdivision; Developer agrees to build no more than 100 houses on the property. Developer's covenant to this effect is valid and enforceable by Landowner. Acting in deliberate disregard of his contractual obligations, Developer builds 120 houses. In a subsequent lawsuit between the parties, the court finds that (i) Developer's breach of contract enabled Developer to realize an additional $200,000 profit from the transaction, and (ii) Landowner would have agreed to permit the construction of an additional 20 houses on payment of $20,000. Landowner's recovery from Developer by the rule of this Section is $200,000. If Developer's liability in restitution were limited to the $20,000 that would have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

been paid in a voluntary transaction, or fixed at any amount less than Developer's $200,000 profit, a party disposed to breach in these circumstances would have no adequate incentive to bargain over a release from the covenant.

*g. The exceptional nature of the claim.* Of the available responses to breach of contract, the disgorgement claim described in § 39 is the least frequently encountered. The cumulative requirements of opportunistic breach (as defined in § 39(2)) will exclude the vast majority of contractual defaults.

By itself, the requirement that an opportunistic breach be *profitable* (as defined in § 39(3)) eliminates most instances of breach. The basic calculation of expectation damages makes it highly unlikely, in any transaction for which there are market-based substitutes, that the gain to the defendant as a result of default will exceed the injury to the plaintiff from the same cause. The defendant's potential liability for incidental and consequential damages, over and above the cost of a substitute performance, limits the occurrence of profitable breaches almost to the vanishing point. It must be emphasized that the profits at which § 39 is directed are profits realized by the defaulting party *as the result of the breach.* There is no claim in restitution to profits derived by the breaching defendant from the contractual performance rendered by the claimant. See Illustration 12.

The scope of opportunistic breach is further restricted by the other elements of the definition of § 39(2). Opportunism in the present context involves a deliberate breach—thereby excluding any default that results from the defendant's inadvertence, negligence, or unsuccessful attempt. Such a limitation is consistent with the general principle that the disgorgement remedies in restitution are principally addressed to instances of conscious wrongdoing. See § 51. The decisive characteristic of opportunism in this context is the attempt to exploit the inadequacy of damage-based remedies for breach. The opportunistic promisor modifies or withholds a promised performance—readjusting the contractual exchange in the promisor's favor—in circumstances where the contractual entitlement of the promisee would be inadequately protected by an award of damages. Under such circumstances, a deliberate and profitable breach reallocates (or reprices) the risks assigned by the contract, undermining the basis on which the parties' bargain was made. By contrast, there is no opportunism and no claim under this Section if the defendant tenders a performance that, when combined with money damages, yields a full equivalent of the plaintiff's contractual entitlement. See Illustration 13.

**Illustrations:**
    12. Buyer and Seller engage in difficult negotiations about the price of goods to be supplied next season. Intending to put pressure on Seller, Buyer delays payment of Seller's current invoices, advising Seller that their account will be settled only when "all outstanding issues" have been resolved. Seller breaks off negotiations and justifiably withholds further deliveries under the parties' existing contract. Seller thereupon sues Buyer on a theory of unjust enrichment, seeking disgorgement of the profits realized by Buyer on the resale of goods previously supplied by Seller for which Buyer has not made timely payment. Buyer is liable to Seller for breach of contract (U.C.C. § 2-709), but Buyer is not liable to disgorge profits by the rule of this Section. Buyer's resale profits have not been realized as a result of the breach. Moreover, Buyer's breach of the payment obligation is unlikely to be profitable: Buyer's liability in direct damages, measured by the amount due plus prejudgment interest, will almost certainly equal or exceed the (temporary) savings to Buyer from failure to pay.13. Seller agrees to manufacture and deliver to Buyer 1000 widgets at $1000 each. Seller's normal cost of production is $250 per widget. Before the date fixed for delivery, problems with Seller's manufacturing equipment increase Seller's cost of production to $350 per widget. Seeking to minimize its own cost of performance, Seller acquires similar widgets from Supplier at $300 each and tenders them to Buyer. Although Seller's conduct is evidently self-interested, it is consistent, under the circumstances, with reasonable commer-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cial standards of fair dealing in the trade (U.C.C. § 2–103(b)). Buyer accepts the goods but notifies Seller that they are nonconforming and sues for breach of warranty. Buyer proves at trial that the goods did not conform to the contract and that each of Supplier's widgets was worth $10 less than a comparable widget manufactured by Seller. Seller's breach of contract is deliberate and profitable (saving $50,000 by comparison with the cost to Seller of making a conforming tender), but it is not opportunistic: on the facts assumed, there is no reason to conclude that Buyer's entitlement will be inadequately protected by an ordinary damage remedy. Buyer is entitled to damages of $10,000 (U.C.C. § 2–714(2)), but Buyer is not entitled to Seller's saved expenditure of $50,000.

*h. Saved expenditure as a measure of damages for unintentional breach.* Although the rule set forth in § 39 is limited to instances of opportunistic (and therefore deliberate) breach of contract, there are cases of unintentional breach in which the amount of the promisor's saved expenditure may furnish an appropriate measure of damages—comparing the cost of the defective performance to the more costly performance that was promised. Measuring damages by saved expenditure may be particularly suitable when the breach relates to specific aspects of the promised performance that have visibly entered into the calculation of the contract price, and when damages measured either by loss in value or cost of cure would not yield an effective remedy to the promisee. See Illustration 14; compare Illustration 7, supra, on the assumption that the breach described in Illustration 7 might be the result of the promisor's negligence.

The choice of saved expenditure as a measure of damages in such cases might be explained as a liability in restitution, by analogy to the rule of this Section. Alternatively, this particular measure of damages might be regarded as a rule of contract law to which notions of unjust enrichment evidently contribute. Unlike cases of opportunistic breach, which are central to the broader issue of benefits wrongfully obtained, cases of unintentional breach represented by Illustration 14 are of marginal significance to the law of unjust enrichment. Although § 39 does not address such a case directly, the outcome is readily justified by combining general principles of restitution with accepted rules of contract damages.

**Illustration:**
    14. Builder and Owner agree on the construction of a house at a price of $2 million. The specifications call for foundations to be made of Vermont granite, and the work has been bid and priced on that basis. By mistake and inadvertence, Builder constructs the foundations of granite quarried in New Hampshire. This fact comes to light when construction has been completed. The difference in the appraised value of Owner's property as a result of the nonconformity is nil. The cost to cure the default would far exceed the total price of the house. Because New Hampshire granite is less expensive than comparable stone from Vermont, Builder has saved $15,000 as a result of his negligent breach of contract. Owner may recover damages of $15,000 for Builder's breach. The case is not within the rule of § 39 (because Builder's default is unintentional), but principles of unjust enrichment reinforce the conclusion that saved expenditure makes an appropriate measure of contract damages in such a case.

*i. Efficient breach.* Modern American contract scholarship devotes considerable attention to a hypothetical case in which breach of contract would be "efficient." The performing party—it is suggested—ought to breach a contract whenever the anticipated profits from breach would be more than sufficient to pay the other party's damages, thereby leaving some parties better off and nobody worse off. An efficient breach of contract by this definition is easy to hypothesize but difficult to find in real life. In a market context, gain to one party is normally offset or exceeded by loss to the other, while the test of efficiency will not be met unless the injured party is fully indemnified against the cost of resolving the resulting dispute. American practice regarding the alloca-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion of litigation expense makes satisfaction of the latter condition especially unlikely.

The rationale of the disgorgement liability in restitution, in a contractual context or any other, is inherently at odds with the idea of efficient breach. Given the pervasive risk of undercompensation by standard damage measures, not to mention the deadweight loss from the cost of dispute resolution, this part of the law of restitution favors voluntary over involuntary transactions in the adjustment of conflicts over any form of legal entitlement. To take without asking, having calculated that one's anticipated liability in damages is less than the price one would have to pay to purchase the rights in question, is precisely the conduct that the law of restitution condemns.

Whether the promisor's decision to modify or withhold a given performance infringes the contract rights of the promisee is a preliminary question of contract law and interpretation. If it does, the promisor's liability in restitution follows from the same principles as restitution for other instances of conscious and profitable interference with legally protected rights. See Illustration 15 and compare § 44. The rule of § 39 does not automatically punish an efficient breach with a disgorgement remedy, however, because of the requirement that the breach be opportunistic. See Comment g and Illustration 13, supra. The defendant's decision not to tender a performance for which there are adequate market substitutes is not opportunistic by the definition of § 39(2), because a remedy in damages is sufficient to protect the contractual entitlement of the promisee in such cases. See Illustration 16.

**Illustrations:**
    15. Farmer sells Buyer his entire crop of carrots for the coming season at a price of $500 per ton. Farmer's carrots have unique qualities not obtainable elsewhere, with the result (inter alia) that the differences are difficult to value. It is in Buyer's interest to be the exclusive distributor of Farmer's carrots, and Farmer's obligation to tender his entire output is a material term of the parties' agreement. Bad weather results in a reduced harvest and higher prices. Farmer delivers 20 tons of carrots to Buyer, then sells a further 10 tons to a competing buyer at $800 per ton. Buyer is entitled to recover $3000 from Farmer by the rule of this Section. It is irrelevant to the recovery in restitution that Buyer's provable contract damages (measured by the contract-market differential or by Buyer's cost to cover) might be less than $3000.16. On April 1, Farmer sells A his entire crop of wheat for the current season at a price of $5 per bushel, for delivery after the June harvest. On May 1, an unexpected rise in the price of June wheat allows Farmer to sell the same crop to B at $10 per bushel. On June 15, Farmer harvests his wheat and delivers it to B. Farmer's wheat is fungible with goods readily available on the open market. On June 16, when A learns of the breach, the spot price of wheat of the kind grown by Farmer has fallen back to $6 per bushel. A is entitled to market or cover damages of $1 per bushel (plus incidental and consequential damages as appropriate). A is not entitled to restitution by the rule of this Section, because Farmer's breach is not opportunistic. The existence of a market on which A can obtain fungible goods means that A's remedy in damages is a substantial equivalent to Farmer's defaulted performance.

*j. Additional limitations to the claim.* A promisee who would be entitled to protection against default by specific performance or injunction, notwithstanding the presence of a contract term validly liquidating damages in other circumstances, is not barred from a claim under § 39 by the provision for liquidated damages in the parties' agreement. Conversely, if the contract is construed to allow the promisor to choose between a specified performance and a specified liability for nonperformance—binding the promisor, in effect, to alternative obligations—the promisor's election to assume the consequences of nonperformance cannot constitute an opportunistic breach, if indeed it is regarded as a breach at all. See § 39(4)(a).

If a contract is one that a court would decline to enforce by specific performance or injunction, on the ground that specific enforcement would be inequitable to the defaulting party, disgorgement by the rule of § 39 may be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inappropriate for the same reasons. In such a case the claim may be qualified or denied (§ 39(4)(b)), notwithstanding the fact that the breach is both profitable and opportunistic. See Illustration 17.

**Illustration:**

    17. A employs B for a term of one year at a salary of $10,000 per month. B abandons his employment with A to take a job with C at $15,000 per month. A is obliged to pay $12,000 per month to hire B's replacement. By the contract law of the jurisdiction, A is entitled to damages in the amount of $2000 per month for the remainder of the contract term. Because of limits to the enforceability of personal-service contracts, however, A is not entitled to specific performance, nor to an injunction prohibiting B's employment with C. B's breach of the contract with A is certainly profitable and arguably opportunistic, but A has no claim to the $5000 per month realized by B as a result of the breach.

**REPORTER'S NOTE**

    *a. General principles and scope; relation to other sections.* Section 39 has no counterpart in either the first or second Restatement of Contracts. Although case authority for the particular Illustrations is reasonably extensive, courts and commentators have hesitated to formulate a rule—seemingly at variance with basic assumptions about liability in contract—that would generalize the outcomes they represent. Increased scholarly attention to the question in recent decades has led to broad acceptance of the premise that disgorgement in such cases corresponds to a liability in unjust enrichment, and that it is appropriate—in some limited set of cases—to treat a deliberate and profitable breach of contract by analogy to an intentional and profitable interference with other legally protected interests.

    For an overview of the problem, see Goff & Jones, Law of Restitution 515–526 (6th ed. 2002); Maddaugh & McCamus, The Law of Restitution 753–774 (2d ed. 2004); Palmer, Law of Restitution § 4.9 (1978 & Supp.). Influential judicial opinions from non-U.S. jurisdictions include Hickey & Co., Ltd. v. Roche Stores (Dublin) Ltd., [1993] Restitution L. Rev. 196 (Ir. High Ct. 1976); Adras Building Material Ltd. v. Harlow & Jones GmbH, [1995] Restitution L. Rev. 235 (Israel Sup.Ct.1988); and Attorney General v. Blake, [1998] Ch. 439 (C.A.1997), app. dismissed, [2001] 1 A.C. 268 (H.L.2000). See also Birks, Restitutionary Damages for Breach of Contract: *Snepp* and the Fusion of Law and Equity, [1987] Lloyd's Mar. & Com. L.Q. 421; Dagan, The Law and Ethics of Restitution 260–282 (2004); Dawson, Restitution or Damages?, 20 Ohio St. L.J. 175, 186–189 (1959); Eisenberg, The Remedy of Disgorgement for Breach of Contract, [ ]; Farnsworth, Your Loss or My Gain? The Dilemma of the Disgorgement Principle in Breach of Contract, 94 Yale L.J. 1339 (1985); Friedmann, Restitution of Benefits Obtained Through the Appropriation of Property or the Commission of a Wrong, 80 Colum. L. Rev. 504 (1980); Friedmann, Restitution of Profits Gained by Party in Breach of Contract, 104 L.Q.Rev. 383 (1988); Jones, The Recovery of Benefits Gained From a Breach of Contract, 99 Law Q. Rev. 443 (1983); Kull, Disgorgement for Breach, the "Restitution Interest," and the Restatement of Contracts, 79 Tex. L. Rev. 2021 (2001); Laycock, Modern American Remedies 600–603 (3d ed. 2002).

    *c. The analogy to injunction or specific performance.* Although modern American decisions continue to recite that specific performance is available only when damages are inadequate, the force of that traditional limitation is dissipated by the rigorous standard by which adequacy is measured. By the test most commonly applied, "Injury is irreparable if plaintiff cannot use damages to replace the specific thing he has lost." Laycock, The Death of the Irreparable Injury Rule 37 (1991).For extensive modern authority in support of this generalization, see id. at 37–72.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*d. Opportunistic breach.* The proposed test of adequacy of damages set forth in § 39(2)(c)(i) and (ii) derives from the modern American decisions on the availability specific performance, as analyzed by Laycock, supra.

Asking whether the promisee could use the damage award to purchase a full equivalent of the defaulted performance (or to make up any deficiency) serves as a rule of thumb to focus the traditional, open-ended inquiry into "adequacy of damages," alias "irreparable injury." Literally interpreted, the test of "full equivalent" yields the correct answer not only when a substitute performance would be theoretically available (as in Illustration 5), but also in those cases—occurring frequently among the Illustrations to § 39—in which the promised performance, following breach by the promisor, has no "full equivalent" available on any market. It follows that damages are *never* an adequate remedy for the breach of a promise to maintain a confidence (Illustration 4), to refrain from competition or other prohibited conduct (Illustrations 6, 8, and 10, among others), or to do something in a certain way (Illustration 7).

Given that such cases involve a performance for which there is no equivalent after the fact, it may seem incongruous or question-begging to measure the adequacy of a damage remedy by investigating the availability of a performance that money literally cannot buy. If the proposed inquiry seems inapposite in a particular case, a court applying the rule of this Section is free to judge the adequacy of damages directly. Section 39 applies when (among other requirements) "the promisee's right to recover damages for the breach affords inadequate protection to the promisee's contractual entitlement," and a court will naturally make that determination as it sees fit. As suggested in Comment *c*, a court can often judge the adequacy of damages for purposes of § 39 by asking whether the claimant would have been entitled to an injunction against the defendant's breach, or to a remedy by specific performance.

*e. When disgorgement is available.* Illustration 1 is based on Coppola Enterprises, Inc. v. Alfone, 531 So. 2d 334 (Fla.1988), and Gassner v. Lockett, 101 So. 2d 33 (Fla.1958). See also Seaside Community Development Corp. v. Edwards, 573 So.2d 142 (Fla.Ct.App.1991); Timko v. Useful Homes Corp., 114 N.J. Eq. 433, 168 A. 824 (Ch.1933). Illustration 2 is based on Laurin v. DeCarolis Constr. Co., 372 Mass. 688, 363 N.E.2d 675 (1977) (noting that the breach was "deliberate and willful," and that a disgorgement remedy on these facts is not punitive: "it merely deprives the defendant of a profit wrongfully made, a profit which the plaintiff was entitled to make"). See also May v. Muroff, 483 So.2d 772 (Fla.Ct.App.1986) (vendor's unauthorized removal of gravel prior to closing yields $240,000 while reducing value of land by only $120,000; purchaser recovers $240,000).

The restitution claims underlying Illustrations 1 and 2 might alternatively be analyzed in light of the doctrine of equitable conversion, according to which "[t]he purchaser is deemed in equity to be the owner of the land, and a court of equity will ... adjust the respective rights and liabilities of the parties upon this assumption." Worrall v. Munn, 53 N.Y. 185, 191 (1873) (vendor held liable for value of timber and minerals severed during period in which purchaser wrongly kept out of possession, inasmuch as liability restricted to diminished value of the land would frequently be inadequate).

Illustration 3 is based on Eden Hannon & Co. v. Sumitomo Trust & Banking Co., 914 F.2d 556 (4th Cir.1990); 973 F.2d 359 (4th Cir.1992) (appeal, following remand, limited to determination of defendant's profits). The decision is noteworthy because it allows "a constructive trust on Sumitomo's profits ... as an equitable remedy for their breach of the agreement." 914 F.2d at 558.The plaintiff had advanced additional, alternative theories of misappropriation of trade secrets and breach of fiduciary duty; the same relief should be available under any of these headings. A similar intermingling of theories appears in Ocor Products Corp. v. Walt Disney Productions, Inc., 682 F.Supp. 90 (D.N.H.1988), where a contract for the sale of specially designed shopping

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bags prohibited the defendant buyer from disclosing the design to other suppliers. The defendant submitted samples of the bag to another manufacturer and eventually bought a large quantity at a lower price. Explaining the defendant's liability primarily on the basis of breach of contract, the court allowed the plaintiff seller to recover the defendant's savings in purchasing bags at a lower price, without having to prove the extent of its damages (in the form of lost profits or otherwise).

Illustration 4 is based on Snepp v. United States, 444 U.S. 507 (1980), and on Attorney General v. Blake, [1998] Ch. 439 (C.A.1997), app. dismissed, [2001] 1 A.C. 268 (H.L.2000). For additional decisions in which the defendant's breach of contract is also described as a breach of fiduciary duty, see, e.g., Lerner Corp. v. Three Winthrop Properties, Inc., 124 Md. App. 679, 723 A.2d 560 (1999) (management agent refuses to abide by contractual termination provision and continues its agency "by exploiting its previous position and access to confidential information"; restitution via forfeiture of management fees paid to agent during period of disloyalty);Automatic Laundry Serv., Inc. v. Demas, 216 Md. 544, 141 A.2d 497 (1958) (exclusive dealing arrangement in which profits were to be shared; breach of contract is also breach of duty of loyalty).

Illustration 5 combines the facts of Peevyhouse v. Garland Coal & Mining Co., 382 P.2d 109 (Okla.1962), with the results in Groves v. John Wunder Co., 205 Minn. 163, 286 N.W. 235 (1939), and American Standard, Inc. v. Schectman, 80 App. Div. 2d 318, 439 N.Y.S.2d 529 (1981). An analogous case is presented whenever the promisor refuses to render some aspect of performance that has evidently been taken into account in the parties' overall agreement as to price. In Joyner v. Weeks, [1891] 2 Q.B. 31 (C.A.), a tenant agreed to make specified repairs to the premises during the term of the lease, then refused to do so; the landlord sold the building to a purchaser who intended to tear it down. The landlord recovered the cost of the omitted repairs, the court observing that in such a case "it is plainly immaterial that at the commencement of an action for a breach of contract the plaintiff is in fact no worse off than he would have been if the contract had been performed." Id. at 33. The seeming paradox dissolves if we assume that the anticipated cost of the repairs was reflected in the parties' negotiation over the rent.

Illustration 6 is based on Y.J.D. Restaurant Supply Co. v. Dib, 98 Misc. 2d 462, 413 N.Y.S.2d 835 (Sup.Ct.1979), and Morgan v. Stagg, 1987 Texas App. Lexis 8560. See also Uinta Oil Refining Co. v. Ledford, 125 Colo. 429, 244 P.2d 881 (1952) (manufacturer sells in competition with distributor within exclusive territory granted to the latter); Oscar Barnett Foundry Co. v. Crowe, 80 N.J. Eq. 258, 86 A. 915 (Err. & App.1912) (owner of unpatented invention grants exclusive license to manufacture, then manufactures in competition with his licensee); Ingram v. Bigelow, 138 N.Y.S.2d 217 (Sup.Ct.1954) (franchisee competes with franchisor in violation of valid territorial restraint).

Illustration 7 adopts the facts and reverses the result in City of New Orleans v. Firemen's Charitable Ass'n, 43 La.Ann. 447, 9 So. 486 (1891).

Illustration 8 is based on Long Building, Inc. v. Buffalo Anthracite Coal Co., 190 Misc. 97, 74 N.Y.S.2d 281 (Sup.Ct.1947). Illustration 9 is based on Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co., 988 F.2d 386 (3d Cir.1993). Illustration 10 is based on British Motor Trade Ass'n v. Gilbert, [1951] 2 All E.R. 641 (Ch.).

*f. Measure of recovery.* Illustration 11 adopts the facts and the holding of Wrotham Park Estate Co. v. Parkside Homes Ltd., [1974] 2 All E.R. 321 (Ch.Div.1973), while expanding the measure of recovery. Restitution in *Wrotham Park* was limited—incorrectly, on the view here adopted—to "such a sum of money as might reasonably have been demanded by the plaintiffs ... as a *quid pro quo* for relaxing the covenant."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*g. The exceptional nature of the claim.* Illustration 12 simplifies the facts and reverses the result of Earth-Info, Inc. v. Hydrosphere Res. Consultants, Inc., 900 P.2d 113 (Colo.1995). The anomalous result in *EarthInfo* was anticipated in these terms by Palmer:A question could arise as to whether [the party injured by breach of contract] is entitled to recover profits made through the defendant's use of [the claimant's] performance, instead of limiting him to restitution of that performance, in specie or in value. There seems to be no case authority supporting such a claim and it should not be supported. Courts should not in effect put the defendant at work for the plaintiff, involuntarily, for mere breach of contract, even though this is sometimes warranted for more serious forms of wrongdoing such as fraud or breach of a fiduciary duty.

Palmer, Law of Restitution § 4.9, at 451 (1978).

In contrast to the case described in Illustration 12, there may be special circumstances in which the breach of an obligation to pay money might properly lead to disgorgement liability within the rule of § 39. In Eckert v. Miller, 57 Ariz. 94, 111 P.2d 60 (1941), tenant acquired a tax title to the premises he occupied, then withheld rent as part of a deliberate scheme to frustrate landlord's attempt to redeem the property—by denying landlord the funds with which to do so. Landlord eventually paid the redemption price into court, and the court confirmed landlord's ownership via constructive trust.

Illustration 13 is a hypothetical example designed to emphasize the point that a breach of contract might be profitable (not to mention "efficient") without being opportunistic as defined herein. Facts along these lines are a staple of commentators' accounts of circumstances in which a party's intentional breach of contract should not be regarded as a wrong. See, e.g., Posner, Economic Analysis of Law 118–119 (4th ed. 1992) (describing cases in which "the breach was committed only to avert a larger loss").

The requirement of § 39(2)(a) that the breach be deliberate makes it plain that there is no liability to disgorge profits when an *unintentional* breach of contract happens to result in profit to the breaching party rather than injury to the nonbreaching party. See Rogillio v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 448 So. 2d 1340 (La.Ct.App.1984) (in rising market, broker mistakenly buys when client had instructed him to sell; client not entitled to broker's profit on shares bought by mistake).

*h. Saved expenditure as a measure of damages for unintentional breach.* Restatement Second, Contracts § 348 does not include saved expenditure among the alternatives to loss in value as a measure of damages, though such a measure may be implied by statements elsewhere about the role of contract remedies in preventing unjust enrichment. See Restatement Second, Contracts § 344, Comment *d*; § 373, Comment *a*. Illustration 14 is suggested by the hypothetical case proposed in Jacob & Youngs, Inc. v. Kent, 230 N.Y. 239, 244, 129 N.E. 889, 891 (1921) (Cardozo, J.). Cases awarding damages by this measure include Samson & Samson Ltd. v. Proctor, [1975] 1 N.Z.L.R. 655, 656 (H.C.) (restitution measured by "the difference in cost ... of the actual work done and the work specified"), and Castille v. 3-D Chemicals, Inc., 520 So.2d 1002 (La.Ct.App.1987) (restitution measured by savings from substituted materials, where no difference in the value of the building could be shown). If the builder's substitution of materials results in a structure that the owner should not be required to accept, the proper remedy is damages measured by the cost of replacement or cure. See, e.g., Kaiser v. Fishman, 187 App.Div.2d 623, 590 N.Y.S.2d 230 (1992).

*i. Efficient breach.* On the relation between the restitution claim described in § 39 and the theory of efficient breach, see Friedmann, The Efficient Breach Fallacy, 18 J. Legal Stud. 1 (1989); O'Dair, Restitutionary Damages for Breach of Contract and the Theory of Efficient Breach, 46(2) Current Legal Problems 113 (1993).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

REST 3d RESTI § 39

Page 16

Restatement (Third) of Restitution & Unjust Enrichment § 39 (T.D. No. 4, 2005)

Illustration 15 is based on Campbell Soup Co. v. Wentz, 172 F.2d 80 (3d Cir.1948), ignoring for purposes of this illustration the issues of unconscionability and liquidated damages addressed in that case. One curious feature of the well-known opinion in *Campbell Soup* is that it purports to be concerned with the buyer's right to specific performance—although the goods have, in fact, already been delivered and consumed. The seller's profits from sale to a third party had been paid into court pending the outcome of the case. The real issue was accordingly not specific performance but the availability of restitution by the rule of § 39, and the decision, reduced to its essentials, is authority in support of the rule. Illustration 16 is based on Acme Mills & Elevator Co. v. Johnson, 141 Ky. 718, 133 S.W. 784 (1911).

*j. Additional limitations to the claim.* As a general rule, "The fact that damages have been liquidated does not give the party who has promised to pay liquidated damages an option to perform the basic agreement or to pay damages." Calamari & Perillo on Contracts § 14.33 (5th ed. 2003) (citing cases). The language of § 39(4)(a) accommodates the possibility that the contracting parties in a particular case may have intended, however, to create such an option.

Illustration 17 is a hypothetical case, based on the discussion of such a claim by Palmer, § 4.9 at 444–446, and Friedmann, 80 Colum. L.Rev. 504, 519–521 (1980). Modern decisions on the measure of damages to the employer from the employee's breach of contract nowhere contemplate a claim to disgorgement of the employee's increased compensation, although the employee's new salary will sometimes be taken as evidence of the employer's damages. See Annot., 61 A.L.R.2d 1008 (1958 & Supp.).

Outside the employment context, if a court takes the view that specific performance would be inequitable between the parties in a particular case—by giving the promisee more than he bargained for under the circumstances, while imposing an undue hardship on the promisor—the same considerations will normally make the court reluctant to order disgorgement of the promisor's breach-created profits. For illustrations of the problem in the traditional specific-performance context, see Laycock, The Death of the Irreparable Injury Rule 175–76 (1991) (collecting cases in which specific performance is denied on the ground of disproportionate hardship to the promisor). In contrast to the all-or-nothing remedy of specific performance, a claim to disgorgement of profits under § 39 inherently invites some shaping of the remedy to accord with the equities between the parties, if only in the measurement of the profits "realized ... as a result of the breach." The language of § 39(4)(b) allows a court to reduce an award of profits as necessary to avoid an outcome it regards as inequitable.

FNa As of the date of publication, this Draft has not been considered by the members of The American Law Institute and does not represent the position of the Institute on any of the issues with which it deals. The action, if any, taken by the members with respect to this Draft may be ascertained by consulting the Annual Proceedings of the Institute, which are published following each Annual Meeting.(2005)

REST 3d RESTI § 39

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.