Jeffrey M. Feldman
ALASKA BAR NO. 7605029
FELDMAN ORLANSKY & SANDERS
500 L Street, Suite 400
Anchorage, Alaska 99501
907.272.3538
907.274.0819 (Fax)

*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| ALASKA RENT-A-CAR, INC., )<br><br>Plaintiff, )<br>v. )<br> )<br>CENDANT CORPORATION, et al., )<br> )<br>Defendants. )<br>_____ ) | Case No. 3:03-cv-00029 (TMB) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT
TESTIMONY OF PATRICK L. ANDERSON**

## I.  INTRODUCTION

Cendant's *in limine* motion to exclude the testimony of Patrick Anderson should be

denied.  Anderson's expert opinion is carefully founded on the breach of Paragraph IV.C.2 of

the Agency Settlement Agreement on which this Court granted summary judgment to Alaska

Rent-A-Car ("RAC").  As contemplated by this Court's decisions, Anderson applied standard

economic methodology to calculate the actual damages RAC suffered as a result of this breach.

In arguing that Anderson's opinions are irrelevant or unreliable, Cendant misstates this Court's

prior rulings, mischaracterizes Anderson's work, and misrepresents applicable law.

Anderson's opinions satisfy all the prerequisites for admissibility under Federal Evidence Rule

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                    Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                          Page 1 of 25
Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 1 of 25

702 and under *Daubert*, if *Daubert* applies here. To the extent Cendant disagrees with Anderson's opinions or criticizes their bases, the proper recourse is cross-examination and the introduction of rebutting evidence at trial, not exclusion of Anderson's testimony.

## II. PROCEDURAL BACKGROUND

Central to Cendant's motion is an inaccurately narrow characterization of what this Court previously ruled. Cendant consistently truncates the Court's rulings, claiming the Court found that Cendant's only breach was using the same personnel to sell and market Avis and Budget. [*E.g.*, Doc. 417 at 3] That is not what this Court actually determined.

### A.    This Court's Initial Ruling on Cendant's Breach of ASA ¶ IV.C.2

In ruling on summary judgment that Cendant breached the Agency Settlement Agreement and is liable to RAC for the consequences of its breach, this Court's order summarized the undisputed evidence as follows:

> As a practical matter, essentially the entire senior management team of ARACS was transferred to CCRG, performing for CCRG the tasks they had performed for ARACS. With few exceptions, the names, departments, titles and addresses on the 2004 CCRG directory are identical to those in the 2002 Avis/Cendant directory. Budget's physical facilities have also been substantially integrated with Avis' physical facilities, with the aim of consolidating as many facilities as possible.

> The CCRG consolidated sales force markets both Avis and Budget brands in an effort to acquire corporate accounts. The primary goal of the CCRG business plan is to obtain new business for both brands. Although shifting business from Avis to Budget or Budget to Avis does not necessarily help CCRG meets its overall business plan, CCRG will shift business from one to the other to meet client specific needs.[1]

Based on this evidence, this Court concluded that Cendant had violated Paragraph IV.C.2 of the Agency Settlement Agreement and ruled that CCRG was liable to RAC:

---

[1]    Memorandum Decision and Order [Doc. 335] at 10 (July 27, 2007).

Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 2 of 25

The evidence in the record clearly and unequivocally establishes that the same CCRG personnel sell and market both Avis and Budget brands. Based on that evidence a rational trier of fact could only find that in so doing CCRG has breached the provisions of ¶ IV.C.2. RAC is entitled to summary judgment in its favor on Count II of the First Amended Complaint as against CCRG as to liability.[2]

Having found a breach of a contract, this Court concluded that RAC was "entitled to whatever damages it actually incurred as a result of the breach of the Agency Settlement -- no more, no less."[3] The Court ruled that "the amount of damages, if any, that RAC incurred as a result of this breach" remained a triable issue of fact.[4]

**B.      This Court's Order on the Measure of Damages for the Breach**

In a subsequent order, following a motion to clarify the scope of damages that RAC could seek at trial, this Court reiterated its prior ruling on the nature of Cendant's breach:

[T]he expectation of RAC was that the Avis sales, marketing and reservation activities, operations and personnel would not be utilized to market, provide and/or make available car rental services other than Avis and that the *Avis sales, marketing and reservation personnel would exercise their best efforts to promote the Avis brand*. This Court previously held that the evidence presented to the Court . . . established that *CCRG used* (and, perhaps, continues to use) *a consolidated reservation/operation center* that utilizes the same personnel to sell and market both the Avis and Budget brands.[5]

In this order on the scope of damages, the Court determined that RAC could not seek damages under RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 39, and in that context determined that RAC had not shown a "material" or "opportunistic" breach.[6]

---

[2]      *Id.* at 31.

[3]      *Id.* at 31-32.

[4]      *Id.* at 31 n.53.

[5]      Memorandum Decision and Order [Doc. 391] at 8-9 (Oct. 15, 2008) (emphases added).

[6]      *See id.* at 8.

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                              Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                              Page 3 of 25
Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 3 of 25

Cendant appears to misread this ruling as a determination by this Court that RAC sustained only nominal or immaterial damages. [Doc. 417 at 5, 7] However, "material" for purposes of § 39 distinguishes a complete breach from a partial breach; that is, it distinguishes situations where the non-breaching party may elect to terminate the contract from situations where the non-breaching party may only sue for damages.[7] Its specialized meaning in that context differs from the ordinary usage of "material" to describe whether damages are substantial or only minor. This Court unquestionably found that the amount of damages is a fact issue for trial.[8] This Court did not determine that RAC sustained only immaterial or nominal damages.

One key reason that the Court rejected RAC's claims under RESTATEMENT § 39 was this Court's conclusion that "an award of damages under traditional law, i.e., [an award of] any losses [RAC] suffered from a diversion of business to Budget by CCRG or the failure of CCRG to adequately promote the Avis brand, if any occurred" would adequately protect RAC's legitimate contractual expectations.[9] This Court reaffirmed that "Alaska Rent-A-Car is entitled to recover the actual damages, if any, it suffered as a result of the breach of ¶ IV.C.2 of the Agency Settlement to the extent permitted under extant New York law governing the award of damages in breach of contract actions."[10]

### III. ANDERSON'S REVISED EXPERT REPORT

Following this Court's rulings on summary judgment and damages, RAC and Cendant

---

[7]    *See id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)); *see also* RESTATEMENT § 241 cmt a; CORBIN ON CONTRACTS § 946 at 928 (1952) ("not infrequently the term material breach is used to mean one that the injured party can elect to treat as a total breach").

[8]    *See* Doc. 335 at 31 n.53.

[9]    Doc. 391 at 10.

[10]    *Id.* at 11.

*Alaska Rent-A-Car v. Cendant Corp. et al.*    Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony    Page 4 of 25
Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 4 of 25

each had an opportunity to have their experts prepare new reports tailored to this Court's rulings. Anderson's 2009 revised report carefully focuses just on the breach of Paragraph IV.C.2 that this Court found. Anderson did not simply recycle the analysis of his earlier reports. He conducted substantial additional analysis. His revised report supersedes, and does not just supplement, the earlier reports, so *only* the 2009 report is now in issue.

Cendant's attacks on Anderson's report grossly distort and mischaracterize it. The full report is available as Exhibit B to Cendant's motion [Doc. 471-3 to -11],[11] and RAC strongly encourages this Court to read the report rather than rely on Cendant's characterizations of it.[12] As Exhibit 2 to this memorandum, RAC provides a table that may assist the Court in finding particular sections of Anderson's lengthy report.

### A.      Scope of Anderson's Analysis

Anderson's revised expert report examines *only* the actual damages caused by the breach of Paragraph IV.C.2 found by the Court -- the use of "a consolidated reservation/operation center that utilizes the same personnel to sell and market both the Avis and Budget brands."[13] His report defines this limitation explicitly. [*E.g.*, Exhibit B at 7, 13, 29] His exclusive focus on this breach is also demonstrated in the specific questions he addresses in his report, including: (1) how to determine the market value of RAC; (2) what valuation factors, if any, are affected by the breach of Paragraph IV.C.2; and (3) what loss of value or reduction in profits, if any, resulted from the breach. [Exhibit B at 8]

---

[11]      To avoid confusion, this memorandum also refers to the report as Exhibit B.

[12]      This Court could also read the parallel report prepared by Cendant's expert, John Finch, which is less than two pages long. *See* Exhibit 1.

[13]      Doc. 391 at 9.

Case 3:03-cv-00029-TMB    Document 447    Filed 08/20/09    Page 5 of 25

## B. Anderson's Methodology

Anderson gathered extensive data on the rental car industry, RAC's finances, and Alaska's economy, which he sourced and summarized in his report. [Exhibit B at 9-10, 26-76] He then applied a standard methodology -- referred to as the "income approach" or "discounted cash flow" (DCF) methodology -- to assess the damages resulting from Cendant's breach of Paragraph IV.C.2. [*Id.* at 77-82] This methodology produces an expert opinion on loss of business value or lost profits by (1) estimating the future income or business value that a company will generate following the breach; (2) estimating the income or value that the company would have generated without the breach; (3) comparing these totals, after taking into account any benefits realized or costs avoided as a result of the breach; and (4) discounting the lost future income to present value. [*Id.* at 16-17]

The income approach is an accepted and often-used methodology for determining damages in situations where one company has acted wrongfully with respect to another company, either due to a breach of contract or other wrongful conduct. The acceptance of this methodology is demonstrated by its use in learned treatises.[14] One treatise author, Robert Schweihs, described how the income approach to measuring commercial damages meets the *Daubert* standards in his article "*The Application of Daubert Challenges to Economic Damages Expert Testimony in Commercial Litigation Matters.*" [Exhibit 3] Long before Anderson used the methodology in this case, he also published a paper in a peer-reviewed treatise that

---

[14]     *See, e.g.,* SHANNON PRATT, ROBERT REILLY, & ROBERT SCHWEIHS, VALUING A BUSINESS (2003); ASWATH DAMODARAN, INVESTMENT VALUATION (2002); JAMES HITCHNER, ED., VALUATION (2003); PATRICK GAUGHAN, MEASURING BUSINESS INTERRUPTION LOSSES (2003); and Patrick Anderson's own BUSINESS ECONOMICS AND FINANCE (2004).

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                        Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                      Page 6 of 25

Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 6 of 25

specifically addresses *Daubert* challenges to damages estimation and the required elements for a proper damages estimate. [Exhibit 4]

The income approach or DCF method also has been well accepted by courts. For example, in *Gross v. Commissioner*,[15] the U.S. Tax Court applied *Kumho Tire* to admit the testimony of an expert appraising the value of a closely-held business because the method he used, a discounted cash flow analysis, was known to the court as a reliable method.[16] New York state courts uniformly accept this methodology for valuing a business.[17]

To apply this methodology, Anderson began by assembling and studying extensive data relevant to determining the damages from the breach of Paragraph IV.C.2. His data include:

- Alaskan economic data, including historic income and population figures, industrial activity, and fundamental conditions affecting the economy

- Detailed data on competing rental car systems, including their franchise structure and ownership, size, revenue, growth trends, on/off airport alignment, and other factors

---

[15]    1999 WL 549463 (Tax Ct. 1999).

[16]    *See id.* at *7 ("We have for many years relied on a discounted cash-flow analysis to determine the present value of one or more future cash-flows."); *see also, e.g., Frymire-Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 186 (7th Cir. 1993) (referring to DCF method as "the methodology that experts in valuation find essential"); *Asarco L.L.C. v. Americas Mining Corp.,* 396 B.R. 278, 357 (S.D. Tex 2008) (noting that the discounted cash flow method was the most reliable method for valuing the stock at issue); *In re Med Diversified, Inc.,* 334 B.R. 89, 99 (Bankr. E.D.N.Y. 2005) (noting that DCF method is recognized as one of the most reliable methods and excluding an expert report for *not* using the DCF method).

[17]    *See, e,g, Jersey Partners, Inc. v. McCully*, 847 N.Y.S.2d 170, 171 (A.D. 2007) (upholding a trial court determination of the value of a closely-held corporation based on expert testimony that used the DCF method); *In the Matter of the Dissolution of Funplex Inc.*, 676 N.Y.S.2d 321, 322 (A.D. 1998) (similar); *Ciaffone v. Ciaffone*, 645 N.Y.S.2d 549, 552 (A.D. 1996) (upholding an expert's business valuation, stating "the opinion was based on an acceptable method of determining the value of a closely-held business, i.e., the discounted cash flow method").

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                    Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                  Page 7 of 25

Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 7 of 25

- Alaska Rent-A-Car's financial statements and operational data

- Information acquired by travel to Anchorage, including renting from the Anchorage airport rental counter, visits to RAC's headquarters, and interviews with RAC's officers

- Industry data on the segments in which various rental car systems compete, pricing and service strategies, the strength and health of the brands, marketing strategies, and the origination of demand from the business and leisure markets

- Documents from the bankruptcy filings and other public statements of Budget, including SEC filings describing the company's condition and prospects

- Deposition transcripts of key Cendant officials, particularly those involved in re-organizing the operations of Budget and Avis[18]

Anderson next took the following steps using these data to estimate the amount of damages to RAC as a result of defendants' breach:

- He identified the total rental car revenue in the three major airports in Alaska from 2003 (the year after Cendant acquired Budget) until 2007 (the most recent year of data).

- After 2007, Anderson estimated sales using the average annual growth rate for rental car sales from 2000 to 2007.

- To estimate rental car sales in the entire state of Alaska, Anderson estimated, based on information from interviews of RAC executives, that 85% of all sales occur in the three largest airports (a conservative estimate).

- Anderson estimated the incremental loss in market value for Avis by using the share-of-market losses for Avis.

- Anderson calculated lost revenue due to Cendant's actions by multiplying total rental car revenue in Alaska by Avis's incremental lost market share to Budget.

- Lost profits were estimated as lost revenue, less avoided costs. Avoided costs include all variable costs of operation, and a portion of the semi-fixed costs (and later fixed costs) that RAC predictably would bear on incremental business.

---

[18] *See* Exhibit B at 9-10. Anderson's report also lists in detail the data he relied on and its sources. *See* Exhibit B at 9-10 & Appx. F-1.

*Alaska Rent-A-Car v. Cendant Corp. et al.*                Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                Page 8 of 25

Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 8 of 25

- Fixed and semi-fixed expenses were estimated using share-of-revenue factors from the income statement analysis, and then increased using an inflation-only cost escalator for succeeding years.

- The ratios of variable, semi-fixed, and fixed costs to revenue were determined by examination of RAC's recent financial information and from interviews with RAC's management. Anderson also estimated the net economic depreciation of vehicles, which combines the accounting entries of purchasing, depreciating, and recording a gain (or loss) on sales.

- Anderson used these ratios to estimate the avoided costs on incremental lost revenue during the years following the breach of contract.

- Assuming that RAC would mitigate its damages by adjusting over time its facility size and other fixed-cost factors, after five years Anderson reduced lost revenue by the semi-fixed expenses, and after seven years by the fixed expenses.

- After all fixed, variable, and semi-fixed expenses were included, the lost revenue on a terminal-value basis was estimated for a single year, and capitalized into a lump sum representing the indefinite loss of profits to RAC from the breach, even after several years. The terminal value capitalization rate is the difference between the cost of equity and the growth rate.[19]

Finally, Anderson calculated the estimated damages, using the income (or discounted cash flow) methodology as follows:

- Project the likely market share in Alaska of a hypothetical non-infringing acquisition and operation of Budget, and an Avis operating in competition with this non-infringing Budget.

- Compare this with the actual market share of Avis and Budget in Alaska, under the actual conditions of a Budget operation that infringes the Agency Settlement Agreement.

- The difference between the profits earned by Avis under actual conditions, and the hypothetical non-infringing conditions, are the lost profits due to infringement of the Agency Settlement Agreement. Payment of an amount equal to these lost profits, discounted to the date of a damages award, would appropriately compensate ARAC for the breach of the contract.[20]

---

[19]   *See id.* at 83-87.

[20]   *See id.* at 16, 83-87.

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                    Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                  Page 9 of 25
Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 9 of 25

### C. Anderson's Totals

Cendant asserts that Anderson's revised report *increased* the amount of actual damages that he calculates RAC suffered as a result of the breach of the Agency Settlement Agreement as compared to his 2006 report. [Doc. 417 at 3-4] The claim is false. In his 2006 damages report, Anderson reported total damages in the amount of $37.9 million (not including antitrust damages).[21] In his 2009 damages report, Anderson calculates total damages for breach of Paragraph IV.C.2. as $15.79 million, less than half the prior damage assessment. [Exhibit B at 23][22]

## IV. ARGUMENT

### A. Anderson's Expert Testimony Passes Muster Under Evidence Rule 702.

#### 1. Anderson's analysis complies with this Court's rulings on the nature of the breach for which RAC may seek damages.

Cendant argues that Anderson's analysis of damages proceeds from an inappropriately expansive view of the breach, not limited to the breach that this Court found. [Doc. 417 at 11-14] Its argument rests on an incomplete, selective, argumentative, and misleading account of both this Court's rulings and Anderson's analysis. More fundamentally, Cendant misunderstands or willfully misstates the law on damages and causation. Nothing in this Court's prior decisions or in standard contract law requires RAC to base its damages proof only on the harm directly caused by the breaching conduct. As this Court said, and as

---

[21] *See* Exhibit 5 (excerpt from Anderson's 2006 report).

[22] Cendant's claim that Anderson previously calculated damages at approximately $10 million relies erroneously on an apples-to-oranges comparison, using a previous partial damages figure, developed when components of RAC's damages claims (based on multiple legal theories) were commingled in a way that they are not now.

*Alaska Rent-A-Car v. Cendant Corp. et al.*  
Plaintiff's Opposition to Motion to Exclude Anderson Testimony  
Case No. 3:03-cv-00029-TMB  
Page 10 of 25

Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 10 of 25

standard law provides, RAC may prove all damages, direct and consequential, that proximately resulted from the breach. This is what Anderson has calculated.

Cendant re-frames the Court's finding of breach in misleading and inaccurately narrow terms: "the Court held that Defendants breached subsection IV.C.2 of the ASA in that 'the same CCRG personnel sell and market both Avis and Budget brands.'" [Doc. 417 at 3] As discussed earlier, this is not all that this Court has said about the breach that it found. This Court's October 2008 order unequivocally found that Cendant breached Paragraph IV.C.2, in which Cendant promised that, upon acquiring another company:

> the sales, marketing and reservation activities, operations and personnel of and for the Avis System will not be utilized to market, provide and/or make available car rental services other than those provided within the Avis System and such sales, marketing and reservation activities, operations and personnel will exercise their best efforts to promote the Avis System[.][23]

Because this Court granted a summary judgment motion, there was no need for it to list (in either of its orders) all the ways that Paragraph IV.C.2 was breached, nor did it purport to do so. It was sufficient to mention only some of the undisputed evidence from which a fact finder would have to conclude that Cendant failed to honor this provision. Even this Court's summary was substantially broader than Cendant's truncated version: this Court found not just that the same personnel sold Avis and Budget, but that they did so in consolidated facilities that formerly were devoted just to the sale of Avis, and this conduct failed to honor RAC's expectation that the Avis sales, marketing, and reservations activities, operations, and personnel would exercise their best effort to promote only the Avis brand.[24]

---

[23] *See* Doc. 335 at 31 (granting summary judgment for breach of Paragraph IV.C.2, which the Court quoted, *id*. at 25).

[24] *See supra* at 2-3, quoting Doc. 335 at 10 and Doc. 391 at 8-9.

In protesting that Anderson stretched the breach that this Court found, Cendant stretches the facts in the record. As just discussed, Cendant's minimalist interpretation of the Court's definition of the breach neglects to consider the totality of this Court's statements addressing the breach. As Section 3 *infra* addresses, Cendant's claims that Anderson failed to consider certain facts are simply wrong; they rely on incomplete or out of context quotes.

More fundamentally, in complaining that Anderson, in calculating damages, expanded the scope of the breach by considering conduct that falls outside the sphere that constituted the breach proper, Cendant misconstrues the order granting summary judgment and conflates proof of liability for a particular breach with proof of the damages caused by that breach. No law provides that damages are recoverable only for harm directly caused by a party's breaching conduct, as Cendant seems to imply. For example, a seller that fails to deliver conforming goods on the due date under a contract may cause harm to the buyer not only in the moment that it breaches the contract; the buyer could prove proximate consequential damages from days or weeks later when the buyer could not complete a contract for which he needed the missing or defective goods. Thus, Cendant errs when it faults Anderson for finding damages that do not rely directly "on any evidence of actual damages to ARAC *from* the combined sales force." [Doc. 417 at 10 (emphasis added)] This Court's order entitles RAC to recover all "damages it incurred *as a result of* the breach." This is standard causation language and hinges recovery of damages on standard contract rules governing proof of causation.

Cendant's own proposed jury instructions (like RAC's) recognize that standard law imposes a causation requirement to recover damages for breach of contract.[25] Thus, a damages

---

[25]     *See* Doc. 435 at 28-29.

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                    Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony              Page 12 of 25

Case 3:03-cv-00029-TMB    Document 447    Filed 08/20/09    Page 12 of 25

trial in a contract case requires more than evidence of valuation; it requires evidence of causation as well, and the injured party bears the burden of proving causation. This Court specified that RAC would be required to prove the actual damages incurred "as a result of the breach." [Doc. 335 at 32] In other words, both causation and damages must be proved at trial because they were not established in the summary judgment briefing on liability.

Anderson's report expressly recognizes the need to address and prove causation. It focuses on "but-for" causation by asking, and then determining, what would have happened if Cendant had not breached Paragraph IV.C.2 -- in other words, what would have happened if Cendant had purchased Budget and operated it as a stand-alone business as required by the Agency Settlement Agreement. [Exhibit B at 7, 14-16] Anderson's report repeatedly and consistently refers to the breach of Paragraph IV.C.2 as the reference point for determining causation. [Exhibit B at 7, 13, 29] And in determining damages incurred by RAC as a result of the breach, Anderson applied the standards for establishing actual and proximate causation.

In accusing Anderson of "expanding" the breach, Cendant seizes on portions of Anderson's report that, wholly appropriately, consider consequential damages. For example, in referring to the advantages that Budget gained at RAC's expense by its use of the Wizard System, Anderson does not "expand the breach." Rather, Anderson indicates that, even though using the Wizard System was not barred, the use that occurred when Cendant improperly consolidated the Avis and Budget sales forces likely would not have occurred but for the breach, and certainly would not have occurred quickly enough, and with sufficient success, to save Budget from bankruptcy as a stand-alone company. [*See* Exhibit B at 15-16][26]

---

[26] That is, Cendant could have given Budget access to the Wizard System, but it could not

*Alaska Rent-A-Car v. Cendant Corp. et al.*　　　　　　　　　　Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony　　　　Page 13 of 25
Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 13 of 25

This Court has expressed its intent to measure RAC's damages by traditional contract law. [Doc. 391 at 11] This is what Anderson has done. Cendant cites no New York cases that bar experts from testifying on issues of causation and damages. Yet Cendant works assiduously to suppress all evidence using the traditional tests of causation, hoping to limit the damages trial artificially to the direct and not consequential damages resulting from its breach. This Court should not condone Cendant's attempt to craft its own law of damages.

**2.      Anderson's reliance on professional judgment is entirely appropriate.**

Cendant criticizes Anderson's report for being based in part on "judgment calls." [Doc. 417 at 16-17] This criticism provides no basis at all for excluding his testimony.

Contrary to the impression Cendant creates, Anderson's opinions are not drawn from thin air. His opinions regarding the damages caused by the breach of Paragraph IV.C.2 are based on extensive and well-documented facts. To the data, he applied professional judgment. Expert opinion is, by definition, testimony by a person qualified to provide an opinion based on a combination of specialized knowledge, skill, education, experience, or training.[27] This is especially so in the field of economics. Learned treatises recognize the need for professional judgment in business valuation.[28] A District Court Judge in a decision regarding the opinion of a business valuation expert witness wrote:

---

use Avis sales and marketing personnel to accomplish that. Using Avis personnel was part of Cendant's breach.

[27]     Fed. Evid. R. 702.

[28]     *See, e.g.,* NATIONAL ASSOCIATION OF CERTIFIED VALUATION ANALYSTS, PROFESSIONAL STANDARDS § 3.6 (professional judgment must be used to select the approach and the method that best indicate the value of the business interest); THE INSTITUTE OF BUSINESS APPRAISERS, INC., BUSINESS APPRAISAL STANDARDS § 1.16 (Publication P-311c) (2001) (the approaches and methods used within a given assignment are a matter that must be

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                    Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                 Page 14 of 25
Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 14 of 25

> That an expert injects personal judgment in the course of offering his testimony is hardly grounds for excluding that testimony. Judgments must inevitably be made in the use of loss reserve calculations, and no actuarial method is so accurate as to eliminate some use of subjective judgment in the estimation of future claims.[29]

Similarly, a bankruptcy court pointed out that experts in certain disciplines, including business valuations, necessarily must exercise professional judgment:

> Experts in disciplines that require the use of professional judgment are less likely candidates for exclusion because challenges may be ultimately viewed as matters in which reasonable experts may differ in exercising their judgment as to the appropriate methodology to employ or the appropriate variable to plug into a calculation. . . . Such matters may be and should be explored and high-lighted through cross-examination of the expert and presentation of contrary evidence, not at the preliminary admissibility stage.[30]

The cases Cendant cites [Doc. 417 at 16] are far afield and provide no guidance on the issue of the appropriateness of using professional judgment in this case. Instead, the cases involve situations where a purported expert offered an opinion unsupported by *any* facts or data.[31] In marked contrast to these cases, Anderson's report is based on extensive data, and it

---

determined by the business appraiser's professional judgment); SHANNON P. PRATT, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 475 (5th ed. 2008) (the most important factors that affect the selection of the appropriate valuation approach or approaches are the professional judgment, technical expertise, and experienced common sense of the analyst).

[29] *Crowley v. Chait,* 322 F. Supp. 2d 530, 449-50 (D.N.J. 2004).

[30] *Sharp v. Chase Manhattan Bank USA, N.A.*, 350 B.R. 520, 528-29 (Bankr. N.D. Okla. 2005) (citations omitted). *See also, e.g., ProtoComm Corp. v. Novell Advanced Servs., Inc.*, 171 F. Supp. 2d 473, 480 (E.D. Pa. 2001) (stating that for business valuation expert the proper method for challenging the expert's opinions was through cross-examination and the presentation of contrary evidence).

[31] *See Guidroz-Brault v. Missouri Pac. Railroad Co.,* 254 F.3d 825, 829 (9th Cir. 2001) (locomotive engineer's expert opinion that crew of derailed train should have been able to see a visible gap in rail if crew had been keeping a proper lookout was excluded because it was not based on any facts); *Mitchell v. Gencorps Inc.,* 165 F.3d 778, 781 (10th Cir. 1999) (expert testimony of industrial hygienist, based only on study of photographs of work site where

carefully and clearly documents every calculation it contains, including the professional judgment it uses in places where the data were limited or choices had to be made regarding modeling approaches.

Anderson's anticipated testimony based on his 2009 report, including the extent to which it uses professional judgment, falls well within the realm and scope of an expert's role. It will help the jury make sense of the complicated facts at issue in this case. Indeed, there is no other meaningful way in which the damages Cendant caused could be established.

### 3. Anderson did not ignore material facts or rely improperly on irrelevant evidence.

Cendant devotes substantial space to accusing Anderson of ignoring or not properly weighing certain facts that Cendant believes are important. [Doc. 417 at 19-24] It should be sufficient to say that these are exactly the kinds of claims that should be addressed at trial, when each party will attempt to persuade jurors that its expert's opinion is more credible. Still, RAC offers a brief response to Cendant's specific claims.

Cendant alleges that Anderson failed to take into account factors that it believes affect a proper damages assessment -- particularly (a) the move of a State of Alaska contract from RAC to Budget in 2001 (before Cendant acquired Budget), (b) the entry of additional competitors, such as Thrifty, which opened a counter in Anchorage in 2003, and (c) the benefits that RAC received from the integration of Avis and Budget. Anderson did in fact consider these factors.

Regarding the transfer of the State's contract from Avis to Budget, Anderson testified that he examined this issue and viewed it as involving a single contract by a single customer

---

chemicals were stored and lists of chemicals contained at site would not assist trier of fact where expert admitted that there were no occupational exposure data).

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                      Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony              Page 16 of 25
Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 16 of 25

for a limited time; in his view, that one customer changed rental car suppliers, by itself, indicates very little. [Exhibit 6 (Anderson Dep. at 169:3-170:10)] He noted in the same passage that the rental car business is competitive and has quite a bit of turnover. [*Id*. at 170:16-17] In short, he did not ignore the fact that the contract changed hands; he simply concluded, as a professional, that this fact merits less weight than Cendant believes it deserves.

Neither did Anderson fail to consider the entry of new competitors into the Alaska rental car market. The deposition passage Cendant cites relates to only one company, Enterprise, which was already in Alaska, then expanded its share of the Alaska market. [*Id*. at 223:4-20] Anderson explained why he believed that it was not necessary to adjust for Enterprise's growth, just as he would not have adjusted his calculation if a small competitor had pulled out of the market. [*Id*.][32]

Anderson did not fail to factor in possible benefits to RAC from the integration of Avis and Budget. [Doc. 417 at 24] He explained that he specifically considered such benefits. He concluded, however, that there were no *net* benefits to RAC; he determined that the benefits to RAC from Budget personnel servicing Avis accounts were more than offset by the harms to RAC. [Exhibit 6 (Anderson Dep. at 185:10-186:25, 240:16-19)] Indeed, as Anderson observed, the parties themselves recognized in negotiating the Agency Settlement Agreement that there would be a net loss to franchisees such as RAC from combining sales and marketing functions. [*Id*.] This then is just another example of how Anderson and Cendant disagree on the proper analysis, not a situation where this Court may determine without trial that Cendant

---

[32]     The same holds true for Cendant's contention that Anderson "completely ignores" the impact of Thrifty. [Doc. 417 at 23] In the table Cendant cites, Thrifty in fact is included in the "All Others" column. [Exhibit B at Table D-6] Moreover, Thrifty was not a new "entry" to the Anchorage market; it simply moved to the airport from an off-airport location.

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                    Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                    Page 17 of 25
Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 17 of 25

is right and Anderson is wrong and his testimony should be excluded.

Cendant gives considerable emphasis to Anderson's use of the "Juneau example" as one of the bases for his lost market share estimate, claiming the analysis is flawed. [Doc. 417 at 19-20] This is not surprising, since the Juneau example is especially damaging for Cendant and provides clear evidence of RAC's lost market share. Budget entered the Juneau market (where Avis was already present) in 2001, prior to the breach of the Settlement Agreement in 2002. [Exhibit 6 (Anderson dep. at 163:21-164:17)] This allowed Anderson to use the Juneau market to do a direct comparison of the difference in Avis's and Budget's market shares before and after the breach. [*Id.* at 175:20-176:7] As Anderson explained:

> [T]he Juneau experience is as close to a perfect experiment as you ever find in the damages world in terms of trying to estimate the effect on one seller of a change in another seller's product.
>
> * * *
>
> So we were also, in effect, able to control for other things that were going on in the market at the time. That gave us as good an indicator as you could hope to get in terms of estimating the effect on Alaska Rent-a-Car of a material change in the offerings of Budget in the Alaska marketplace at that time.

[*Id.* at 177:20-178:2, 179:1-9]

Though the Juneau example is particularly instructive, contrary to Cendant's insinuation, Anderson also considered numerous other forms of data in addition to the Juneau market when developing his lost market share estimate. [Exhibit B at 85-86] Cendant disputes the weight that the Juneau example should have received, but it has not shown that Anderson had no sound basis for the analysis he used, only at most that another expert might weigh the factors differently.

"Experts routinely base their opinions on assumptions that are necessarily at odds with

their adversary's view of the evidence."[33]   That is the nature of the adversary system. Although Cendant may disagree with Anderson's opinion, his report clearly demonstrates that his testimony falls well within the standards articulated by Rule 702 because (1) it is closely and directly tied to analyzing the actual damages resulting from the breach of Paragraph IV.C.2 found by the Court in its July 2007 and October 2008 Orders; (2) it is based on an accepted and reliable methodology; and (3) it is supported by extensive data.

### 4.    RAC is not required to prove damages only by specific examples.

At its core, Cendant's attack on Anderson's testimony rests on the premise that actual damages may only be calculated by identifying specific customers or accounts that would have sent more business to RAC if Cendant had not breached the parties' agreement by consolidating the Avis and Budget operations.  [Doc. 417 at 6]  However, even Cendant's own expert agrees that such an approach is not feasible:

> Even if there were some data showing a net shift from one brand to the other, such data would not distinguish between those customers who were persuaded to switch agencies by sales efforts and those who had their own motives for switching and thus also would have switched under a separate-national-accounts regime.[34]

Because it is impossible to assess damages by identifying specific customers who switched from one brand to another due to the joint marketing and sales departments, Anderson did not attempt this pointless analysis.  Instead, as described above, Anderson used circumstantial evidence, analyzed through the well-recognized income approach, to determine the actual damages caused by the breach.  [Exhibit B at 77-83]  Contrary to Cendant's claims [Doc. 417 at 6-9], Anderson did not "admit" that he failed to base his analysis on "actual

---

[33]     *S.E.C. v. Roszak,* 495 F. Supp. 2d 875, 882-83 (N.D. Ill. 2007).

[34]     Exhibit 1 at 2.

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                          Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                        Page 19 of 25

Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 19 of 25

damages." In the passages Cendant cites, all that Anderson acknowledged is that he did not do what Cendant's expert concedes is impossible.

Cendant's call for direct evidence would prevent injured parties in all kinds of cases from proving claims for lost profit through the testimony of qualified experts, who routinely base their opinions on circumstantial rather than direct evidence of causation and loss. In contract disputes involving large corporations, which easily can encompass millions of transactions, the restriction Cendant proposes would all but doom lost-profits claims. Claims for profits not earned because of a breach necessarily require indirect proof using hypothetical transactions and earnings. Cendant cites no New York precedent imposing special restrictions on the use of circumstantial evidence in expert opinions. Instead, Cendant stipulated to the standard jury instruction that the law does not distinguish between direct and circumstantial evidence.[35]

Courts everywhere accept a reasonable approximation of damages "where the difficulties in determining damages arise in large part from [the defendant's] own [breach]."[36] New York follows this standard rule. Applying New York law, the Second Circuit explained that "the burden of uncertainty as to the amount of damage is upon the wrongdoer, and the test for admissibility of evidence concerning prospective damages is whether the evidence has any tendency to show their probable amount."[37] Under New York law, when the existence of damages has been established with certainty, and the only uncertainty is as to the amount of

---

[35]    *See* Doc. 435 at 11.

[36]    *Reeves v. Alyeska Pipeline Service Co.,* 56 P.3d 660, 669 (Alaska 2002).

[37]    *Contemporary Mission, Inc. v. Famous Music Corp.,* 557 F.2d 918, 926 (2d Cir. 1977) (citations omitted).

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                      Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                    Page 20 of 25

Case 3:03-cv-00029-TMB    Document 447    Filed 08/20/09    Page 20 of 25

damages, the plaintiff will not be denied a recovery of substantial damages because damages are difficult to ascertain:

> The plaintiff need only show a "stable foundation for a reasonable estimate of royalties he would have earned had defendant not breached." . . . . "Such an estimate necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." . . . . "The law will make the best appraisal that it can, summoning to its service whatever aids it can command."[38]

It is always challenging to determine what would have happened in a hypothetical world where defendants did not breach their contracts, and the present case is no exception. Precisely because direct measurement of damages is challenging, RAC retained an experienced economist to study extensive market data and to apply an accepted economic methodology to develop a reasonable, fact-based estimate of the damages. Cendant may challenge Anderson through cross-examination and through the introduction of contradictory evidence. It has stated no grounds for excluding Anderson's testimony.

## B. Anderson's Expert Testimony Is Not Excludable Under *Daubert*.

### 1. Cendant ignored the threshold question whether *Daubert* applies.

Cendant cites *Daubert* and *Kumho Tires*[39] throughout its memorandum, implying that these cases offer another basis for excluding Anderson's testimony. However, Cendant fails to assert and explain its basis for claiming that the *Daubert/Kumho* test applies here. Cendant seems to assume that the federal test applies simply because the case is in federal court. In the circumstances at issue here, the validity of Cendant's assumption is hardly self-evident.

---

[38]    *Id.* at 926-27 (citations omitted).

[39]    *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                              Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                          Page 21 of 25
Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 21 of 25

This case is pending before the Court on diversity jurisdiction. This motion involves the admissibility of expert testimony offered to prove an element of a state-defined cause of action: breach of a contract whose express terms specify the parties' choice to apply New York law in resolving all disputes arising under the contract. New York courts do *not* follow the *Daubert/Kumho* standard.[40] There is no obvious reason to override the terms of the contract and the law of New York by applying the federal test.[41]

On these facts, Cendant's failure to offer and establish the basis for its position that the federal test governs amounts to a waiver of its *Daubert/Kumho* challenge.[42]

**2.      Cendant did not meet its burden of asserting a *Daubert* claim.**

This Court has broad discretion "in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed[.]"[43]   Cendant is not

---

[40]      New York has rejected *Daubert* and continues to apply the standard adopted in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *See Parker v. Mobil Oil Corp.*, 824 N.Y.S.2d 584, 589 (2006); *People v. Wesley*, 611 N.Y.S.2d 97, 100 n.2 (1994). Moreover, New York courts apply *Frye* only to "novel scientific testimony" and have not included economic testimony in this category; in cases where *Frye* does not apply, New York courts hold that admissibility of expert evidence is determined by the same standard "as that applied to all evidence, not just to scientific evidence" -- namely, a voir dire foundation established at trial. *See Wesley*, 611 N.Y.S.2d at 103-04.

[41]      Indeed, the United States Supreme Court has recognized and emphasized that no bright-line-test is feasible and compliance with the *Daubert* factors never is mandatory. *See Kumho*, 526 U.S. at 149-50.

[42]      RAC has nevertheless briefly addressed the merits of the challenge; because RAC contends that the challenge is baseless, this Court may reject Cendant's challenge without resolving the unbriefed choice-of-law issue. In the event this Court believes that the unbriefed issue whether *Daubert* applies may be determinative, RAC requests the Court rule that Cendant waived its *Daubert/Kumho* challenge by failing to submit adequate briefing. Cendant should not be permitted to brief the issue for the first time in its reply memorandum.

[43]      *United States v. Calderon-Segura*, 512 F.3d 1104, 1109-10 (9th Cir. 2008) (quoting *Kumho Tire*, 526 U.S. at 152).

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                     Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony            Page 22 of 25

Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 22 of 25

entitled to a *Daubert* hearing as a matter of right.[44]  As the proponent of Anderson's expert testimony, RAC undeniably bears the threshold burden of establishing that Anderson's expert opinions are based on valid and reliable methodology.[45]  RAC has made that showing.[46] Anderson's report establishes his credentials; it lists the data he relied on; it names and explains the methodology he used and describes in detail how he analyzed the data and reached his conclusions.  The report cites cases and treatises that establish that his methodology is generally accepted as reliable and widely used by courts, by educational and government institutions, and in the private sector.  Additionally Anderson subjected himself to depositions in which Cendant had ample opportunity to question him.

Once a prima facie showing of compliance with *Daubert* is made, the burden shifts and the opposing party becomes entitled to a hearing only upon proffering conflicting evidence that raises a genuine dispute as to compliance.[47]  But Cendant has offered no such evidence -- just contentions of counsel.  Absent conflicting evidence creating a genuine dispute as to the reliability and validity of Anderson's methodology, Cendant must challenge Anderson's opinions in the usual way: by cross-examination and proof of impeaching facts at trial.

---

[44]    *Id.; see also Millenkamp v. Davisco Foods Int'l, Inc.*, 562 F.3d 971, 978-79 (9th Cir. 2009).

[45]    *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 n.10 (9th Cir. 1995).

[46]    A prima facie showing can be made in a number of ways: through the testimony of an independent expert (*see, e.g., id.*); by establishing that the expert uses a methodolgy that is generally accepted as reliable and valid (*see*, *e.g.*, *Calderon-Segura*, 512 F.3d at 1110); or by disclosing the expert's credentials and subjecting the expert to a deposition that allows the opposing party to confirm that the expert will use a reliable technique (*see, e.g.*, *Millenkamp*, 562 F.3d at 978-79).

[47]    *See*, *e.g.*, *Daubert* 43 F.3d at 1319 n.10; *Calderon-Segura*, 512 F.3d at 1109-10; *see also United States v. Saya*, 961 F. Supp. 1395, 1396 (D. Haw. 1996).

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                    Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                  Page 23 of 25
Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 23 of 25

### 3. On the merits, the *Daubert* challenge is meritless.

In *Daubert*, the Supreme Court created a "gatekeeping" function whereby a district court has discretion to determine the admissibility of expert testimony before trial, principally to prevent the presentation of "junk science." Though motions, like Cendant's, typically treat *Daubert* as a way to exclude an adversary's expert testimony, "[a] review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."[48] *Daubert* itself made clear that the trial court's role as gatekeeper is not intended to replace the adversary system: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[49] Questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion, rather than its admissibility, and ordinarily should be left for the jury's consideration.[50] Defendants list some exceptional cases, where an expert's testimony was so completely lacking in reliability or relevance that a court refused to allow it.[51] But courts generally should resolve doubts regarding usefulness of an

---

[48] *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006); *see* Advisory Committee Notes to 2000 amendments to Federal Rules of Evidence, FRE 702, *citing, United States v. 14.38 Acres of Land, More or Less, Situated in Leflore Co.,* 80 F.3d 1074 (5th Cir. 1996).

[49] 509 U.S. at 595.

[50] *See 14.38 Acres of Land,* 80 F.3d at 1077; *see also, e.g., S.E.C. v. Roszak,* 495 F. Supp. 2d 875, 880 (N.D. Ill. 2007) ("the rejection of expert testimony is the exception rather than the rule, and the trial court's role as gatekeeper is not intended to serve as the replacement for the adversary system").

[51] *E.g., Blue Dane Simmental Corp. v. American Simmental Ass'n,* 178 F.3d 1035, 1039 (8th Cir. 1999) (excluding testimony where expert admittedly failed to address any factors that he himself agreed were important); *Jinro America Inc. v. Secure Investments, Inc.,* 266 F.3d 993, 1006 (9th Cir. 2001) (excluding testimony based on ethnic bias and "impressionistic generalizations"); *Mukhtar v. Cal. State Univ., Hayward,* 299 F.3d 1053, 1064 (9th Cir.

*Alaska Rent-A-Car v. Cendant Corp. et al.*                                    Case No. 3:03-cv-00029-TMB
Plaintiff's Opposition to Motion to Exclude Anderson Testimony                  Page 24 of 25

Case 3:03-cv-00029-TMB   Document 447   Filed 08/20/09   Page 24 of 25

expert's testimony in favor of admissibility.[52]

Anderson's report easily meets the standards for admissibility under *Daubert*. Anderson is a qualified expert economist, a point Cendant does not contest. Anderson used a standard, well-recognized methodology -- the income approach or discounted cash flow. Cendant has not claimed that his analysis is not mainstream or that it is novel or "junk science." Anderson relied on substantial data, whose accuracy Cendant does not challenge.

The sole basis for Cendant's *Daubert* challenge is Cendant's disagreement with some of Anderson's assumptions and the weight he assigns to certain factors. As discussed above, Cendant is wrong that Anderson overlooked material facts. Cendant has shown only that it has an alternative view of how the facts should be weighed and what conclusions should be drawn. Showing the alleged weaknesses in an expert's testimony is the classic role for cross-examination. None of this establishes a basis for excluding Anderson's testimony under *Daubert*.

Dated: August 21, 2009    /s/ JEFFREY M. FELDMAN
           AK Bar No. 7605029
           **FELDMAN ORLANSKY & SANDERS**

           *Counsel for Plaintiff*

---

2002) (remanding because trial court failed to engage in *any* reliability assessment at all); *United States v. Hoac,* 990 F.2d 1099, 1103 (9th Cir. 1993) (excluding psychologist's testimony because it was not based on any formal testing or substantial contact with defendant); *Diede v. Burlington Northern R. Co.,* 772 F.2d 593, 595 (9th Cir. 1985) (excluding testimony regarding the cost of an annuity as irrelevant because damages are generally awarded in lump sum payments); *United States v. Hitt,* 981 F.2d 422, 424 (9th Cir. 1992) (excluding photographs, not expert testimony, that were prejudicial and unrelated to the issue in dispute); *Elcock v. Kmart Corp.,* 233 F.3d 734, 756 (3d Cir. 2000) (excluding testimony where expert admitted that he was using his own, novel method that used an arbitrary mixture of other methods, and which was not generally accepted in the field).

[52] *See, e.g., Obrey v. Johnson*, 400 F.3d 691, 696-97 (9th Cir. 2005); *Clark by and through Clark v. Heidrick,* 150 F.3d 912, 915 (8th Cir. 1998).

Case 3:03-cv-00029-TMB  Document 447  Filed 08/20/09  Page 25 of 25